No. 1:22-cv-05660

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

─────────────────────

IN RE: LATAM AIRLINES GROUP, S.A.,

*Debtors,*

─────────────────────

AD HOC GROUP OF UNSECURED CLAIMANTS,

*Appellant,*

v.

LATAM AIRLINES GROUP S.A., ET AL.,

*Appellees.*

─────────────────────

On Appeal From The United States Bankruptcy Court For The
Southern District Of New York, Case No. 20-11254-JLG
The Hon. James L. Garrity Jr.

─────────────────────

## APPELLANT'S OPENING BRIEF

─────────────────────

Jeffrey A. Fuisz
Robert T. Franciscovich
Madelyn Nicolini
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 863-8000
Email:
    jeffrey.fuisz@arnoldporter.com
    robert.franciscovich@arnoldporter.com
    madelyn.nicolini@arnoldporter.com

Donald B. Verrilli, Jr.
Ginger D. Anders
Joshua Kain Day (*pro hac vice* forthcoming)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Ste 500E
Washington, DC 20001
Telephone:  (202) 220-1100
Email:    Donald.Verrilli@mto.com
    Ginger.Anders@mto.com
    Kain.Day@mto.com

*Additional counsel listed on inside cover*

Michael D. Messersmith (*pro hac vice* forthcoming)
Sarah Gryll
ARNOLD & PORTER KAYE SCHOLER LLP
70 West Madison Street, Suite 4200
Chicago, IL 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Email:
    michael.messersmith@arnoldporter.com
    sarah.gryll@arnoldporter.com

Seth Goldman (*pro hac vice*)
Benjamin G. Barokh (*pro hac vice* pending)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9100
Emails:
    Seth.Goldman@mto.com
    Benjamin.Barokh@mto.com

William C. Perdue
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Email:
    william.perdue@arnoldporter.com

*Counsel for the Ad Hoc Group of Unsecured Claimants*[1]

---

[1] Munger, Tolles & Olson LLP is counsel to the members of the Ad Hoc Group of Unsecured Claimants other than HSBC Bank Plc.  All members of the Ad Hoc Group of Unsecured Creditors have consented to the filing of this brief.

# CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Bankruptcy Procedure 8012, the Ad Hoc Group of Unsecured Claimants states that it is an ad hoc group of institutions or funds, accounts and entities managed by certain institutions.  The institutions which are members of the Ad Hoc Group of Unsecured Claimants are as follows:

***Avenue Capital Management II, L.P.***  Avenue Capital Management II, L.P.'s general partner is Avenue Capital Management II GenPar, LLC and no publicly held corporation owns 10% or more of its stock.

***Corre Partners Management, LLC***.  Corre Partners Management, LLC does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***CQS (US), LLC***.  CQS (US), LLC's parent company is CQS Management Limited and no publicly held corporation owns 10% or more of its stock.  The beneficial owner of CQS (US) LLC is Sir Michael Hintze.

***HSBC Bank Plc***.  HSBC Bank Plc is a wholly owned subsidiary of HSBC Holdings plc, which is a publicly traded company.  No publicly held corporation owns 10% or more of HSBC Holdings plc's stock.

***Invictus Global Management LLC***.  Invictus Global Management LLC does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Livello Capital Management LP***.  Livello Capital Management LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.

***Pentwater Capital Management LP***.  Pentwater Capital Management LP does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.  The beneficial owner of Pentwater Capital Management LP is Matthew Halbower.

## <u>TABLE OF CONTENTS</u>

**Page**

Introduction ...................................................................................................1

Jurisdictional Statement.................................................................................4

Statement of the Issues..................................................................................4

Standard of Review........................................................................................5

Statement of the Case.....................................................................................5

    I.     Restructuring Under Chapter 11..........................................................5

    II.    The Debtors and the Chapter 11 Cases................................................8

    III.   The Negotiation of the Plan and Backstop Agreements......................9

    IV.   Treatment of Unsecured Creditors Under the Plan............................12

    V.    Treatment of Equity Holders Under the Plan ...................................15

    VI.   The Backstop Agreement...................................................................16

    VII.  No Market Testing of the Backstop Agreement's Record-Setting
            Terms.................................................................................................17

    VIII. The Bankruptcy Court Approves the Backstop Agreement..............19

    IX.   Confirmation of the Plan...................................................................21

Summary of Argument .................................................................................22

Argument.......................................................................................................24

    I.     The Plan and Backstop Agreement Violate § 1123(a)(4)'s Equal
          Treatment Requirement.....................................................................24

        A.   The Commitment Creditors Are Entitled to Consideration Far
             Greater than that Offered to Their Peer Creditors....................27

            1.   The Commitment Creditors Have a Greater Opportunity
                 to Subscribe to Class C Notes .........................................27

            2.   The Commitment Creditors Also Receive Substantially
                 Greater Value Than Other Class 5 Creditors .................29

        B.   The Commitment Creditors' Treatment in the Plan and
             Backstop Agreement Is on Account of Their Claims ..............31

            1.   The Direct Allocation Was Treatment for the
                 Commitment Creditors' Claims .....................................32

## TABLE OF CONTENTS
### (Continued)

Page

2. The Remaining Backstop Consideration Is Also Provided to the Commitment Creditors Based on Their Status as Class 5 Creditors ..........................................................35

C. Confirmation of this Plan Provides a Roadmap for Other Plans to Treat Minority Creditor Groups Unfairly ...........................36

II. The Backstop Consideration Is Unreasonable Under 11 U.S.C. §§ 503 and 1129(a)(4) ....................................................................38

A. The Bankruptcy Code Requires That the Backstop Fees Be Evaluated for Reasonableness. ................................................38

B. The Bankruptcy Court Applied a Far Less Demanding Standard for Reasonableness Than Was Required ................................41

C. The Backstop Payments Are Unreasonable ............................44

1. The Backstop Payments Are Grossly Disproportionate to the Commitment Creditors' True Risk .........................44

2. None of the Risks the Bankruptcy Court Identified Render the Backstop Fees Reasonable .........................48

3. The Backstop Agreement's Negotiation Process Does Not Render the Backstop Fees Reasonable ..................51

III. The Backstop Agreement Is a Mechanism to Buy Confirmation Votes, Violating 11 U.S.C. § 1123(a)(3) ....................................................54

Conclusion ....................................................................................56

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*In re Adelphia Communications Corp.*,
   361 B.R. 337 (S.D.N.Y. 2007) ........................................................................54

*In re Amfesco Industries, Inc.*,
   81 B.R. 777 (Bankr. E.D.N.Y. 1988) ..............................................................39

*In re AMR Corp.*,
   497 B.R. 690 (Bankr. S.D.N.Y. 2013) .............................................................40

*In re AOV Industries, Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986) .......................................................................30

*In re B&B West 164th Street Corp.*,
   147 B.R. 832 (Bankr. E.D.N.Y. 1992) .............................................................33

*In re Bagen*,
   201 B.R. 642 (S.D.N.Y. 1996) .........................................................................48

*In re Cajun Electric Power Cooperative, Inc.*,
   150 F.3d 503 (5th Cir. 1998) ...........................................................................32

*In re CIS Corp.*,
   142 B.R. 640 (S.D.N.Y. 1992) ....................................................................39, 43

*In re Dana Corp.*,
   412 B.R. 53 (S.D.N.Y. 2008) ...............................................................24, 27, 28

*In re Ditech Holding Corp.*,
   606 B.R. 544 (Bankr. S.D.N.Y. 2019) .............................................................39

*In re Energy Future Holdings Corp.*,
   990 F.3d 728 (3d Cir. 2021) .......................................................................40, 42

*Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*,
   554 U.S. 33 (2008) .............................................................................................8

*Ford Motor Credit Co. v. Dobbins*,
   35 F.3d 860 (4th Cir. 1994) .............................................................................39

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*In re Helm*,
  335 B.R. 528 (Bankr. S.D.N.Y. 2006)............................................................42

*Howard Delivery Service, Inc. v. Zurich Am. Ins.*,
  547 U.S. 651 (2006)..........................................................................24, 37

*In re Integrated Resources, Inc.*,
  147 B.R. 650 (S.D.N.Y. 1992).................................................................42

*In re Jorgensen*,
  66 B.R. 104 (B.A.P. 9th Cir. 1986).............................................................54

*In re Journal Register Co.*,
  407 B.R. 520 (Bankr. S.D.N.Y. 2009)........................................................39

*Kuehner v. Irving Trust Co.*,
  299 U.S. 445 (1937)...............................................................................24

*In re LATAM Airlines Group S.A.*,
  2022 WL 1471125 (S.D.N.Y. May 10, 2022) ..............................................39

*Leiman v. Guttman*,
  336 U.S. 1 (1949)..........................................................................40, 48, 52

*In re LightSquared, Inc.*,
  534 B.R. 522 (S.D.N.Y. 2015).................................................................24

*In re Lionel Corp.*,
  29 F.3d 88 (2d Cir. 1994)..........................................................................5

*In re Lionel Corp.*,
  722 F.2d 1063 (2d Cir. 1983)..................................................................42

*In re Madison Hotel Associates*,
  749 F.2d 410 (7th Cir. 1984)...................................................................54

*Maxwell Newspapers, Inc. v. Travelers Indemnity Co.*,
  170 B.R. 549 (S.D.N.Y. 1994)..................................................................26

*In re NNN Parkway 400 26, LLC*,
  505 B.R. 277 (Bankr. C.D. Cal. 2014) ........................................................52

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*In re Pacific Drilling S.A.*,
  2018 Bankr. LEXIS 3024 (Bankr. S.D.N.Y. Oct. 1, 2018)............. 25, 41, 47, 54

*In re Smart World Technologies, LLC*,
  423 F.3d 166 (2d Cir. 2005).................................................................41

*In re WHET, Inc.*,
  33 B.R. 443 (Bankr. D. Mass. 1983) ................................................41

*Wolf v. Weinstein*,
  372 U.S. 633 (1963)..........................................................................40

**FEDERAL STATUTES**

11 U.S.C. § 301(a) ..............................................................................5

11 U.S.C. § 363 ............................................................... 18, 19, 42, 43

11 U.S.C. § 363(b) .......................................................................*passim*

11 U.S.C. § 363(c) ..............................................................................6

11 U.S.C. § 364 ..................................................................................5

11 U.S.C. § 503 ..........................................................................*passim*

11 U.S.C. § 503(b) .......................................................................40, 41

11 U.S.C. § 503(b)(1)(A) ....................................................... 6, 19, 39

11 U.S.C. § 541 ..................................................................................5

11 U.S.C. § 1108..................................................................................6

11 U.S.C. § 1115(b)..............................................................................6

11 U.S.C. § 1123(a)(1)..........................................................................6

11 U.S.C. § 1123(a)(1)..........................................................................6

11 U.S.C. § 1123(a)(2)..........................................................................6

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

11 U.S.C. § 1123(a)(3) ........................................................................... 2, 4, 6, 54

11 U.S.C. § 1123(a)(4) ................................................................................. *passim*

11 U.S.C. § 1124(1) ................................................................................................ 7

11 U.S.C. § 1126 ..................................................................................................... 7

11 U.S.C. § 1126(a) ................................................................................................ 7

11 U.S.C. § 1126(c) ................................................................................................ 7

11 U.S.C. § 1126(f) ................................................................................................. 7

11 U.S.C. § 1129 ..................................................................................................... 7

11 U.S.C. § 1129(a)(1) ................................................................................ 4, 7, 25

11 U.S.C. § 1129(a)(3) ................................................................................. *passim*

11 U.S.C. § 1129(a)(4) ................................................................................. *passim*

11 U.S.C. § 1129(b)(2)(B) ..................................................................................... 8

11 U.S.C. § 1141(c) ................................................................................................ 8

28 U.S.C. § 157(b) ................................................................................................. 4

28 U.S.C. § 158(a) ................................................................................................. 4

28 U.S.C. § 1334 ................................................................................................... 4

**FEDERAL RULES**

Fed. R. Evid. 408 ................................................................................................. 52

## **INTRODUCTION**

This appeal arises out of the bankruptcy court's confirmation of a reorganization plan (the "Plan") that provides a select group of majority unsecured creditors with an enormous, unprecedented payment of $734 million in cash and preferential treatment in subscribing to the reorganized business's new securities offerings.  Similarly situated unsecured creditors holding a minority of claims—including Appellant the Ad Hoc Group of Unsecured Claimants—were excluded from the negotiations that resulted in this arrangement, and they now are left with a far inferior recovery on their claims.  The Plan and its associated agreements therefore violate fundamental principles of bankruptcy law, including the requirement that creditors in the same class must be given equal treatment, and the principle that fees associated with a reorganization must be reasonable and not a disguised means of paying preferred creditors for their votes in favor of the plan.

The Debtors, LATAM Airlines Group S.A. ("LATAM Parent") and its affiliates (collectively, the "Debtors"), are a Latin American airline group.  In May 2020, certain of the Debtors filed for Chapter 11 bankruptcy protection.  Emergence from bankruptcy required the Debtors to raise billions of dollars in new capital.  To that end, the Debtors approached a select group of major creditors and shareholders to negotiate a deal.  The preferred creditors—who would eventually become the "Commitment Creditors"—hold a supermajority of unsecured claims (known as the

"Class 5 claims"), and thus controlled the vote of the entire class (and could bind dissenting smaller creditors like Appellant) in favor of any reorganization.  The Commitment Creditors sought to commit billions of dollars in new capital to support the Debtors' emergence from bankruptcy, as well as to "backstop" certain new money investments (i.e., to purchase any such investments that did not sell) in exchange for backstop fees.  Once it became clear that the Debtors sought to reorganize in a manner that enabled their majority shareholders to retain their equity even as creditors were forced to accept less than the full value of their claims, the Commitment Creditors sought significantly higher compensation.  Extensive negotiations then took place among the Commitment Creditors, the Debtors, and the shareholders—without minority creditors.  Indeed, Appellant submitted an alternate backstop proposal with terms that were more favorable than those ultimately reached, but the Debtors summarily rejected it.  Ultimately, the Commitment Creditors and majority shareholders agreed to backstop the Debtors' issuance of three series of notes convertible to equity and an equity rights offering.

The agreements provide the Commitment Creditors with preferential treatment and backstop compensation that the bankruptcy court and the Debtors' own expert conceded was both unprecedentedly massive in size and not in any way market tested.  Specifically, the Commitment Creditors receive the exclusive right to purchase a total of 86.2% of the most valuable series of notes (the "Class C

2

Notes") offered to Class 5 creditors and that provide almost twice the recovery of the default treatment notes for Class 5 creditors, even though the Commitment Creditors possess only 72% of the Class 5 claims.  As a result of that unequal allocation, the Commitment Creditors have a far greater opportunity to obtain more value on their claims than the remaining Class 5 creditors, who are limited to 14% of the Class C Notes despite possessing approximately 28% of the claims.  The Commitment Creditors also receive backstop fees of $734 million in cash.  Those payments include $654 million to backstop the Class C Notes offering—even though the amount of the Commitment Creditors' money actually at risk for that 14% is only $450 million.

The Bankruptcy Code has numerous provisions designed to protect minority creditors who, like Appellant here, are excluded from negotiations between a debtor and majority creditors who possess the voting power to control the treatment of the entire creditor class.  The preferential treatment given to the Commitment Creditors clearly violates the Bankruptcy Code's requirement that similarly situated creditors be treated equally.  11 U.S.C. § 1123(a)(4).  The bankruptcy court concluded otherwise solely by characterizing the benefits granted to the Commitment Creditors not as a recovery on their claims, but as compensation for their assumption of the backstop risk.  But the plain terms of the Plan and the agreements leave no doubt that the Commitment Creditors received superior treatment *on account of their*

3

*claims.*  And even if the bankruptcy court were correct, that would simply mean that the compensation granted to the Commitment Creditors must be treated as a fee for services provided to the estate and scrutinized for its reasonableness.  11 U.S.C. §§ 1129(a)(4), 503.  Under that framework, the record-setting compensation is clearly unreasonable because it far exceeds the risk the Commitment Creditors actually assumed.  Ultimately, this Court should see the arrangement for what it is: a deal in which preferred supermajority creditors received highly favorable treatment in exchange for their votes in favor of the Plan, in violation of the Bankruptcy Code's longstanding prohibition on vote buying.  11 U.S.C. § 1123(a)(3).

The bankruptcy court's decisions must be reversed.

## JURISDICTIONAL STATEMENT

The bankruptcy court exercised jurisdiction to enter its Decisions and Orders under 28 U.S.C. §§ 157(b) and 1334.  The bankruptcy court entered a final order confirming the Plan on June 18, 2022.  This appeal was timely filed on June 21, 2022.  This Court has jurisdiction under 28 U.S.C. § 158(a).

## STATEMENT OF THE ISSUES

1.      Whether the bankruptcy court committed reversible error by approving the creditor backstop agreement and chapter 11 plan of reorganization as meeting the requirements of equal treatment under §§ 1123(a)(4) and 1129(a)(1), and good faith under § 1129(a)(3), even though the agreement and plan provide a select group

of *pari passu* creditors with preferential treatment that cannot be justified as compensation for their agreement to backstop certain securities being issued under the reorganization plan.

2.     Whether the bankruptcy court committed reversible error by approving the creditor backstop agreement and the reorganization plan as meeting the requirements of §§ 1129(a)(4), 363(b), and 503, even though the agreement and plan provide certain creditors with fees in the form of cash payment and a direct allocation of securities that are grossly disproportionate, and in the aggregate exceed, the amount of securities being offered to non-backstop stakeholders.

3.     Whether the bankruptcy court committed reversible error by approving the creditor backstop agreement and chapter 11 reorganization plan.

## STANDARD OF REVIEW

This Court reviews the bankruptcy court's legal conclusions *de novo* and its fact findings for clear error.  *In re Lionel Corp.*, 29 F.3d 88, 92 (2d Cir. 1994).

## STATEMENT OF THE CASE

**I.     Restructuring Under Chapter 11**

Voluntary chapter 11 cases begin when the debtor files a petition.  11 U.S.C. § 301(a).   At that point, all of the debtor's property becomes property of the bankruptcy estate, *id.* § 541, and an automatic stay is imposed, *id.* § 364.  Together, these provisions "bring all of the debtor's property and all of the claims against the debtor into one proceeding, where the debtor can be maintained as a going concern

5

and the claims can be resolved in a single forum." 7 Collier on Bankruptcy ¶ 1100.05 (16th ed. 2022).

During chapter 11, the debtor often remains in possession of the estate. 11 U.S.C. § 1115(b). The so-called "debtor in possession" is free to continue running its business in most cases. 11 U.S.C. § 1108. It may use estate property in the ordinary course of its business, *id.* § 363(c), but if it intends to use estate property other than in the ordinary course of business, notice and a hearing are required. *Id.* § 363(b). In continuing to run the business and participating in the bankruptcy case, the debtor may also incur administrative expenses. *Id.* § 503. If those expenses are "actual, necessary costs and expenses of preserving the estate," the debtor may pay them after notice and a hearing before the bankruptcy court. *Id.* § 503(b)(1)(A).

To exit chapter 11, the debtor formulates a reorganization plan. By statute, that plan must explain how the debtor intends to treat claims asserted against the bankruptcy estate. 11 U.S.C. § 1123(a)(1)–(4). To do so, the debtor must divide creditors' claims into classes based on their nature (e.g., secured claims compared to unsecured claims). *Id.* § 1123(a)(1). Any plan for reorganization must treat creditors within the same class equally. *Id.* § 1123(a)(4).

In most bankruptcy cases, as is the case here, the debtor will not be able to pay every claim against the bankruptcy estate in full. That is, some of the claims must be impaired—altering a creditor's legal rights by reducing its right to recovery.

11 U.S.C. § 1124(1).  To protect impaired creditors, Congress established a voting system.  *Id.* § 1126.  Any impaired class of creditors must vote to approve the debtor's plan.  *Id.* § 1126(a), (f) (requiring approval of plan from all creditors, except those whose claims are not impaired).  But unanimity is not required, just a supermajority.  *Id.* § 1126(c) ("A class of claims has accepted a plan if such plan has been accepted by creditors . . . that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors . . . that have accepted or rejected such plan.").  Thus, a creditor may be compelled to take less than full payment of its claim if the class in which its claim is placed votes to accept the plan.

A debtor must present its reorganization plan to the bankruptcy court for confirmation.  *Id.* § 1129.  To confirm a plan, the court must verify that "[t]he plan complies with the applicable provisions of this title," including, as relevant here, § 1123(a)(4)'s equal treatment requirement, and § 1129(a)(3)'s requirement that "[t]he plan has been proposed in good faith."  *Id.* § 1129(a)(1), (3).  Additionally, the bankruptcy court must vet all payments made for services, costs, and expenses under the plan for reasonableness.  *Id.* § 1129(a)(4).  The confirmation process protects the bankruptcy estate from reduction through wasteful spending or fees that are used as disguised treatment of claims to secure support for a plan.  In addition to these requirements, the plan must comply with the absolute priority rule.  *Id.*

§ 1129(b)(2)(B).  Under that rule, a dissenting class of creditors must be paid in full before any junior class—that is, a class with a lower priority for payment, including shareholders—can be paid.  *See id.*

All told, chapter 11 creates an intricate framework that "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate."  *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008).  It allows the debtor to emerge from bankruptcy "free and clear of all claims and interests of creditors," 11 U.S.C. § 1141(c), but to do so, the debtor must satisfy a litany of conditions aimed at protecting creditors.

## II.     The Debtors and the Chapter 11 Cases

LATAM Parent is a publicly traded company incorporated in Chile, and the majority of its stock is controlled by a few shareholders—Delta Airlines, Inc.; Qatar Airways Group U.K. Ltd.; Andes SpA, Inversiones Andres II SpA, Inversiones PIA SpA and Comercial las Vertientes SpA; and Costa Verde Aeronáutica S.A., Lozuy S.A., Inversiones Costa Verde Ltda y Cia, en Comandita por Acciones (collectively, the "Majority Shareholders").  A000570.[2]

---

[2] Citations of this form refer to Appellant's appendix.

In spring and summer 2020, LATAM Parent and certain of its affiliates sought chapter 11 bankruptcy protection in the U.S. Bankruptcy Court for the Southern District of New York, largely because of the pandemic's effect on their operations.

## III.   The Negotiation of the Plan and Backstop Agreements

In June 2021, the Debtors distributed an illustrative plan term sheet exclusively to large creditor groups and the Majority Shareholders.   A002865. Recipients included the Commitment Creditors (a.k.a. the "Evercore Group"), who hold more than 70% of the general unsecured claims against LATAM Parent. A000570.



Backstop agreements enable a debtor that needs to raise funds to offer securities in the reorganized entity for purchase with what is known as a new money investment.  A backstop party promises, sometimes in return for a backstop fee, to buy the securities

that others do not want to purchase, thereby ensuring that the debtor raises the necessary capital. ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

     The sticking point in the negotiations was the extent and amount of value that existing shareholders could receive in the reorganized Debtors. ██████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████



In November 2021, after failing to reach agreement, the Debtors, the Majority Shareholders, and the Commitment Creditors entered mediation.  Appellant was excluded from those negotiations, which were shielded by the mediation privilege and not subject to discovery.  That mediation produced the Plan, which is essentially a compromise between the Commitment Creditors and the Majority Shareholders. It permits equity holders to retain their interests, exercise their preemptive rights, and exercise exclusive rights to acquire equity in the reorganized Debtors, while not paying LATAM Parent creditors in full.

In November 2021, the Debtors filed the Plan and the Disclosure Statement and executed a Restructuring Support Agreement with the Commitment Creditors and the Majority Shareholders.  In January 2022, the Debtors entered into two

backstop agreements—one with the Commitment Creditors (the "Backstop Agreement") and the other with a group of shareholders.  Under the Plan and these agreements, the Debtors will issue three series of convertible notes (Class A, Class B, and Class C) and an $800 million equity rights offering (the "ERO") to be used, along with other sources, to effectuate the treatment provided to creditors and equity holders under the Plan.

## IV.   Treatment of Unsecured Creditors Under the Plan

Creditors who hold unsecured claims against LATAM Parent ("Unsecured Creditors") are classified in Class 5, which consists of three subclasses—Class 5a, Class 5b, and Class 5c.[3]  A019785–88.

By default, Unsecured Creditors who are not Commitment Creditors are placed in Class 5a.  *Id.*  In exchange for and in full satisfaction of their claims, Unsecured Creditors in Class 5a receive Class A Notes and a cash allocation (equal to at least 4.87% of claims).  The Class A Notes do not require any new money investment and convert to equity in the reorganized Debtors at a ratio of 0.200119x, which equates to a recovery of 20% on the dollar at Plan Equity Value (meaning the

---

[3] Unsecured Creditors that opt into Class 5c receive their pro rata share of Chilean denominated New Local Notes up to a maximum of $180 million.  A019760; A019804–05.

agreed upon equity value of the reorganized Debtors under the Plan).[4]  Inclusive of

the 4.87% of cash, Class 5a Unsecured Creditors receive a total recovery of 25% on

their claims.

Class 5b consists of the Commitment Creditors and Unsecured Creditors

(other than Commitment Creditors) that opt into Class 5b.  In exchange for and in

full satisfaction of their claims, Unsecured Creditors in Class 5b receive their share

of one half of the Class C Notes and a cash allocation (equal to a minimum 2.4% of

excess claims that receive Class A Notes).  The Class C Notes require a purchase

price that is paid partly in cash (i.e., new money) and partly in exchange for Class 5

claims, such that for every dollar of Class C Notes, Unsecured Creditors provide 48

cents in cash and 52 cents in claims.  But the Class C Notes convert to equity in the

reorganized Debtors at a ratio of 0.680947x (more than three times the ratio of Class

A Notes), providing a substantially higher recovery than Class 5a.

The Plan and Backstop Agreement, however, specify the allocation of these

more valuable Class C Notes between Commitment Creditors and other Unsecured

Creditors and set a cap on the total issuance of Class C Notes.  In total, $6.902 billion

of Class C Notes will be issued under the Plan for $3.3 billion in new money and

$3.5 billion of claims classified in Class 5.  As noted in the Class 5 treatment section

---

[4] A019762 (Plan Equity Value equals the agreed-upon total enterprise value of the
reorganized Debtors minus debt issued under the Plan).

of the Plan, one half of the Class C Notes will be issued exclusively to the Commitment Creditors (the "Direct Allocation") in exchange for cash and Class 5 claims. The remaining one half of the Class C Notes will be issued to Unsecured Creditors (including the Commitment Creditors) in Class 5b.

The Plan, however, provides Commitment Creditors the right to subscribe to this remaining one-half of Class C Notes with 72.46% of their claims that remain after the Direct Allocation. The effect is to ensure that the Commitment Creditors have the right to subscribe to 72.46% of the remaining Class C Notes even if all eligible Unsecured Creditors opt into Class 5b (i.e., the Commitment Creditors can subscribe in an amount equal to their pre-Direct Allocation *pro rata* share of Class 5 claims). A002851–52. To take the Direct Allocation, however, the Commitment Creditors must use half their claims, leaving them with only 36.23% of all Class 5 claims. This amounts to 56.81% of the Class 5 claims remaining after the Direct Allocation—which is the Commitment Creditors' true post-Direct Allocation pro rata share.[5] In effect, the Plan allows the Commitment Creditors to acquire 1.275

---

[5] The Direct Allocation extinguishes half of the Commitment Creditors' claims, A002851–52, eliminating 36.23% of all Class 5 claims. That leaves 63.77% of all Class 5 Claims. The Commitment Creditors' claims that are not exhausted in the Direct Allocation—about 36.23% of all Class 5 Claims—represent approximately 57% of these leftover claims.

times their true pro rata share (72.46% divided by 56.81%).[6]

In the end, Commitment Creditors receive 86.23% of Class C Notes, despite holding 72.46% of Class 5 claims. The effect of the Direct Allocation and fixed allocations in Class 5b is that Commitment Creditors receive a recovery on their claims in Class 5b of approximately 42.5% (without counting the Backstop Fees) and non-Commitment Creditors with *pari passu* claims in Class 5b receive a recovery of approximately 32.1%.

## V. Treatment of Equity Holders Under the Plan

Under the Plan and the shareholders' backstop agreement, holders of existing equity interests in LATAM Parent (including the Majority Shareholders) "shall be retained and reinstated" subject to the dilution of the convertible notes and ERO. A019789. The Plan, however, permits existing equity holders to exercise preemptive rights to purchase Class A Notes and Class C Notes. A019785–88; A010634–35; A010641. And the Plan also provides existing equity holders the exclusive right to purchase (i) $1.373 billion of convertible class B notes ("Class B Notes") at a discount to Plan Value and (ii) the $800 million ERO. The end result is that non-Commitment Creditors recover 20-30%, while existing equity holders acquire significant rights to purchase the equity of the reorganized Debtors through

---

[6] Because the Class C Notes distribution is capped, creditors who elect Class 5b treatment may end up receiving some Class A Notes—which provide a lower return.

Class B Notes and the ERO (approximately 33% of new equity at Plan Equity Value) as well as their preemptive rights without market testing their new money investment; maintain four of nine board seats; and have their strategic agreements assumed. A019797–98; A019814; *see* A019802. That is possible because the Commitment Creditors are voting for the Plan, under which they receive 60% of their claims in total.

## VI.   The Backstop Agreement

In addition to the Direct Allocation discussed above, the Plan and Backstop Agreement provide the Commitment Creditors substantial additional fees. These include: (i) a 20% fee in cash—equal to approximately $654 million related to the new money portion of the Class C Notes and (ii) an additional 20% cash fee equal to approximately $80 million[7] to backstop $400 million of the ERO (collectively, the "Backstop Fees"). A000900. In addition, as noted, Commitment Creditors acquire half the Class C Notes off the top and can acquire 72.46% of the remaining half. In total, the Commitment Creditors will receive at least 86.2% of the Class C Notes and receive $734 million in cash as Backstop Fees. A002838; A002891.

---

[7] Approximately $9 million of the $80 million has now been provided to other parties as a backstop fee. A019966. This brief uses to full $80 million figure for consistency with the decision below.

16

Including the cash Backstop Fee, Commitment Creditors' total recovery is approximately 62.7% at Plan Equity Value.

Under the separate backstop agreement among the Debtors and Majority Shareholders, no separate cash fees are paid for backstopping the Class B Notes issuance or $400 million of the ERO.

## VII.   No Market Testing of the Backstop Agreement's Record-Setting Terms

The 20% backstop fee provided the Commitment Creditors for backstopping the Class C Notes was "plainly among the highest fees" offered to backstopping parties.   A002917; *see* A002344–45; A000908.   Indeed, it was record setting; Debtors' expert, Mr. Herlihy, was not aware of any cash fee on a backstop payment quite so large.   A002344–45.   Of the twenty-eight allegedly comparable backstop agreements cited in Mr. Herlihy's declaration, none provided such a large cash payment.   *Id.*   And accounting for all of the benefits provided to the Commitment Creditors, the Backstop Agreement provided consideration well above the 75th percentile for consideration provided in those allegedly comparable agreements.   *Id.*

Yet the economics of the Backstop Agreement were never tested in the market.   A002865–66; A002308:20–23.   As the bankruptcy court determined, "it is undisputed that when the Debtors finalized their backstop proposal with the [Commitment Creditors,] they took no steps to 'solicit additional proposals' in the market that might have been superior."   A002865–66.   To be sure, the Debtors

17

contacted investment funds and other entities in an effort to raise capital.  A002867–
68; A020744–45.    But all of these negotiations occurred before the Backstop
Agreement was negotiated, and there is no evidence the Backstop Agreement was
market tested separately from the entire Plan.  A000895–97.

Moreover, once the deal had been reached with the Commitment Creditors
and Majority Shareholders, the Debtors failed to entertain other, superior backstop
offers.  On January 26, 2022, Appellant and other third parties submitted an alternate
financing proposal (the "Ducera Proposal").  A002867; A020905.  This proposal
substantially mimicked the terms of the deal with the Commitment Creditors, except
that it reduced the fees from 20% to 15%, removed the Direct Allocation, and instead
included a mechanism providing that all Unsecured Creditors wishing to participate
would receive the same treatment.  A002868.  The Debtors declined to entertain this
proposal, citing a laundry list of concerns:  (1) it did not provide sufficient committed
capital, (2) it had an expansive due diligence condition, (3) it did not provide a secure
path to confirmation, (4) it did not provide the amounts that individual parties would
contribute, and (5) the proposal was an unsigned letter.  A002868–70.

On February 10, 2022, Appellant provided the Debtors with an updated
proposal that addressed many of the Debtors' stated concerns.  A022552–A022638.
Again, the Debtors rejected the offer.  In part, the Debtors relied on the fact that
Appellant could not deliver confirmation of their proposal because it did not hold

more than two-thirds of the Class 5 claims.  A002311–12.  That is, Appellant could not deliver what the Debtors had already secured through the Backstop Agreement— enough votes to confirm the Plan.

## VIII.  The Bankruptcy Court Approves the Backstop Agreement

The Debtors sought approval of the Backstop Agreement under 11 U.S.C. §§ 363 and 503.  Appellant and other parties objected.  A002840–41.  Appellant argued that the Backstop Agreement (1) treated creditors within the same class unequally; (2) provided for unreasonably large backstop fees; and (3) amounted to impermissible vote buying.  *See, e.g.*, A002840–41; A002863; A002872.  The bankruptcy court reserved judgment on equal treatment.  A002862.

Addressing the reasonableness of the fees, the bankruptcy court found the Backstop Agreement satisfied 11 U.S.C. § 363's lenient "business judgment rule" standard.  A002910–11.[8]  The court explained that § 363 requires "great deference to the debtor's decision-making" absent bad faith.  A002910.  The court found that

---

[8] In doing so, the bankruptcy court applied the "all-in backstop fee" analysis, which "calculates the cost of backstop arrangements based on a combination of (i) the actual fees paid to backstop parties, and (ii) the value of a direct allocation . . . in the new money being offered."  A022534.  The Debtors' expert calculated the "all-in backstop fee" to be 23.8% of the nominally backstopped amount (the 20% backstop fee, plus 3.8% that comes from the $125 million value the expert attributed to the Direct Allocation).  A002906–07.

Appellant had "not rebutted the presumption that entry into the Backstop Agreements is a proper exercise of the Debtors' business judgment." A002914.

In passing, the bankruptcy court concluded that "the Backstop Payment [was] reasonable," A002916, and recited the standard for awarding "actual, necessary costs" priority under 11 U.S.C. § 503(b)(1)(A), A002915.  But it did not conduct a meaningful analysis under those standards:  the court simply referred back to its "business judgment rule" analysis.  A002917.  And the court refused to apply § 1129(a)(4)'s more stringent "reasonableness" standard, finding it "not relevant." A002916–17.

The bankruptcy court also rejected the argument that "the Debtors blindly accepted all of [the Commitment Creditors'] terms in an effort to gain their support for the Plan." A002869.  It relied heavily on the parties' mediated negotiations, *id.*, and on its view that the Ducera Proposal was not viable, A002868–69.  The court also noted that the Debtors had shopped around for equity financing in initially seeking the capital infusion necessary to reorganize.  A002870.

In March 2022, the bankruptcy court overruled all objections to the Backstop Agreement in its Backstop Decision, A002834–2918, and approved the Backstop Agreement.[9]  A003166–3408.

---

[9] Appellant appealed the bankruptcy court's approval of the Backstop Agreement, but Judge Furman dismissed that appeal as premature.

## IX.   Confirmation of the Plan

Appellant objected to the Plan on largely the same grounds as the Backstop Agreement.   A020677.   The bankruptcy court overruled each of Appellant's objections and confirmed the plan.

First, the bankruptcy court held that the Plan did not provide the Commitment Creditors with preferential treatment in violation of 11 U.S.C. § 1123(a)(4).   The court acknowledged that the Commitment Creditors received "additional compensation."   A020741.   But it held that that compensation was not "based on [the Commitment Creditors'] status as Holders of Allowed General Unsecured Class 5 Claims," but instead was consideration for their backstop commitments.   *Id.*

Second, the bankruptcy court rejected Appellant's reasonableness arguments, relying almost exclusively on its Backstop Decision.   *E.g.*, A020742–43.   This time, the court did not refuse to apply 11 U.S.C. § 1129(a)(4).   Instead, "[i]n assessing whether the Debtors have demonstrated that the Plan complies with section 1129(a)(4)," the court applied "the same standards under section 363(b) that it [had] applied in approving the Backstop Fees as reasonable."   A020747.   That is, the court incorporated its application of the "business judgement rule" in the Backstop Decision.   A002909–10.   It found "no basis for revisiting its findings and conclusions set forth in the Backstop Opinion."   A020747.

Finally, the bankruptcy court held the Plan did not violate 11 U.S.C. § 1129(a)(3)'s good faith requirement. A020748. Again, the court mainly adopted its Backstop Decision. *Id.* It reiterated that the Backstop Agreement and Plan were the product of extended negotiations overseen by a mediator. A020749.

## SUMMARY OF ARGUMENT

In a negotiation that excluded minority creditors, the Debtors and Commitment Creditors struck a deal that violates core tenets of bankruptcy law. Through the Plan and Backstop Agreement, the Commitment Creditors are entitled to recover nearly a billion dollars more than other Class 5 creditors. And even if that recovery were payment for the Commitment Creditor backstop obligations, it would constitute a grossly unreasonable fee. Combined, these two errors reveal the deal for what it truly was—an agreement in which the Debtors provided the Commitment Creditors preferential treatment in exchange for their votes to confirm the Plan. Accordingly, the bankruptcy court's confirmation of the Plan and approval of the Backstop Agreement must be reversed.

I.     The Plan and Backstop Agreement violate 11 U.S.C. § 1123(a)(4)'s equal treatment requirement. The Commitment Creditors receive a far greater recovery compared to other similarly situated creditors—i.e., other Class 5 creditors. And contrary to the bankruptcy court's conclusion, that treatment is unquestionably based on the Commitment Creditors' status as Class 5 creditors.

II.     If the consideration to the Commitment Creditors is characterized as compensation for the backstop commitments, it violates the reasonableness requirements of 11 U.S.C. §§ 503 and 1129(a)(4).  In exchange for their backstop commitments, the Commitment Creditors stand to receive what the bankruptcy court acknowledged are "plainly among the highest" fees of any comparable transaction: two 20% cash payments plus an exclusive, direct allocation of securities, for total compensation of hundreds of millions of dollars.  These unprecedented fees match or even exceed the value of the securities that might end up unsubscribed and that the Commitment Creditors are actually at risk of having to backstop.  Compensation so grossly disproportionate to the risk assumed by the Commitment Creditors cannot be reasonable.   In addition, the negotiation process only confirms the fees' unreasonableness, as the Debtors negotiated almost exclusively with preferred stakeholders and failed to market test the fees, despite the availability of at least one financially superior alternative proposal.

III.     Given the Plan's unequal treatment and the Backstop Agreement's unreasonableness, the arrangement's true motivation is clear: the Debtors used highly favorable treatment to secure the Commitment Creditors' supermajority votes.  That violates the good-faith principle of 11 U.S.C. § 1129(a)(3).  The Plan should not have been confirmed, and the bankruptcy court's decision should be reversed.

# **ARGUMENT**

## I.    The Plan and Backstop Agreement Violate § 1123(a)(4)'s Equal Treatment Requirement

"The Bankruptcy Code aims, in the main, to secure equal distribution among creditors." *Howard Delivery Serv., Inc. v. Zurich Am. Ins.*, 547 U.S. 651, 655 (2006); *Kuehner v. Irving Tr. Co.*, 299 U.S. 445, 451 (1937).  That core tenet of bankruptcy law is more than just an underlying policy; it is codified throughout the Bankruptcy Code.  Most relevant here, chapter 11 requires equal treatment in plans of reorganization:  "[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide the same treatment for each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).  "Equality of treatment" under this provision "involves two facets:  (1) all class members must receive equal value, and (2) each class member must pay the same consideration in exchange for its distribution." *In re LightSquared, Inc.*, 534 B.R. 522, 537 (S.D.N.Y. 2015).  Ultimately, "[t]he key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity." *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008).  The equal treatment requirement mitigates the danger that a supermajority creditor group could approve a plan that mistreats a minority group of creditors by preventing confirmation of a plan that prefers a select group of creditors. *See* 11 U.S.C. § 1129(a)(1).

Indeed, § 1123(a)(4) becomes especially important where, as here, a supermajority group of creditors and the debtor negotiate a plan of reorganization without participation by smaller creditors. The Plan and Backstop Agreement are products of privileged negotiations among the Commitment Creditors and the Debtors, while Appellant and other Class 5 creditors were excluded. *Cf.* A019367; A019385–A019387; A019389–A019391 (closing arguments summarizing involvement). Worse, the result of that exclusionary negotiation is a reorganization that undisputedly accords the supermajority group of creditors an outsized recovery through direct allocations and large backstop fees. "The problem with special allocations in rights offerings . . . or big backstop fees that are paid to bigger creditors . . . is that it is far too easy for the people who sit at the negotiating table to use those tools primarily to take for themselves a bigger recovery than smaller creditors in the same classes will get." *In re Pac. Drilling S.A.*, 2018 Bankr. LEXIS 3024, at *6 (Bankr. S.D.N.Y. Oct. 1, 2018). And because such "special allocations" and large fees can be formally characterized by the parties as collateral payments rather than treatment for claims, it is easy for them to be employed as a disguised form of special treatment.

Courts must therefore closely scrutinize reorganization plans that contain such structures and were negotiated among a supermajority of creditors and the debtor. "Bankruptcy Judges have a fiduciary obligation to protect creditors," so they "must

play a quasi-inquisitorial role," and they must refuse confirmation if § 1123(a)(4) is violated.  *Cf. Maxwell Newspapers, Inc. v. Travelers Indem. Co.*, 170 B.R. 549, 550 (S.D.N.Y. 1994) (citation and internal quotation marks omitted) (addressing court approval of settlement in chapter 11 proceedings).

The bankruptcy court entirely failed to fulfill that obligation here.  The exclusive negotiations among the Commitment Creditors and the Debtors produced a Plan and Backstop Agreement that entitle the Commitment Creditors to a far outsized recovery compared to their peer creditors, including through exorbitant fees and unique investment opportunities.  As even the bankruptcy court acknowledged, the Commitment Creditors are set to receive "additional compensation" compared to other Class 5 creditors.  A020741.  But the bankruptcy court's passing mention hardly does the situation justice.  The Plan fails the equal treatment analysis on two fronts, providing the Commitment Creditors a *greater* opportunity to recover *more* valuable consideration for their claims.  In total, Commitment Creditors have the opportunity to recover 62.7% for every dollar of allowed Class 5 claims, including a massive cash payment, and that recovery far outstrips the non-Commitment Creditors' potential for recovery, which cannot exceed 32%.

The bankruptcy court excused that clearly unequal treatment based on its view that the Commitment Creditors' superior treatment represents compensation for collateral value that the Commitment Creditors provide to the estate by backstopping

the offerings.   But the Plan's plain terms leave no doubt that the Commitment Creditors receive that extra consideration based on their status as Class 5 creditors with the ability to vote Class 5 in favor of the Plan.   The Plan therefore violates § 1123(a)(4).   If ratified by this Court, the Plan will provide a roadmap for other debtors and preferred creditors to violate § 1123(a)(4) with impunity.

### A.    The Commitment Creditors Are Entitled to Consideration Far Greater than that Offered to Their Peer Creditors

The Plan gives the Commitment Creditors a far greater opportunity to subscribe to Class C Notes than other creditors, and it affords them considerably more value for their claims.

### 1.    The Commitment Creditors Have a Greater Opportunity to Subscribe to Class C Notes

For the equal treatment requirement to be satisfied, all similarly-situated creditors must have an equal opportunity to recover.   *See In re Dana Corp.*, 412 B.R. at 62.   Even without considering the cash fees paid to the Commitment Creditors, they are entitled to more than their pro rata share of Class C Notes.

Starting with the Class C Notes offering as a whole, the Direct Allocation requires the Debtors to hold back half the Class C Notes for the Commitment Creditors.   A019749 (defining Direct Allocation).   On top of the Direct Allocation, the allocation in Class 5b is structured to ensure that Commitment Creditors have the opportunity to subscribe for approximately 72% of the remaining Class C Notes,

even if all eligible Unsecured Creditors opt into Class 5b.  A019785–88; pp. 14-15, *supra*.   In total, the Commitment Creditors are assured of the opportunity to subscribe to 86% of all Class C Notes—almost 15% more than their pro rata share of all Class 5 Claims (72%).   Non-Commitment Creditors, on the other hand, are capped at a right to subscribe to no more than 14% of all Class C Notes despite holding about 28% of all Class 5 claims—so they have a chance to recover only *half* of their pro rata share.  *See id.*  Put simply, there is a disparity of opportunity: Commitment Creditors are entitled to more than their pro rata share, while non-Commitment Creditors are entitled to less.  *See In re Dana Corp.*, 412 B.R. at 62 (similarly situated creditors must be given "the same opportunity").

That conclusion holds even looking at the allocation in Class 5b.  After 50% of the Class C Notes go to Commitment Creditors in the Direct Allocation, the Plan provides Commitment Creditors the right to subscribe to Class C Notes equal to 72.46% of their remaining claims.  The effect is that even if all eligible Unsecured Creditors opt into Class 5b, the Commitment Creditors are assured the right to subscribe to 72.46% of the remaining Class C Notes.  A019785–88.  But this fails to be pro rata in Class 5b because it does not account for how the Direct Allocation impacts the Commitment Creditors' claims and therefore their proportionate shares. To claim the Direct Allocation, the Commitment Creditors must surrender a portion of their Class 5 Claims: for each dollar of Class C Notes, a creditor must pay 48

cents in cash and 52 cents in claims. A010634 (noting the Direct Allocation Amount is 52.638% claims and 47.362% cash); A019795–96 (setting the ratio of claims to new money for Class C Notes). To take advantage of the Direct Allocation's opportunity to subscribe to over $3.451 billion in Class C Notes, therefore, the Commitment Creditors must give up approximately $1.816 billion in Class 5 claims. After doing so, the Commitment Creditors will hold approximately 57% of all remaining Class 5 claims. *See* pp. 14-15, *supra*. This represents the Commitment Creditors' true pro rata share of Class 5 claims after the Direct Allocation. Yet the effect of the Plan's allocation of subscription rights in Class 5b is that Commitment Creditors are still entitled to approximately 72% of the Class C Notes remaining after the Direct Allocation even if they make up only 57% of Class 5b. A019785–88. That means the Commitment Creditors may, again, subscribe to more than their true pro rata share of the Class C Notes remaining after the Direct Allocation—approximately 1.275 times their share. The same opportunity is not available to non-Commitment Creditors in the same Class 5b. A019754 (defining "Class C Distribution"); A019764 (defining pro rata share); A019785–88 (providing "pro rata" share of remaining Class C Notes). That is not equal treatment.

### 2. The Commitment Creditors Also Receive Substantially Greater Value Than Other Class 5 Creditors

As a corollary to the Commitment Creditors' unequal subscription opportunities, the Plan and Backstop Agreement afford the Commitment Creditors

substantially greater value compared to their peer creditors. "[T]he most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members." *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986). That is just what happened in this case.

All told, the Debtors' own calculations show the Commitment Creditors are set to recover a far greater percentage of their allowed claims compared to non-Commitment Creditors. The Debtors admit that, including the Direct Allocation and Backstop Fees, the Commitment Creditors will receive approximately 63 cents for every dollar of allowed Class 5 claims. A019084:9–11. And even excluding the Backstop Fees, the Commitment Creditors have the opportunity to receive 43 cents for every dollar of allowed Class 5 claims through the direct allocation of Class C Notes. A008772 (valuing Class C Notes). This is a far greater recovery than the Debtors' calculated recovery for non-Commitment Creditors who receive Class 5a treatment—25% for every dollar of allowed claims—or even Class 5b treatment—32% for every dollar of allowed claims. A019102:25–03:24; A015930.

This outsized recovery flows, in part, from the Commitment Creditors' greater opportunity to subscribe to Class C Notes. Those notes can be purchased at a significant discount to plan value, 20.7%, and they convert to equity at a far greater ratio than other notes. A002903.

The remainder of the disparity comes from the massive Backstop Fees, which will be paid to the Commitment Creditors in cash.   A002879–80; A022546. Including the $734 million cash payment increases the Commitment Creditors' total recovery by approximately 20 cents on the dollar, from 43 cents (based solely on their subscription to Class C Notes) to 63 cents all told.  A008772; A019084:9–11. And unlike the Class A or Class C Note offerings, the fees are to be paid in cash up front.  No other Class 5 creditors were offered such a sizeable cash payment.  This is simply not equal treatment.

### B.   The Commitment Creditors' Treatment in the Plan and Backstop Agreement Is on Account of Their Claims

The bankruptcy court did not dispute that the Commitment Creditors recover more under the Plan than other creditors in Class 5.  Instead, the court approved the Commitment Creditors' concededly outsized recovery based solely on its conclusion that the "additional compensation that the Commitment Creditors will receive under the Plan is not based on their status as [Class 5 creditors]," but instead represents compensation for the Commitment Creditors' backstopping the securities offerings. A020741.  That conclusion disregarded the text of the relevant agreements and their undisputed operation.

###### 1. The Direct Allocation Was Treatment for the Commitment Creditors' Claims

Under the plain terms of the Plan and Backstop Agreement, the Direct Allocation was provided as treatment for the Commitment Creditors' claims.  Most simply, as described above, "the Commitment Creditors must discharge their claims to access" the Direct Allocation.  A020742; *see also* A019785–88; A019795–96.  It is difficult to imagine any more direct evidence that the Direct Allocation constitutes treatment for claims.  *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998) (treatment for claims occurs when payment is "made in satisfaction" of claims).  Moreover, the Debtors cannot contend that the Commitment Creditors' entitlement to the Direct Allocation was somehow separate from the Plan: the Backstop Agreement was a cornerstone of the overall reorganization, and the Plan cross-references the Backstop Agreement, such that both documents contemplate that the Commitment Creditors must discharge billions of dollars in claims to take the Direct Allocation.  A010634–35 (defining Aggregate Offering Amount); A019749 (defining Direct Allocation Amount); A019804 (referencing reservation of Direct Allocation for distribution to Backstop Parties).  Moreover, the Commitment Creditors' right under the Plan to subscribe to the Direct Allocation arises only because they possess Class 5 claims.  No stakeholder in any other class may receive the Direct Allocation.  That reinforces the conclusion that the Direct Allocation is not collateral to the Commitment Creditors' status as classified

claimant, but instead represents a payment expressly "for the purpose of reducing" the Commitment Creditors' claims. *See, e.g.*, *In re B&B W. 164th St. Corp.*, 147 B.R. 832, 841 (Bankr. E.D.N.Y. 1992) (holding such a payment was invalid under § 1123(a)(4)).

The bankruptcy court nonetheless dismissed the Direct Allocation's required exchange of claims as merely "the mechanism through which class C Notes are obtained." A020741. The court thus treated the claims-discharge aspect of the Direct Allocation as a mere procedural device. That is erroneous for at least three reasons.

First, the Plan makes clear that Class 5 claims have ascertainable monetary value that is extinguished when the claims are exchanged for new notes, even without any new money investment. For example, Class 5 creditors who accept Class 5a treatment receive Class A Notes and cash in exchange for their allowed claims without contributing any new money. A019785–88. And Class A Notes convert to equity just like Class C Notes, albeit at a lower conversion rate. *Id.* Class 5 creditors' claims thus have value apart from any new money contribution: the amount of equity resulting from Class 5a treatment. So the bankruptcy court could not properly ignore that value—which the Commitment Creditors were able to exchange for a form of recovery in the Direct Allocation—when evaluating equal treatment under the Plan.

Second, the bankruptcy court effectively rewrote a central term of the Plan and Backstop Agreement.  The claims-exchange process was a key facet of the Debtors' plan to raise equity capital, which the bankruptcy court viewed as the heart of the Plan.  A020671; *see* A019620–21.  And the Debtors negotiated the Plan's structure—including the claims-exchange process—with the Majority Shareholders and Commitment Creditors.  Having agreed to permit the exchange of claims for equity, the Debtors should not be heard to deny that the claims are central to the arrangement.

Third, the bankruptcy court's equal-treatment analysis betrays an internal inconsistency in its reasoning.  If the claims exchange was a mere procedural mechanism to obtain the Direct Allocation, rather than a substantive surrender of value, the court should have treated the Direct Allocation as a pure cash contribution when evaluating the reasonableness of the fees.  But it did not do so.  Instead, it accepted the Debtors' calculation of the discount to plan value offered by the Class C Notes—a calculation that depended on the fact that Class C Notes extinguish a certain amount of creditors' Class 5 claims.  A002882 (citing A000908 for discount value); A000908 (noting discount to plan value); *see also* A022544 (explaining calculation).  So it was inconsistent for the bankruptcy court to ignore the claims-discharge portion of the Direct Allocation when assessing equal treatment.

Moreover, if (contrary to the plain terms of the Plan and the Backstop Agreement) the Direct Allocation were a pure equity financing arrangement, the bankruptcy court should have evaluated the reasonableness of the backstop consideration with that in mind.  If the Commitment Creditors do not actually extinguish claims in obtaining the Direct Allocation, and instead continue to possess 72% of Class 5 claims after the Direct Allocation, then the Commitment Creditors are provided the ability to purchase $3.451 billion of Class C Notes in the Direct Allocation for far less than face value.  A010634 (noting the Direct Allocation Amount is 52.638% claims and 47.362% cash); A010641.  This would significantly increase these Class C Notes' value to the Commitment Creditors, A022533 (describing calculation), resulting in either an even greater preferential recovery or fees that are even more unreasonable.

### 2.    The Remaining Backstop Consideration Is Also Provided to the Commitment Creditors Based on Their Status as Class 5 Creditors

For similar reasons, the other backstop consideration also amounts to preferential treatment.  In addition to the Direct Allocation, the Backstop Agreement entitles the Commitment Creditors to significant consideration not offered to other Class 5 creditors, including a $654 million cash payment for the Class C Notes backstop, payment of professional fees, reimbursement for up to $3 million in expenses arising out of the chapter 11 proceedings, and indemnification.  A010670–

71 (Backstop Payment); A010672–73 (Expense Reimbursement); A010706 (Indemnification).  The Backstop Agreement and Plan require the backstopping parties to be Class 5 creditors, because the only way to fulfill the backstop commitment is to purchase Class C Notes using Class 5 claims.  All consideration provided under the Backstop Agreement to backstop the Class C Notes therefore is provided on account of the Commitment Creditors' Class 5 claims.

The bankruptcy court's market testing analysis reinforces that conclusion. "[I]t is undisputed that when the Debtors finalized their backstop proposal with the Commitment Creditors, they took no steps to 'solicit additional proposals' in the market that might have been superior."  A002865–66 (citation omitted).  Yet the bankruptcy court overruled objections based on that failure to market test the backstop proposal, relying on the Debtors' exploration of various reorganization financing options that would supply "the funds they need to exit chapter 11" (that is, on the Debtors' negotiations surrounding the Plan as a whole).  A002866–70.  If the Backstop Agreement and its consideration were truly "collateral" to the Plan, they should have been market tested independently of the Plan.

### C.   Confirmation of this Plan Provides a Roadmap for Other Plans to Treat Minority Creditor Groups Unfairly

If the bankruptcy court's decision is allowed to stand, it will provide a roadmap for debtors and supermajority creditors to craft plans of reorganization that evade the Bankruptcy Code's protections by cloaking preferential treatment in a

backstop agreement or similar devices.   Minority creditor groups will have no meaningful equal treatment objection, even if the backstop arrangement results from exclusive negotiations, and even if it was not market tested.  Indeed, there is virtually no limit to the preferential treatment a debtor can provide a commitment creditor under the guise of a backstop agreement.

Take a slightly modified version of this case, for example.  Imagine that the Debtors agreed to hold back *all* rather than half of the Class C Notes for the Commitment Creditors.  Under the bankruptcy court's rationale, even a 100% allocation would represent compensation for the backstop commitment, so it would not violate the equal treatment requirement.[10]  But such a recovery is absurd.  It provides a preferred group of creditors the *only* option to buy *preferred* securities that have a significantly higher rate of return.  That would flout the basic aim of bankruptcy law—"secur[ing] equal distribution among creditors." *Howard Delivery Serv.*, 547 U.S. at 655.

---

[10] Moreover, this 100% holdback would almost certainly qualify as reasonable under the bankruptcy court's erroneous reasonableness analysis. *See* Part II, *infra*. Using the Debtors' methodology, *see* note 8, *supra*, providing the Commitment Creditors with the entire Class C distribution would increase the all-in backstop fee, relative to the entire amount backstopped, by only 3.8%—doubling the value of the Direct Allocation and increasing the total backstop value from 23.8% to 27.6%. A000908. The court likely would have considered this higher percentage reasonable in light of the Debtors' allegedly comparable agreements. *See* A002917; A000908.

In sum, the Debtors and the Commitment Creditors—who hold a controlling share of Class 5 claims—struck a deal that disadvantages minority claimholders. Yet the bankruptcy court refused to protect those minority creditors, ignoring undisputed facts and rewriting key aspects of the Plan and Backstop Agreements. By doing so, the bankruptcy court confirmed a Plan and approved a Backstop Agreement that provide far greater recovery to a set of preferred creditors in violation of 11 § U.S.C. § 1123(a)(4). Accordingly, the bankruptcy court's decisions should be reversed and the Plan should be set aside.

## II. The Backstop Consideration Is Unreasonable Under 11 U.S.C. §§ 503 and 1129(a)(4)

If the bankruptcy court were correct that the treatment granted to the Commitment Creditors represented payments for value provided, rather than preferential treatment for their claims, then the Debtors had the burden of demonstrating that those payments satisfied the Bankruptcy Code's requirements that such fees must be reasonable. The Debtors did not satisfy that burden, and the bankruptcy court erred in concluding otherwise.

### A. The Bankruptcy Code Requires That the Backstop Fees Be Evaluated for Reasonableness.

The bankruptcy court correctly recognized that the Backstop Fees must comply with §§ 1129(a)(4) and 503. A020745–46; A002915–17. Both provisions require that the Backstop Fees be reasonable.

Under § 1129(a)(4), a plan may not be confirmed unless the plan's proponents establish that "[a]ny payment made . . . for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case," are "reasonable." §1129(a)(4); *In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019); *accord* 7 Collier on Bankruptcy ¶ 1129.02 (16th ed. 2022). "Section 1129(a)(4) is designed to" empower "the bankruptcy court" to "police the awarding of fees in title 11 cases." *In re J. Reg. Co.*, 407 B.R. 520, 537 (Bankr. S.D.N.Y. 2009). Because the Backstop Fees are "costs and expenses" incurred "in connection with the . . . case," § 1129(a)(4) applies and requires the fees to be reasonable. *See In re LATAM Airlines Grp. S.A.*, 2022 WL 1471125, at *7 (S.D.N.Y. May 10, 2022) (§ 1129(a)(4) applies to the Backstop Agreement at confirmation).

Section 503(b)(1)(A) also imposes a reasonableness requirement. That provision allows the payment of "administrative expenses," if, among other things, the debtor demonstrates that they are "actual, necessary costs and expenses of preserving the estate." § 503(b)(1)(A). The "modifiers 'actual' and 'necessary' must be observed with scrupulous care" and "narrowly construed," *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994), so that administrative expensive priority will "only be granted under extraordinary circumstances," *In re CIS Corp.*, 142 B.R. 640, 642 (S.D.N.Y. 1992) (quoting *In re Amfesco Indus., Inc.*, 81 B.R. 777, 785 (Bankr. E.D.N.Y. 1988)). "The party seeking to recover expenses

must 'carry the heavy burden of demonstrating' that such expenses" meet the statutory criteria, which includes showing that the "requested claims" are "reasonable." *In re Energy Future Holdings Corp.*, 990 F.3d 728, 742 (3d Cir. 2021). After all, "it is axiomatic that unreasonable expenses would never be necessary." *Id.* (alteration omitted).

Under both provisions, then, the Debtors and Commitment Creditors must show that the Backstop Fees are reasonable. That standard takes its meaning from the abuses that §§ 1129(a)(4) and 503(b) were enacted to prevent. Before the enactment of §1129(a)(4)'s statutory predecessor, those who provided services to the estate often would exact fees that bore "no relation to the value of services rendered." *Wolf v. Weinstein*, 372 U.S. 633, 639 (1963) (quoting *Leiman v. Guttman*, 336 U.S. 1, 7 (1949) (discussing statutory precursor to § 1129(a)(4)); *id.* at 640–41 (need for "judicial superintendence" to prevent "abuses in the payment of compensation and allowances" was "one of the principal reasons for the enactment" of the Bankruptcy Code's "broad mandate that fees and allowances must be 'reasonable'"). To be reasonable, therefore, fees must at minimum be proportionate to the value provided to the estate.

Judicial scrutiny is particularly warranted here, as the Backstop Fees "are made from assets of the estate." *In re AMR Corp.*, 497 B.R. 690, 698 (Bankr. S.D.N.Y. 2013). Payments from the estate's assets implicate important principles

animating the Bankruptcy Code.  For one thing, "the debtor bears the burden of maximizing the value of the estate."  *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005) (alteration omitted).  In addition, while "[t]he Code allows for reasonable financing terms," and "backstop fees" "can be appropriate," they can also be "a disguised means of giving bigger creditors a preferential recovery."  *In re Pac. Drilling S.A.*, 2018 Bankr. LEXIS 3024, at *6-7.  Courts should therefore scrutinize whether "real risks are taken" and whether the backstop fees are "proportionate to those risks."  *Id.* at *6-7; *see also In re WHET, Inc.*, 33 B.R. 443, 446 (Bankr. D. Mass. 1983) (finding fees unreasonable under § 503(b) because they were not sufficiently related to value provided).

### B.   The Bankruptcy Court Applied a Far Less Demanding Standard for Reasonableness Than Was Required

In confirming the Plan, the bankruptcy court failed to engage in the scrutiny required by §§ 503 and 1129(a)(4).  Although the court purported to analyze whether the Backstop Fees are reasonable under those provisions, its analysis borrowed largely from its prior ruling, in the Backstop Decision, approving the Backstop Fees under § 363(b).  That was error.  Sections 503 and 1129(a)(4) embody a far more rigorous conception of reasonableness than § 363(b).

Section 363(b), which governs "use" of estate property outside "the ordinary course of business," 11 U.S.C. § 363(b), incorporates the "business judgment rule," which asks simply whether the Debtors had a "sound business reason" for entering

into the Backstop Agreement.  A002909–10 (citing *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  "When applying the 'business judgment' standard, courts show great deference to the debtor's decision-making" and "will approve corporate actions unless they "derive from bad faith, whim or caprice."  A002910 (quoting *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006)) (alteration omitted).  "Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  A002910–11 (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992)); *see* A002914.  Thus, while §§ 503 and 1129(a)(4) impose on the *Debtors* the "heavy burden" of showing that the requested claims are substantively reasonable, *In re Energy Future Holdings Corp.*, 990 F.3d at 742, § 363(b) presumes reasonableness and requires the *objectors* to show the absence of any sound business reason for the Debtors' actions.  In sum, § 363(b), unlike §§ 503 and 1129(a)(4), does not require the court to inquire into the proportionality of the fees to the value provided to the estate.

Despite those critical differences, the bankruptcy court's confirmation order in fact applied the § 363 standard in purporting to analyze reasonableness under §1129(a)(4).  Indeed, the court expressly declared that there was *no difference* between § 1129(a)(4) and § 363(b), noting that it "will apply the same standards under section 363(b)"—i.e., the deferential business judgment standard—"that it applied in approving the Backstop Fees as reasonable."  A020747.  The court then

conclusorily stated that it would not "revisit[]" its conclusion under § 363(b), and that the Backstop Fees were therefore "reasonable under section 1129(a)(4)." A020747.  That was legal error.

Moreover, although the bankruptcy court concluded that the Backstop Fees were reasonable under § 503 in the Backstop Decision, A002915; A002917–18—a conclusion it did not revisit in the confirmation order—the court in the Backstop Decision did not actually engage in the searching reasonableness analysis required by § 503.  *CIS Corp.*, 142 B.R. at 642.  The court acknowledged that the fees are "plainly among the highest" ever negotiated.  A002917.  But rather than carefully scrutinize the transaction to determine whether those massive fees were justified, the court simply asserted without support that the fees were reasonable in light of COVID-19 and the "volatile" nature of the airline industry.  A002917; *see* A002884. That was *ipse dixit*: the court did not require the Debtors to quantify the risk; refused to consider the undisputed evidence that the Commitment Creditors' true economic risk is in fact quite low, *see* pp. 45-48, *infra*; and did not analyze whether the value that the Commitment Creditors provide by underwriting the risk is proportional to the admittedly massive Backstop Fees, A002883–84.  Instead, the court concluded that the fees were reasonable under § 503 based primarily on procedural considerations more appropriate to the § 363 business-judgment analysis, including that "the Debtors require the financing to exit chapter 11" and that the fees were

negotiated at arm's length in mediation.  A002917–18.  But that asserted procedural regularity is no substitute for a reasonable *outcome* under §§ 503 and 1129(a)(4)— particularly when, by the court's own acknowledgment, the agreement at issue contemplates payment of unprecedented fees out of the estates to a subset of favored creditors.  In short, the court's deferential approach is inconsistent with the rigorous reasonableness analysis required by §§ 503 and 1129(a)(4).

### C.    The Backstop Payments Are Unreasonable

Properly considered under §§ 503 and 1129(a)(4), the Backstop Fees are clearly unreasonable.  They are unprecedentedly high; they match or even *exceed* the actual amount of the Commitment Creditors' risk in the transaction; and they are the result of a deal negotiated among the Debtors, their Majority Shareholders, and a single group of preferred creditors that was not market tested.

#### 1.    The Backstop Payments Are Grossly Disproportionate to the Commitment Creditors' True Risk

In exchange for the backstop commitments, the Commitment Creditors will receive a stunning 20% cash fee on the $3.269 billion Class C Notes offering ($654 million), plus a 20% cash fee on half of the ERO as consideration for backstopping 50% of the ERO ($80 million).  All told, the Backstop Agreement provides the Commitment Creditors with $734 million in cash fees, and (by the Debtors' expert's calculation) $125 million in value derived from the Direct Allocation through which the Commitment Creditors exclusively can purchase half the Class C Notes.

A002879–80; A002906–07; A022534–35; A000908 (calculating Direct Allocation value).   As the bankruptcy court candidly acknowledged, these fees are "plainly among the highest" of any comparable transaction.  A002917.  More than that:  the Backstop Fees are record-setting. ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███

The sheer size and unprecedented nature of the Backstop Fees should have occasioned searching scrutiny.   To justify record-setting fees, the risk that the Commitment Creditors have agreed to backstop ought to be commensurately substantial.  But the opposite is true here.  In fact, the fees paid to the Commitment Creditors *exceed* the value of the securities that might not be subscribed.

That is so because, of the $3.669 billion that the Commitment Creditors nominally agreed to backstop ($3.269 billion of the Class C Notes offering plus $400 million of the ERO), only a small amount is actually at risk of going unsubscribed (and thus at risk of having to actually be backstopped by the Commitment Creditors). The Commitment Creditors have effectively agreed to buy 86% of the Class C Notes: they have negotiated for the exclusive right to purchase half of the Class C Notes through the Direct Allocation, and to subscribe approximately 72% of their

remaining Class 5 claims to the remaining half of Class C Notes in Class 5b, for a total of about 86% (or $2.791 billion) of the Class C Notes.  A022546; A019785–88.  That leaves only 14% of the Class C Notes that might go unsubscribed and trigger the Commitment Creditors' actual backstop.  The amount of new money investment needed to buy this 14%—*i.e.*, the amount that the Commitment Creditors would be required to pay to subscribe to the 14%—is $450 million.  A002879; A022546.  Looking just at the Class C Notes portion of the Backstop Agreement, then, the Commitment Creditors are being paid $654 million (the 20% fee) plus $125 million (the value of the Direct Allocation), or $779 million in total, to assume the risk of having to pay $450 million.  The fee is thus *173%* of the amount of the Commitment Creditors' capital that is at risk with respect to the Class C Notes.

By comparison, the bankruptcy court viewed the backstop fee for the Class C Notes as "plainly among the highest" based on the Debtors' expert's characterization of the fee as representing 23.8% of the $3.269 billion *total* new-money required in the Class C Notes offering.  *See* note 8, *supra*; A002917; A002909.  That 23.8% was already above the 75th percentile of the purportedly comparable backstop fees according to the Debtors' own expert.  A002907; A000908.  But when one properly considers only the portion of the Class C Notes that are actually at risk of being unsubscribed, the backstop fee is 173% of the at-risk amount.  That dwarfs any of the purported comparables and demonstrates that the backstop fee is wildly out of

proportion to the risk that the Commitment Creditors actually assumed.

Even when the ERO portion of the backstop transaction is considered together with the Class C Notes portion, the Backstop Fees are astronomical in relation to the risk assumed. Adding in the $400 million ERO at-risk amount (the cash the Commitment Creditors have agreed to provide if unsubscribed) and a $80 million backstop fee for the ERO, only $850 million ($450 million in Class C Notes plus the $400 million ERO) is at risk of potentially being unsubscribed by others.[11] To cover this $850 million risk, the Commitment Creditors receive $734 million in cash fees and $125 million in value derived from the Direct Allocation, for a total all-in backstop fee of $859 million. In other words, the Backstop Agreement covers *101%* of the Commitment Creditors' maximum possible at-risk backstop amount. The Backstop Agreement thus insulates the Commitment Creditors from *any* risk, instead bestowing on them a potential windfall vastly disproportionate "to the value of services rendered." *Wolf*, 372 U.S. at 639; *Leiman*, 336 U.S. at 7; *see In re Pac. Drilling S.A.*, 2018 Bankr. LEXIS 3024, at *6–7 ("backstop fees" must be "proportionate to" the "real risks" taken). Were that not enough, the Backstop Agreement also provides additional consideration—e.g., professional fees, up to $3

---

[11] Given the substantially higher recovery for Class C Notes compared to Class A Notes, *see* pp. 12-13, *supra*, it is unlikely that the remaining 14%, or $450 million, of the Class C Notes will remain unsubscribed—which would really leave only the $400 million ERO at risk of being unsubscribed.

million in expense reimbursement, indemnification, and termination fees—that push the backstop consideration further over the total at-risk amount.   A002854; A010672; A010706; A021424–25.

A fee so grossly disproportionate to the risk cannot qualify as "reasonable." This Court should not countenance the very "spectacle" that drove Congress to adopt a reasonableness requirement in the first place. *Wolf*, 372 U.S. at 639; *Leiman*, 336 U.S. at 7.

### 2. None of the Risks the Bankruptcy Court Identified Render the Backstop Fees Reasonable

The bankruptcy court refused to evaluate the Backstop Fees in relation to the tiny fraction of the transaction that is truly at risk.  The court reasoned that on paper, "the Commitment Creditors are exposed to risk from the full amount of the offerings"—i.e., all $3.669 billion—because the Backstop Agreement compels Commitment Creditors "to purchase 100% of the Class C Notes and up to $400 million of the ERO" even if they do not want to purchase the portion to which they have exclusive rights (i.e., the Direct Allocation and Class C Notes in Class 5b). A002881.

But that reasoning cannot be reconciled with the fact that "[t]he Bankruptcy Code intends to recognize economic realities." *In re Bagen*, 201 B.R. 642, 644 (S.D.N.Y. 1996).  Here, the economic realities are clear.  The Commitment Creditors *want* to acquire the Class C Notes:  the notes provide a substantially more favorable

recovery on their claims than any other offering, which is obviously why the Commitment Creditors negotiated for *superior* rights to purchase them.  A021406

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ The Commitment Creditors obtained the exclusive rights to purchase 86% of the Class C Notes, and the right to place their claims in Class 5b by default, while other Unsecured Creditors must opt in.  A019785–87; A019367; A019375–76; A019389–90; A019687.  In fact, were the backstop risk as significant as the Debtors suggest, they and the Commitment Creditors would have allowed *all* Class 5 creditors to participate in the Backstop Agreement and permitted oversubscription of the Class C Notes, thereby spreading the risk across a larger pool and mitigating the chances that any Class C Notes remain unsubscribed.  The parties' refusal to do so confirms that the Class C Notes are highly desirable, likely to be fully subscribed, and not risky enough to justify the exorbitant fees approved by the bankruptcy court.

Moreover, the bankruptcy court's unsupported assertion that the Commitment Creditors are "exposed to the risks of material changes in the Debtors' business outlook," A002883, is wrong in two respects.  First, relying solely on the Debtors' motion, the bankruptcy court accepted that the Commitment Creditors face "particularly acute" risks because of the "continued uncertainty" caused by the

pandemic and "the extended period the commitments must remain in place." A002871 (citation omitted).  But the Debtors, despite bearing the burden, provided no concrete evidence to measure that risk.  Nor did the Debtors explain how it justified an exorbitant backstop fee.

Second, and more importantly, the plain terms of the agreements insulate the Commitment Creditors from any real pandemic-related risk.  Under the Backstop Agreement, the Commitment Creditors' backstop obligations arise only if no COVID-19 "'variant of concern'" or "'variant of high consequence'" is designated in the forty-five days before the closing date.  A010704.  If a variant is designated in that period, the Backstop Agreement suspends the closing date for forty-five days until certain conditions are met.  A010704.  Those conditions ensure that the Debtors are financially stable.  Specifically, the Commitment Creditors need not perform if, before closing, the "outlook for LATAM's passenger business (measured by the total number of passengers booked for travel within the next 30 days) is weaker than the outlook on the same day of 2019"—that is, *before* the pandemic-related harm to the Debtors' business—"by a specific margin."  A002871–72; A010700; A010752.  In addition, the Debtors must maintain minimum levels of liquidity on a monthly basis that ensure a positive business outlook.  A010700.  If those conditions remain unmet, the closing will not occur.  A010700.  The bankruptcy court entirely ignored the risk-mitigating effect of these conditions precedent to closing.  A002877–78.

Indeed, the bankruptcy court's unsupported assertion that the Commitment Creditors remain subject to meaningful risk is particularly unjustified given that the court itself accepted the Debtors' healthy economic expectations. The Debtors have repeatedly insisted that the economic "hurdles" of the past few years "are not present today." A002876–77. The Debtors' Chief Financial Offer testified that based on the "outlook for 2022," the Debtors were likely to "meet" the passenger-bookings condition. A002877; *see* A021182–86. The bankruptcy court accordingly found "that there is a significant likelihood that" the Debtors "will be able to meet the conditions precedent," which, as noted, ensure that the Debtors' business is operating smoothly. A002878. Yet the court then ignored the salience of the Debtors' strong financial condition in its risk analysis.

### 3. The Backstop Agreement's Negotiation Process Does Not Render the Backstop Fees Reasonable

The bankruptcy court also opined that the Backstop Fees were reasonable based on its view that the Debtors negotiated at "arm's-length" with the Commitment Creditors and unsuccessfully "sought out" other financing sources. A002917–18. Those procedural circumstances cannot insulate an unreasonable outcome from invalidation under §§ 1129(a)(4) and 503. *See* pp. 40-41, *supra*. But in all events, the negotiation process only confirms the Backstop Fees' unreasonableness: the Backstop Agreement was negotiated almost exclusively with the Commitment Creditors and not market tested.

Even assuming the Debtors negotiated with the Commitment Creditors at arm's-length, they did not allow other creditors to participate.  Certain objectors asked repeatedly to be included but were denied because the Debtors wanted to secure the Commitment Creditors' support for the Plan.  *See* pp. 17-19, *supra*; A019367; A019375–76; A019389–90.  And the negotiations were privileged and shielded from discovery and judicial review.  *See* Fed. R. Evid. 408.  These facts justify *more* rigorous scrutiny of reasonableness, not less: the Bankruptcy Code's "expanded controls over reorganization fees and expenses" are designed to prevent the "serious abuses" that historically arose when parties negotiated fees "by private arrangement outside of court."  *Leiman*, 336 U.S. at 6.

Nor did the Debtors adequately market test the Backstop Fees.  A002865–66 (recognizing "it is undisputed" the Backstop Fees were not market tested); A021309. Market testing is necessary to determine "if more (or better) could be gotten elsewhere."  *In re NNN Parkway 400 26, LLC*, 505 B.R. 277, 281 (Bankr. C.D. Cal. 2014).  Yet the Debtors and Commitment Creditors categorically refused to do so, even when presented with a better proposal.  Before the backstop hearing, Appellant submitted the Ducera Proposal, a reorganization plan that provided financing on far better terms.  It reduced the cash fee to 15% and eliminated the Direct Allocation, removing the preferential treatment accorded to the Commitment Creditors.  And unlike the Plan, the Ducera Proposal opened the backstop to all Class 5 creditors.

Nonetheless, the Debtors dismissed the Ducera Proposal out of hand, citing a laundry list of reasons. *See* pp. 18-19, *supra*. When Appellant addressed many of those concerns, the Debtors rejected that proposal too. *Compare* A020905–A020971 *with* A022552–A022638.

Of course, the Ducera Proposal was unable to "provide a secure path to confirmation," A002869, precisely because it came from a minority group of creditors. That problem was intractable, but only because the Debtors had already struck a deal with the Commitment Creditors. That is, the Debtors could not engage with the Ducera Proposal because a supermajority of creditors would vote only for a Plan whose terms were more favorable to them rather than the Debtors. But in analyzing the reasonableness of the Backstop Fees as *compensation* for the backstop commitment, the Ducera Proposal's inability to deliver the votes needed to confirm a plan should  not matter. The point remains that the proposal was financially superior—proving that the Debtors could have obtained better terms to backstop the same risk. In other words, the exorbitant backstop compensation to which the Debtors agreed was not proportional to the risk involved, but was instead calibrated to secure the Commitment Creditors' votes. That is the very sort of unreasonable side deal that the Code's reasonableness requirements prohibit.

**III.    The Backstop Agreement Is a Mechanism to Buy Confirmation Votes, Violating 11 U.S.C. § 1123(a)(3)**

The true purpose of the Backstop Agreement is clear:  the Debtors bought confirmation votes from the Commitment Creditors in exchange for preferential treatment.  The bankruptcy court therefore erred when it found the Plan was proposed in good faith.  *See* A020748; A002864; A002866–67; A002913.

A court may not confirm a plan unless it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "Good faith requires a fundamental fairness in dealing with one's creditors."  *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986).  As particularly relevant here, "[t]he Bankruptcy Code . . . does not permit the payment of extra compensation to large creditors in exchange for their commitment to vote for a plan."  *In re Pac. Drilling*, 2018 Bankr. LEXIS 3024, at *6; *cf. In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 363 (S.D.N.Y. 2007) (exchanging votes for consideration can violate 11 U.S.C. § 1123(a)(4)).  Paying certain creditors for their votes, to the detriment of other similarly situated creditors, by definition violates the equal treatment requirement, and any plan with such a purpose also violates § 1129(a)(3).  *Cf. In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir. 1984) (good faith requires consistency with bankruptcy purposes); *In re Jorgensen*, 66 B.R. at 109.

For all the reasons stated above, the Plan and Backstop Agreement were clearly aimed at buying the Commitment Creditors' support.  The Commitment

Creditors receive an outsized recovery compared to similarly situated creditors. And that disparate treatment cannot be explained as compensation for the Commitment Creditors' backstop obligations: the consideration far outstrips the actual risk of undersubscription. Ultimately, the Debtors wanted to ensure plan confirmation, and the Commitment Creditors used the leverage arising from their supermajority to extract exorbitant terms—as the Debtors' cursory consideration of the Ducera Proposal confirms. This was not, as the bankruptcy court found, an ordinary settlement with typical concessions. A020748–49. It is a vote-buying agreement plain and simple, and it cannot be reconciled with § 1129(a)(3)'s good-faith requirement.

This case demonstrates the importance of the Bankruptcy Code's good-faith, equal treatment, and reasonableness protections. The Code permits a majority of creditors to bind minority creditors in the same class; but underlying that permission is the fundamental rule that creditors in the same class must receive the same treatment. By using fees and direct allocations, the majority of creditors here secured superior treatment for themselves, and in return they agreed to vote for a plan that impairs minority creditors in the same class (giving them a worse recovery) and provides value to existing shareholders. It is therefore critical to closely scrutinize whether fees and direct allocations are on account of the majority creditors' provision of financing rather than on account of their claims. Otherwise, creative

structuring will erode the necessary connection between creditor votes and creditor treatment that ensures fair treatment of creditors in reorganizations and that underpins the Bankruptcy Code.

## **CONCLUSION**

Based on the foregoing reasons, the bankruptcy court's confirmation order and backstop order should be reversed.

Dated: July 11, 2022
Washington, DC

Respectfully submitted,

By: */s/  Donald B. Verrilli, Jr.*

Donald B. Verrilli, Jr.
Ginger D. Anders
Joshua Kain Day (*pro hac vice* forthcoming)
**MUNGER TOLLES & OLSON LLP**
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:  (202) 220-1100
Email:  Donald.Verrilli@mto.com
　　　 Ginger.Anders@mto.com
　　　 Kain.Day@mto.com

Seth Goldman (admitted *pro hac vice*)
Benjamin G. Barokh (*pro hac vice* pending)
**MUNGER TOLLES & OLSON LLP**
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9100
Email:  Seth.Goldman@mto.com
　　　 Benjamin.Barokh@mto.com

Jeffrey A. Fuisz
Robert T. Franciscovich
Madelyn Nicolini
**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 863-8000
Facsimile: (212) 863-8689
Email:  jeffrey.fuisz@arnoldporter.com
      robert.franciscovich@arnoldporter.com
      madelyn.nicolini@arnoldporter.com

Michael D. Messersmith (*pro hac vice* forthcoming)
Sarah Gryll
**ARNOLD & PORTER KAYE SCHOLER LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602
Telephone: (312) 583-2300
Facsimile: (312) 583-2360
Email:
      michael.messersmith@arnoldporter.com
      sarah.gryll@arnoldporter.com

William C. Perdue
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave, NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
Email:  william.perdue@arnoldporter.com

*Counsel to the Ad Hoc Group of Unsecured Claimants*[12]

---

[12] Munger, Tolles & Olson LLP is counsel to the members of the Ad Hoc Group of Unsecured Claimants other than HSBC Bank Plc.  All members of the Ad Hoc Group of Unsecured Creditors have consented to the filing of this brief.

## **CERTIFICATION UNDER BANKRUPTCY RULE 8015(H)**

This document complies with the word limit of Federal Rule of Bankruptcy Procedure 8015(a)(7) because, excluding the parts of the document exempted by Fed. R. Bankr. P. 8015(g), this document contains 12,963 words.

## **CERTIFICATION UNDER BANKRUPTCY RULE 8013(D)(2)(D)**

This document has been served in accordance with Rule 8011 of the Federal Rules of Bankruptcy Procedure for electronic service.