No. 22-CV-05660

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

LATAM AIRLINES GROUP S.A., ET AL.,

*Debtors,*

AD HOC GROUP OF UNSECURED CLAIMANTS,

*Appellant,*

– v. –

LATAM AIRLINES GROUP S.A., ET AL.,

*Appellees.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK (GARRITY, J.)

IN RE LATAM AIRLINES GROUP, S.A., ET AL., CASE NO. 20-11254-JLG

BRIEF FOR APPELLEES

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jeffrey A. Rosenthal
Lisa M. Schweitzer
David H. Herrington
Abena A. Mainoo
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Appellees LATAM Airlines Group S.A., et al.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rules 8012 and 8014(a)(1) of the Federal Rules of Bankruptcy Procedure, Appellees LATAM Airlines Group S.A., Lan Cargo S.A., Transporte Aereo S.A., Inversiones Lan S.A., Technical Training LATAM S.A., LATAM Travel Chile II S.A., Lan Pax Group S.A., Fast Air Almacenes De Carga S.A., Linea Aerea Carguera De Colombia SA, Aerovias De Integracion Regional S.A., LATAM Finance LTD, LATAM Airlines Ecuador S.A., Professional Airline Cargo Services, LLC, Cargo Handling Airport Services, LLC, Maintenance Service Experts, LLC, Lan Cargo Repair Station LLC, Prime Airport Services Inc., Professional Airline Maintenance Services, LLC, Connecta Corporation, Peuco Finance Ltd., Latam Airlines Peru S.A., Inversiones Aereas S.A., Holdco Colombia II Spa, Holdco Colombia I Spa, Holdco Ecuador S.A., Lan Cargo Inversiones S.A., Lan Cargo Overseas Ltd, Mas Investment Ltd., Professional Airline Services Inc., TAM S.A., TAM Linhas Aereas S.A., Aerolinhas Brasileiras S.A., Prismah Fidelidade Ltda., Fidelidade Viagens E Turismo S.A., TP Franchising Ltda., Holdco I S.A., Multiplus Corredora De Seguros Ltda., and Piquero Leasing Limited (collectively, "<u>Appellees</u>" or the "<u>Debtors</u>"), by and through their undersigned counsel, hereby state:

-ii-

1.     LATAM Airlines Group S.A. is a public corporation and identifies Delta Air Lines, Inc. as a public corporation that directly or indirectly owns 10% or more of its stock.

2.     LATAM Airlines Group S.A. is the parent corporation of Holdco I S.A., Inversiones Lan S.A., Lan Cargo S.A., Lan Pax Group S.A.,  LATAM Finance Ltd., LATAM Travel Chile II S.A., Peuco Finance Ltd., Piquero Leasing Limited, Professional Airline Services, Inc., TAM S.A.,[1] and Technical Training LATAM S.A.

3.     Inversiones Aéreas S.A. is the parent corporation of Latam Airlines Perú S.A.[2]

4.     Lan Cargo Inversiones S.A. is the parent corporation of Línea Aérea Carguera de Colombia S.A.[3]

5.     Lan Cargo Overseas Ltd. is the parent corporation of Mas Investment Ltd.

6.     Lan Cargo Repair Station, LLC is the parent corporation of Maintenance Service Experts, LLC and Professional Airline Maintenance Services LLC.

---

[1]     LATAM Airlines Group S.A. owns a majority of TAM S.A.'s stock.
[2]     Inversiones Aéreas S.A. owns a majority of Latam Airlines Perú S.A.'s stock.
[3]     Lan Cargo Inversiones S.A. owns a majority of Línea Aérea Carguera de Colombia S.A.'s stock.

7.      Lan Cargo S.A. is the parent corporation of Connecta Corporation, Fast Air Almacenes de Carga S.A., Lan Cargo Inversiones S.A., Lan Cargo Overseas Ltd., Prime Airport Services Inc., and Transporte Aéreo S.A.[4]

8.      Lan Pax Group S.A. is the parent corporation of Holdco Colombia I SpA, Holdco Colombia II SpA, Holdco Ecuador S.A.,[5] and LATAM Airlines Ecuador S.A.[6]

9.      Línea Aérea Carguera de Colombia S.A. is the parent corporation of Inversiones Aéreas S.A.[7]

10.     Prime Airport Services, Inc. is the parent corporation of Lan Cargo Repair Station LLC.

11.     Professional Airline Services, Inc. is the parent corporation of Cargo Handling Airport Services, LLC and Professional Airline Cargo Services, LLC.

12.     TAM Linhas Aereas S.A. is the parent corporation of Fidelidade Viagens e Turismo S.A., Multiplus Corredora de Seguros Ltda., and Prismah Fidelidade Ltda.

13.     TAM S.A. is the parent corporation of TAM Linhas Aéreas S.A. and TP Franchising Ltda.

---

[4]      Lan Cargo S.A. owns a majority of Transporte Aéreo S.A.'s stock.
[5]      Lan Pax Group S.A. owns a majority of Holdco Ecuador S.A.'s stock.
[6]      Lan Pax Group S.A. owns a majority of LATAM Ecuador Airlines S.A.
[7]      Línea Aérea Carguera de Colombia S.A. owns a majority of Inversiones Aéreas S.A.'s stock.

14.     Holdco Colombia I SpA and Holdco Colombia II SpA are both parent corporations of Aerovías de Integración Regional S.A.[8]

15.     Holdco I S.A., Inversiones Aéreas S.A., Inversiones Lan S.A., Lan Cargo S.A., Lan Pax Group S.A., Latam Airlines Perú S.A., LATAM Finance Ltd., LATAM Travel Chile II S.A., Peuco Finance Ltd., Piquero Leasing Limited, Professional Airline Services, Inc., TAM S.A., and Technical Training LATAM S.A. identify LATAM Airlines Group S.A. as a public corporation that directly or indirectly owns 10% or more of their stock.

---

[8]     Holdco Colombia I SpA and Holdco Colombia II SpA split majority ownership of Aerovías de Integración Regional S.A.'s stock.

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................... 1

STATEMENT OF THE ISSUES................................................................... 8

STANDARD OF REVIEW ........................................................................... 8

STATEMENT OF THE CASE....................................................................... 9

I.     The Debtors File For Bankruptcy Protection ...................................... 9

II.    The Backstop Agreements .................................................................. 10

    A.    The Debtors' Plan and Backstop Negotiations ......................... 10

    B.    Fees Owed to the Commitment Creditors Under
        the Backstop Agreements............................................................ 14

    C.    Market Testing of the Backstop Agreements............................. 15

        1.    The Backstop Fees Are Reasonable................................. 18

III.   Bankruptcy Court's Approval of the Backstop
      Agreements ......................................................................................... 21

IV.    Events Subsequent to the Execution of the Backstop
      Agreements ......................................................................................... 23

V.     Confirmation of the Plan ................................................................... 24

SUMMARY OF ARGUMENT ..................................................................... 26

ARGUMENT ................................................................................................ 28

I.     The Bankruptcy Court Did Not Err in Approving the
      Backstop Agreements Under Sections 503, 363(b), and
      1129(a)(4) ............................................................................................ 28

    A.    The Bankruptcy Court Did Not Err in Finding the
        Backstop Agreements Reasonable Using the "All-
        In Backstop Fee at Plan Value" Methodology............................ 28

B.    The Bankruptcy Court Did Not Err in Approving the Backstop Agreements As Reasonable Under Section 503 ................................................................. 31

C.    The Bankruptcy Court Appropriately Applied Sections 363(b) and 503(b)(1) In Reviewing the Backstop Fees ....................................................... 35

D.    The Bankruptcy Court Correctly Found that Section 1129(a)(4) Does Not Apply to the Backstop Agreements ................................................. 37

E.    The Bankruptcy Court Did Not Err in Finding that the Backstop Payments Are Commensurate With the Risks Assumed by the Backstop Parties ............................. 39

    1.    The Commitment Creditors Are Exposed to Downside Risk on the Entire $3.669 Billion Commitment ............................................................. 40

    2.    The Limited Conditions Precedent Do Not Meaningfully Reduce The Commitment Creditors' Risk ............................................................. 43

F.    The Bankruptcy Court Properly Found that the Ducera Proposal Was Not A Viable Alternative to the Backstop Agreements ...................................... 47

II.   The Plan Does Not Violate 1123(a)(4)'s Equal Treatment Requirements ......................................................... 48

A.    The Direct Allocation of New Convertible Notes Class C Is Compensation, Not a Claim Recovery ................. 51

B.    The Bankruptcy Court Did Not Err in Finding that the Mechanism by Which the Commitment Creditors Access the Direct Allocation Does Not Implicate 1123(a)(4) ....................................................... 55

**Page**

III.  The Bankruptcy Court Did Not Err in Finding that the
      Debtors Proposed the Plan in Good Faith in Accordance
      with the Requirements of Section 1129(a)(3) ..................................... 56

CONCLUSION .............................................................................................. 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ad Hoc Comm. of Pers. Inj. Asbestos Claimants v. Dana Corp.*
  *(In re Dana Corp)*,
  412 B.R. 53 (S.D.N.Y. 2008) ..................................................... 49

*Anderson v. City of Bessemer*,
  470 U.S. 564 (1985)................................................................... 8

*Bedford JV, LLC v. Sky Lofts, LLC*,
  No. 12-CV-5850 (DLI), 2013 WL 4735643
  (E.D.N.Y. Sept. 3, 2013).............................................................. 32

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)........................................ 49

*In re Ashley River Consulting, LLC*,
  Nos. 14-13406 (MG), 14-13407 (MG), 2015 Bankr. LEXIS 3819
  (Bankr. S.D.N.Y. Nov. 6, 2015) ................................................. 36, 39

*In re Bd. of Dirs. of Telecom Arg., S.A.*,
  528 F.3d 162 (2d Cir. 2008) ....................................................... 56

*In re CHC Grp., Ltd.*,
  Case No. 16-31854 (BJH), 2017 WL 11093971
  (Bankr. N.D. Tex. Mar. 3, 2017) ................................................ 49

*In re Drexel Burnham Lambert Grp.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)........................................ 36, 39

*In re Fin. Oversight & Mgmt. Bd.*,
  7 F.4th 31 (1st Cir. 2021)............................................................ 31

*In re Heron, Burchette, Ruckert & Rothwell*,
  148 B.R. 660 (Bankr. D.D.C. 1992) ........................................... 50

*In re Peabody Energy Corp.*,
  933 F.3d 918 (8th Cir. 2019) ....................................................... 52

*In re Quigley Co.*,
  377 B.R. 110 (Bankr. S.D.N.Y. 2007)......................................... 49

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ............................................. 50

*In re Trenton Ridge Invs., LLC*,
  461 B.R. 440 (Bankr. S.D. Ohio 2011) .................................... 36, 39

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ....................................................... 49

*In re WorldCom, Inc.*,
  No. 02-13533, 2003 Bankr. LEXIS 1401
  (Bankr. S.D.N.Y. Oct. 31, 2003) ............................................ 36, 39

*Nichols v. Maxwell (In re Nichols)*,
  No. AZ-09-1325 PaDJu, 2010 Bankr. LEXIS 3168,
   (B.A.P. 9th Cir. Mar. 17, 2010) ................................................. 32

*Trade Creditor Grp. v. L.J. Hooker Corp. (In re Hooker Invs., Inc.)*,
  188 B.R. 117 (S.D.N.Y.1995),
   *aff'd*, 104 F.3d 349 (2d Cir.1996)............................................ 31-32

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v.
Vill. at Lakeridge, LLC*,
  138 S. Ct. 960 (2018)................................................................... 8

## Rules and Statutes

11 U.S.C. § 503(b)(1)(A).................................................. *passim*

11 U.S.C. 1123(a)(4)......................................................... *passim*

11 U.S.C. § 1129(a)(4)...................................................... *passim*

Appellees respectfully submit this brief in opposition (the "Opposition") to the opening brief (the "Opening Brief") submitted by the Ad Hoc Group of Unsecured Claimants ("Appellant"), ECF No. 19.

## PRELIMINARY STATEMENT

This appeal seeks to derail over two years of dedicated efforts and hard-fought negotiations on the part of the Debtors to save their business and emerge from chapter 11, despite an ongoing global pandemic, unprecedented financial and geopolitical instability, and the complex, cross-jurisdictional nature of these Chapter 11 Cases. [9]   The Debtors' plan of reorganization (the "Plan") and Backstop Agreements contested here are the product of nearly fifteen months of effort to canvas the capital markets for funders willing and able to backstop a unique and challenging proposal: provide approximately $5.4 billion in funding, committed up to ten months in advance, to back transactions subject to approval by a foreign regulatory body, the Chilean Comisión para el Mercado Financiero.   While the Debtors and their advisors actively solicited over 50 potential funders for proposals in an open and well-publicized fundraising process, they also faced the challenge of designing a Plan that complied with both Chilean and U.S. law.   U.S. bankruptcy law recognizes creditor priority; under Chilean law, existing shareholders have

---

[9]   Any capitalized terms not defined herein shall have the meaning ascribed to them later in this Opposition or in the Plan.   *See* A024635-A024781.   This Opposition will mark all subsequent references to docket entries on the bankruptcy docket as "BR ECF No."

preemptive rights on any new equity offerings.   This required the Debtors to formulate a Plan aligned with U.S. statutory requirements, while simultaneously negotiating with their major shareholders to be willing to compromise their Chilean law preemptive rights to support a plan of reorganization.   Appellant's attempts to recast many months of market testing, vigorous negotiations, and stakeholder coalition-building that ultimately culminated in Plan confirmation with tremendous and widespread creditor support fall short when the Plan and Backstop Agreements are properly evaluated against the complex context in which they were designed, their actual terms (as opposed to Appellant's mischaracterization of those terms), and the Bankruptcy Code, with which they undeniably comply.

LATAM Airlines Group S.A. ("LATAM Parent"), a publicly traded Chilean company, and its affiliated debtors and debtors-in-possession together with certain non-debtor affiliates, are Latin America's leading airline group ("LATAM"). LATAM was a thriving airline before the COVID-19 pandemic abruptly interrupted its operations and caused a sudden and devastating decline in revenue that ultimately led the Debtors to file for chapter 11 bankruptcy in May and July 2020.   In the two years since filing, despite the backdrop of an unprecedented global pandemic, the Debtors have worked tirelessly to secure the funding and creditor support necessary for a plan of reorganization that would allow them to exit chapter 11 and continue charting their pre-pandemic course of success.

One of the most crucial aspects of the Debtors' ability to exit chapter 11 successfully is sufficient exit funding, in the magnitude of $8 billion, both to fund Plan distributions and for future operations after exit.  When they began seeking exit financing and over the course of many subsequent months, the Debtors and their advisors engaged in a vigorous and robust marketing process to generate interest among any and all potentially interested parties.  As these efforts progressed, the Debtors and their advisors engaged in discussions with numerous sophisticated investment funds and key stakeholders with the ability and potential interest to provide the necessary capital commitments for the Debtors to emerge from chapter 11.  Importantly, not only is the chapter 11 process public, but the Debtors' five-year business plan and other Plan-related materials also were all disclosed in public securities filings in September 2021.  This open process resulted in multiple initial proposals that the Debtors and their advisors rigorously explored, and which ultimately culminated in a court-ordered mediation conducted by the Honorable Allan L. Gropper (Ret.).

As a direct result of this mediation and months of negotiations with creditors, shareholders, and investment funds, the Debtors entered into a Restructuring Support Agreement (the "RSA") with (1) the ad hoc group of LATAM Parent creditors (the "Parent GUC Ad Hoc Group," and as signatories along with other creditors to the RSA, the "Commitment Creditors") who together controls more than 70% in amount

3

of the general unsecured claims asserted against LATAM Parent, and (2) a few large shareholders (together, the "RSA Shareholders") who together own or control more than 51% of LATAM Parent's common stock.  Critical to the RSA, the Debtors obtained commitments from the Commitment Creditors and Backstop Shareholders through the Backstop Agreements to backstop over $5.4 billion in new money investments and support the Plan and take all actions necessary to implement the transactions it contemplates.

Thus, in addition to enabling the Debtors to raise more than $5.4 billion in backstop funding, the RSA also enabled the Debtors to secure critical support of a broad array of stakeholders, including a sufficient base of shareholders necessary to comply with Chilean law.  Following confirmation of the Plan, the Debtors are required to seek regulatory approval in Chile to issue the contemplated new securities.  Under Chilean law, shareholders have preemptive rights to subscribe to and purchase any new equity offerings; without the agreements in place under the RSA, implementation of the Plan would not be possible.  The tension between creditor and shareholder rights afforded by the U.S. absolute priority rule and Chilean preemptive rights—a looming issue from the outset of these Chapter 11 Cases—required the Debtors to develop a Plan that addressed and harmonized these interests, which the Debtors accomplished as reflected in a Plan supported by a broad coalition of creditors and shareholders.

4

In exchange for the Commitment Creditors' agreement to backstop approximately $3.669 billion in new capital, the Backstop Agreements provide for compensation to these parties in the form of a cash backstop fee of 20% of the $3.669 billion New Convertible Notes Class C offering ($734 million) and the exclusive right to subscribe to and purchase up to 50% of the New Convertible Notes Class C Offering (the "Direct Allocation").  This was the result of arm's-length, fierce negotiation among the Debtors, the Backstop Parties, and their respective professional advisors over many months, and reflects compensation for not only the Commitment Creditors' agreement to put at risk $3.669 billion in backstopping capital, but also the far longer-than-average (up to ten months) duration of this commitment, provided to an international airline at a time of general market volatility due to COVID-19, rising fuel prices, and a general state of geopolitical and economic instability.

Throughout the past two years, the Debtors have remained laser-focused on one goal: to secure their successful emergence from chapter 11, and to do so on the best terms possible, for both their stakeholders and their continued success as a business.  Ultimately, the large majority of all LATAM creditors, who voted overwhelmingly to confirm the Plan, and the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), in approving the Backstop Agreements as reasonable and confirming the Plan, agreed that the Debtors achieved

this goal despite unprecedented global and market challenges. Appellant—a group of creditors that did not even form or first appear in the Debtors' Chapter 11 Cases until *after* the Debtors' solicitation of backstop proposals, *after* the mediation in which the terms of the RSA were negotiated, and *after* the Debtors' Plan was filed in late November 2021—has time and again attempted to recast the long, public negotiation of the RSA and Backstop Agreements as a private and exclusive process designed to exclude creditors and give preferential treatment to the Commitment Creditors on account of their unsecured claims. The factual record simply does not support its allegations, and thus, after considering the parties' evidence, the Bankruptcy Court rejected them.

What rings particularly hollow in Appellant's attempt to recast the Debtors' path to confirmation is its suggestion that the Debtors rejected viable alternative funding proposals (an undeniably factual issue), including Appellant's own "Ducera Proposal." Here again, the evidence squarely supports the Bankruptcy Court's findings in this regard. The Bankruptcy Court properly found the Ducera Proposal— which fell $1.8 billion short of the Debtors' funding needs—was non-viable given its facially glaring deficiencies. As an unsigned, uncommitted letter with broad diligence conditions, delivered months after the RSA was negotiated and signed and in the midst of active litigation, it was clearly a litigation ploy rather than a genuine alternative.

6

What Appellant now seeks is extraordinary—despite the unprecedented geopolitical and financial uncertainty against which the Backstop Parties have agreed to backstop more than $5 billion in new capital for a period that is among the longest ever, Appellant complains that the fees paid to the Commitment Creditors are so unreasonable that this Court should overturn a plan confirmed with immense creditor support, despite Appellant failing to identify any factual errors made by the Bankruptcy Court or any binding case law the Bankruptcy Court failed to respect. Appellant has already twice unsuccessfully litigated its positions in opposing the Debtors' entry into the Backstop Agreements and the confirmation of the Plan, and its third try should fare no better.

The extensive factual record and the plain terms of the Plan, the Backstop Agreements, and the RSA all confirm that the Bankruptcy Court did not err in approving the Backstop Agreements and the Plan. Appellant's appeal almost exclusively contests factual findings that are amply supported by the record and not clearly in error. The Plan is the product of years of effort and hard-fought negotiation and reflects reasonable terms squarely in compliance with the Bankruptcy Code. The Bankruptcy Court's decisions must be affirmed.

## STATEMENT OF THE ISSUES

1.      Did the Bankruptcy Court commit clear error in approving the Backstop Agreements  as reasonable under section 503 and as a valid exercise of the Debtors' business judgment under section 363(b) following a two-day evidentiary hearing?

2.      Did the Bankruptcy Court err in finding that the Plan did not violate sections 1123(a)(4), 1129(a)(4), and 1129(a)(3)?

## STANDARD OF REVIEW

Appellant asks this Court to reverse factual findings made by the Bankruptcy Court in connection with the Backstop Agreements and the Plan, particularly the reasonableness of the terms of the Backstop Agreements and the fees paid thereunder.  These factual findings can only be overturned if the Court finds them to be clearly erroneous.   To warrant overturning a factual finding on appeal, the reviewing court must be "left with a definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985) (internal citations omitted).  Any remaining issues for this Court's review are at best mixed questions of law and fact, and the standard of review for these questions will not necessarily be *de novo* but rather will "depend[] on whether answering [them] entails primarily legal or factual work."  *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 962 (2018).  Here, that work is overwhelmingly factual.

8

## STATEMENT OF THE CASE[10]

### I.    The Debtors File For Bankruptcy Protection

Appellees collectively comprise Latin America's leading airline group and one of the largest airlines in the world.  Appellees initiated chapter 11 proceedings (the "Chapter 11 Cases") under Title 11 of the United States Code, 11 U.S.C. § 101 et. seq., on May 26, 2020, July 7, 2020, and July 9, 2020 in the Bankruptcy Court.

During the early stages of their bankruptcy proceedings, the Debtors focused on (i) obtaining debtor-in-possession ("DIP") financing that could fund their Chapter 11 Cases, which was approved in the fall of 2020, *see* A023117-A023118, and (ii) rightsizing their fleet obligations, including renegotiating fleet arrangements for their 340 aircraft.  In the spring of 2021, the Debtors then turned to the development of their post-bankruptcy business plan and a plan of reorganization, and identified potential sources of equity commitments to backstop their proposed plan.  During this time, various creditors and creditor representatives actively participated in the cases, including the Official Committee of Unsecured Creditors (the "UCC"), the indenture trustee under LATAM Parent's Chilean Local Bonds Series A through D and Series E in the aggregate amount of $490.5 million, Banco del Estado de Chile ("Banco Estado"), and the Parent GUC Ad Hoc Group, which grew to represent holders of over 70% of LATAM Parent claims, and other claims.  Under Chilean

---

[10]    Much of the Statement of the Case comes from the Bankruptcy Court's factual findings in the Backstop Decision and the Confirmation Decision.

law, existing shareholders are granted certain preemptive rights that provide for their approval of and right to participate in new common stock or convertible notes offerings.  The Debtors' largest shareholders—including Costa Verde Aeronáutica S.A. ("CVA"), Delta Air Lines, Inc. ("Delta"), and Qatar Airways Investments (UK) Ltd. ("Qatar")—also actively participated in the Chapter 11 Cases and engaged with the Debtors on these unique issues and how they intersected with other chapter 11 plan requirements.

## II.   The Backstop Agreements

### A.   The Debtors' Plan and Backstop Negotiations

In connection with the Plan and their exit from the Chapter 11 Cases, the Debtors must raise more than $8 billion in new money to satisfy their cash payment obligations under the Plan and to finance their ongoing operations and capital needs following emergence.  The Debtors contemplate raising most of these funds through convertible notes offerings and equity rights offerings ("ERO") in the Chilean capital markets (the "Offerings"), as well as through new exit financing.  Because these funds would be raised following confirmation and it was expected that the Debtors would need several months to implement the Plan prior to the effective date to comply with Chilean law, it was critical for the Debtors to secure a backstop commitment from parties willing to essentially guarantee (with very narrow exceptions) the success of the capital raise by promising to provide the funds in the

event that others in the market were unwilling to do so.  Particularly for a Latin American airline navigating a global pandemic amidst several other significant macroeconomic and geopolitical challenges, a backstop commitment was vital to the Debtors' ability to propose and confirm a plan of reorganization.  This is not contested.[11]

The Debtors undertook vigorous and robust efforts to backstop their exit capital raise.  Around May 2021, the Debtors developed their business plan, provided it to various creditors and shareholders, and sought exit financing proposals.  The Debtors and their advisors affirmatively contacted approximately 45 investment funds and strategic parties, including members of the Parent GUC Ad Hoc Group, the Moelis Group, the Backstop Shareholders, the DIP Loan providers, and Chilean bondholders.  *See* A002866; *see also* A021282-A021283.  The Debtors distributed a template term sheet for proposals but did not include or require any particular economics.  As negotiations developed, the Debtors executed non-disclosure agreements with over 60 entities with which they were engaged in discussions.  *See* A000896.  The Debtors publicized their intent to obtain exit capital and their solicitation of offers, enabling any party with the necessary financial ability to come forward with any proposals.  *See* A002867; *see also* A021240-A021241.  In

---

[11]     Backstop commitments are commonly used in chapter 11 cases to ensure that post-confirmation capital raises will be successful and thus proposed plans of reorganization are feasible.  *See* A000588.

September 2021, over two months before filing the Plan, *see* A000025-A000124, the Debtors publicly disclosed their business plan and proposed term sheet.

As a result of this extensive outreach, the Debtors received and considered a number of proposals from entities with no connection to the Debtors or their key stakeholders. *See* A002866-A002867. Ultimately, the Debtors received formal proposals from the Parent GUC Ad Hoc Group, the Moelis Group, and the Backstop Shareholders in August and September 2021. *See* A002867; *see also* A021286.

The Debtors engaged with each of the entities who provided formal proposals to negotiate an agreement that would provide the necessary capital on conditions that would enable the Debtors to emerge successfully. *See* A002867; *see also* A021286. Following several months of negotiations, the Debtors and various key stakeholders entered into mediation with Judge Gropper. As the Debtors' chief financial officer testified, this grueling mediation lasted "day in, day out" for the entire month of November 2021. *See* A021110-A021111; *see also* A002867. After extensive arm's-length negotiations, the Debtors reached an agreement with certain key stakeholders on critical aspects of a comprehensive restructuring. These key stakeholders included CVA, Delta, and Qatar (collectively, the "Backstop Shareholders"), and the Commitment Creditors (together with the Backstop Shareholders, the "Backstop Parties").

The agreements reached among the Debtors and these parties were memorialized in the RSA, the Backstop Shareholders Backstop Agreement (providing $1.773 billion in equity backstop commitments), the Commitment Creditors Backstop Agreement (providing $3.669 in backstop commitments) (together with the Backstop Shareholders Backstop Agreement, the "Backstop Agreements"), and the Plan.  Under these agreements, the Commitment Creditors act as a backstop and agreed to purchase up to $400 million of the Unsubscribed ERO New Common Stock, and subscribe for and purchase up to $3.269 billion of the Unsubscribed New Convertible Notes Class C.  The Backstop Shareholders will backstop up to $400 million of the Unsubscribed ERO New Common Stock and up to $1.373 billion of the New Convertible Notes Class B Offering.

Whereas prior to entering into the Backstop Agreements, the Backstop Parties had no obligation to purchase a single dollar of the Debtors' securities (as with any other creditor), under the Backstop Agreements, the Backstop Parties must purchase up to $5.4 billion of Plan securities to the extent that other creditors do not subscribe. This commitment includes any securities that are offered and not subscribed to by other parties, as well as the securities allotted to the Backstop Parties themselves, regardless of market conditions or what their post-confirmation choice otherwise might be.  And unlike other creditors, who can wait until after confirmation (potentially long after) to analyze market conditions and decide whether the Debtors'

future securities are a worthwhile investment, the Backstop Parties bound themselves in November 2021 (subject to Court approval, which occurred in March 2022) to backstop these securities. *See* A002834-A002918; A003166-A003408.[12] Thus, at that time, they were locked into their commitment through fall 2022 (assuming Plan confirmation), a commitment of up to ten months. When compared to other comparable arrangements, the Backstop Parties' backstop commitment is one of the longest and largest on record. *See* A000904. In essence, the Backstop Agreements pass the risk associated with such a large capital raise from the Debtors to the Backstop Parties, ensuring that the Debtors will receive sufficient capital to successfully reorganize and continue as an ongoing business post-emergence.

## B. Fees Owed to the Commitment Creditors Under the Backstop Agreements

There are two separate, but interdependent, Backstop Agreements. The Backstop Shareholders are not owed any fees for their commitment to backstop $400 million of the ERO and $1.373 billion of the New Convertible Notes Class B Offering under the Backstop Shareholders Agreement. *See* A000577. Under the Commitment Creditors Backstop Agreement, in exchange for their commitment to backstop $3.269 billion of the Unsubscribed New Convertible Notes Class C and $400 million of the ERO, the Commitment Creditors are owed a payment of 20% of

---

[12] Appellant's "calculations"—discussed *infra* in Argument, Section I.E—assume that the Backstop Parties are entitled to no consideration for their advance commitment to purchase their allotment rather than wait to evaluate market conditions many months later.

the $3,669,160,305.88 in funding they have agreed to backstop, approximately $734 million (the "Backstop Fees").  *See* A000571; *see also* A023736-A023737.  The Commitment Creditors are also offered the Direct Allocation, which is the exclusive right to subscribe to up to 50% of the New Convertible Notes Class C as additional compensation for their agreement to backstop the Offerings.

### C.    Market Testing of the Backstop Agreements

Contrary to Appellant's claims, and as the Bankruptcy Court found, the Debtors thoroughly market tested the Backstop Agreements prior to their approval.  *See* A002865-A002867.  Before entering into the Backstop Agreements, the Debtors and their professional advisors engaged in a vigorous and robust marketing process in an effort to generate interest in backstopping the Offerings, eventually participating in mediation with Judge Gropper.  Throughout the marketing process, the Debtors negotiated with multiple investment funds and key stakeholders, each with the potential interest and ability to provide the necessary capital commitments to support the Debtors' emergence from chapter 11.  This process was open and well-known, spanning several months during which the Debtors' willingness to consider all available options was highly publicized.  Appellant's claim that it "was excluded from those negotiations" is flatly untrue.  *See* Opening Brief at 11. Appellant could have approached the Debtors at any time prior to November 2021 to express its interest in providing a backstop.  Moreover, as the Bankruptcy Court

15

noted, "the Mediator had the discretion to invite any additional parties that were not otherwise Designated Parties to participate." *See* A002846. Furthermore, Appellant's assertions are particularly ill-conceived given that at this point in time, the group was not even known to exist because it had not yet appeared or participated in the Chapter 11 Cases. Appellant only first appeared in the Chapter 11 Cases on December 15, 2021—after the Plan had been filed and more than 18 months after the Chapter 11 Cases were first initiated—when it joined another party's request for an order terminating the Debtors' exclusivity period to file a chapter 11 plan and solicit acceptance thereof and suggested it would provide a full backstop of an alternative plan proposal by year-end. *See* A023018-A023021. The backstop proposal never materialized by year-end, its objection was overruled by the Court, and the Debtors' plan exclusivity was extended. Appellant only filed its Rule 2019 Statement identifying the group's members on December 29, 2021. *See* A023022-A023027.

Meanwhile, after months of hard-fought negotiation prior to the Plan filing, including through mediation overseen by Judge Gropper, and continued negotiation and finalization of the backstop terms through January 2022, the Debtors were able to secure an agreement with the Backstop Parties that, subject to certain terms and conditions, provided $5.4 billion in funding needs on the best available terms and provided the most feasible path towards Plan confirmation.

16

Appellant's argument that the Debtors failed to market test the Backstop Agreements ignores the robust evidence of a thorough marketing and negotiation process, as reflected in the findings made by the Bankruptcy Court in approving the Backstop Agreements.    Appellant's assertion that the Bankruptcy Court "determined" that "it is undisputed that when the Debtors finalized their backstop proposal with the Commitment Creditors, they took no steps to 'solicit additional proposals' in the market that might have been superior" is a sleight of hand— Appellant merely quotes the summary of Appellant's arguments for this proposition from the Memorandum Decision Granting the Debtors' Motion for Entry on an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements, and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations (the "Backstop Decision"), BR ECF No. 4667, and ignores the Bankruptcy Court's actual findings regarding the Debtors' capital raising efforts.  *Compare* A002865-A002867, *with* Opening Brief at 17.  In fact, the Bankruptcy Court recognized that the Debtors "'explore[d] a number of restructuring proposals' during the pendency of these Chapter 11 Cases." A002866.  These efforts included the Debtors' engagement with various parties— ultimately negotiating over 60 non-disclosure agreements with interested parties and their advisors, and engaging in a significant diligence process that involved answering over 600 diligence questions to facilitate negotiations—for several

17

months to develop a backstop proposal. *See* A000894-A000896; *see also* A000840. That the Debtors engaged in these efforts is uncontested. The Bankruptcy Court also held that "the evidence undermines the Objectors' [including Appellant's] argument that the Debtors did not appropriately or sufficiently seek other partners beyond the parties to the Backstop Agreements." A002869.

### 1. The Backstop Fees Are Reasonable

As is commonplace in backstop arrangements, the Commitment Creditors will receive a fee for their commitment to backstop the $3.669 billion in new capital (here, 20%, or approximately $734 million), and the exclusive right to subscribe to 50% of the New Convertible Notes Class C (i.e., the Direct Allocation). The Bankruptcy Court utilized an "All-In Backstop Fee at Plan Value" methodology to evaluate the reasonableness of the Backstop Fees. *See* A002917. The Debtors showed at the hearing for the Debtors' Motion for Entry of an Order Authorizing and Approving the Backstop Agreements at 21 (the "Backstop Motion"), BR ECF No. 4056, that the Backstop Fees, when compared to other comparable transactions, were a "hair above the 75th percentile" utilizing the Bankruptcy Court's selected All-In Backstop Fee at Plan Value methodology. *See* A002705. The Bankruptcy Court recognized that the Backstop Fees were "plainly among the highest fees" on the Debtors' chart of comparable transactions, *see* A002917, but found that they were

18

reasonable because of the length and size of the backstop commitments and the environment in which the commitments were made.  *See* A002917.

Despite Appellant's attempts to mischaracterize the testimony of the Debtors' expert, Mr. Brent Herlihy of PJT Partners LP, he clearly concluded that the terms of the Backstop Agreements were "within the range of commitment fees paid in other comparable cases."  A000903.  Mr. Herlihy explained that "the special challenges presented here, as well as the duration of the commitment, serve to further justify the Backstop Payments."  A000903.  As compared to other comparable backstops, "the size of the backstop commitment and the backstop duration of approximately eight months are well above the median and mean of the comparable backstop arrangements."  A000904.  Mr. Herlihy opined that the much longer-than-average backstop period and larger-than-average backstop commitment justified the fees paid to the Commitment Creditors.  A000903.  Appellant's own expert, Mr. Joshua Scherer, agreed that "the longer the period of time that [a backstop] commitment is outstanding, the greater the risk."  *See* A022410.

Appellant's allegation that "the Debtors failed to entertain other, superior backstop offers," *see* Opening Brief at 18, such as their supposed alternative financing proposal made mid-litigation on January 26, 2022 (the "Ducera Proposal"), is flatly contradicted by the record.  The Debtors concluded that the Ducera Proposal was an inadequate alternative to the terms negotiated with the

Backstop Parties for various reasons. *See* A001967. First, the Ducera Proposal did not provide sufficient committed capital. Although Appellant avers that it covered the amounts backstopped by the Commitment Creditors, that is only a *portion* of the Backstop Commitments. The Ducera Proposal did not include funding to cover the full amount of the capital required—including the nearly $1.8 billion commitment provided by the Backstop Shareholders in furtherance of the RSA; Appellant indisputably made no efforts to determine whether it could obtain such a commitment from the Backstop Shareholders to support the Ducera Proposal. Second, the Ducera Proposal had an expansive due diligence condition that would allow Appellant to withdraw its proposal at any time, at its sole discretion—a risk that the Debtors could not assume. Third, the Ducera Proposal did not provide a secure path to confirmation because it did not offer sufficient funding and because it would not provide sufficient support to confirm a plan of reorganization. Fourth, the Ducera Proposal did not provide details regarding the amounts that each party would individually contribute. Finally, the Ducera Proposal was not a binding commitment because it was presented as an unsigned letter. *See* A021312-A021313, A021565-A021567. Appellant did not submit a revised proposal until the day of the court hearing to approve the Backstop Agreements. *See* A023028-A023031. In any event, the revised proposal did not resolve all of the Debtors' concerns. Ultimately, the Bankruptcy Court agreed with the Debtors in finding, as a matter of fact, that

"the [Ducera] proposal falls short of a viable alternative or substitute for the Backstop Agreements." *See* A002869.

## III.   Bankruptcy Court's Approval of the Backstop Agreements

On January 12, 2022, the Debtors sought the Bankruptcy Court's approval of the Backstop Agreements. *See* A000557-A000860.

As the determination of the reasonableness of the Backstop Agreements is a fact-intensive analysis reflective of the specific case context, the parties participated in extensive discovery in connection with Appellant's and other parties' objections (with discovery beginning even before the Backstop Motion was filed). The Debtors produced numerous documents, including minutes and presentations from Board and Audit Committee meetings for the period from June 2021 through January 2022; the Debtors also produced for deposition their chief financial officer, a witness pursuant to Federal Rule of Civil Procedure 30(b)(6), and their financial advisor and lead negotiator of the Backstop Agreements; the parties also exchanged reports from four expert witnesses who sat for six depositions collectively.

Appellant filed an objection to the Backstop Motion (the "AHG Backstop Objection"), arguing *inter alia* that the aggregate compensation offered to the Commitment Creditors in the form of the Backstop Fees and Direct Allocation was

21

unreasonable.  *See* A001245-A001564.[13]  The Debtors in turn filed a reply to the AHG Backstop Objection and the Parent GUC Ad Hoc Group and the Backstop Shareholders each filed statements in support of the Backstop Motion.  *See* A001930-A002160; A023042-A023051; A023032-A023041; A023052-A023074. The Debtors offered evidence that the Backstop Fees and aggregate compensation were reasonable and that entry into the Backstop Agreements was a proper exercise of the Debtors' business judgment.  This included a detailed analysis of a data set of 28 comparable transactions, a data set essentially endorsed by all of the objectors, including Appellant, and ultimately accepted by the Bankruptcy Court.  *See* A000908; A002897, A002900.[14]

On February 10 and 11, 2022, the Court conducted a two-day evidentiary hearing on the Backstop Motion during which five witnesses—the Debtors' chief financial officer and the four experts (one of whom, the Debtors' financial advisor, testified as a fact and expert witness)—testified.  *See* A002161-A002503, A002504-A002833.  On March 15, 2022, the Bankruptcy Court issued an 85-page decision with extensive factual findings that rejected the arguments raised by Appellant and other objectors and provided a thorough analysis supporting its approval of the

---

[13]     Objections were filed by other parties who now support the Plan and the Backstop Agreements following further settlements that have benefited all general unsecured creditors, including Appellant.  *See* A008927-A008959; A010594-A010596; A005375-A008740; A010591-A010593; A004920-A005374; A024782-A025077; A025078-A025079.

[14]     Appellant's expert proposed cherry-picking the removal of a few comparable transactions from the data set, an approach rejected by the Bankruptcy Court.  *See* A022389-A022394; A002899.

Backstop Motion.  *See* A002834-A002918; A003166-A003408.  The Bankruptcy Court found, *inter alia*, that (1) the Backstop Parties were "providing necessary funding to the Debtors on terms that are fair and reasonable," (2) the parties "engaged in arm's-length negotiations," and (3) "the authorization of the Debtors to enter into and perform under the Backstop Agreements is integral to the Debtors' pursuit of the Plan."  *See* A002841, A002870.  The opinion highlighted how the Backstop Agreements will facilitate the Debtors' emergence from chapter 11 and that the "Backstop Parties . . . *are the only parties* that have proposed any reorganization transaction, plan and exit proposal . . . which enjoy the creditor and shareholder support necessary to confirm and implement an otherwise confirmable plan of reorganization that complies with applicable foreign law in the United States and the other jurisdictions where the Debtors operate, including Chile."  A002858 (emphasis added).[15]

## IV.   Events Subsequent to the Execution of the Backstop Agreements

One of the myriad reasons for the Debtors' entry into the Backstop Agreements was to ensure that there would be guaranteed purchasers of their Offerings in the face of uncertain economic times and volatile financial markets in

---

[15]   On March 25, 2022, Appellant filed a notice of appeal of the Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief, BR ECF No. 4732, and the Backstop Decision.  *See* A003849-A004187.  On May 10, 2022, the District Court dismissed the appeal as interlocutory.  *See* Opinion & Order, *In re LATAM Airlines Group S.A.*, No. 22-CV-2556-JMF (S.D.N.Y. May 10, 2022), ECF No. 49.

the airline sector and the market generally.  *See* A000902.  Pursuant to the Backstop

Agreements, the risks associated with these uncertainties are passed to the Backstop

Parties, who agreed to purchase all of the unsubscribed Offerings subject to limited

conditions.  As the Bankruptcy Court acknowledged, the Backstop Parties bear the

"risks of material changes to the Debtors' business outlook which could negatively

impact the price of the Debtors' stock."  *See* A002883.

As predicted, these risks have not turned out to be "mere abstractions," *see*

*id.*, but instead real events that have transpired to negatively impact financial markets

globally.  Events subsequent to execution of the Backstop Agreements have already

demonstrated the substantial value the Backstop Agreements provide to the Debtors:

despite increasingly volatile global financial markets, rising interest rates and

skyrocketing fuel prices, the threat of a global recession, the continued challenges

from COVID-19, and unstable geopolitical circumstances, the commitments

negotiated by the Debtors in the Backstop Agreements remain secure.

## V.    Confirmation of the Plan

Following approval of the Backstop Agreements, the approval of the Debtors'

disclosure statement and the solicitation of votes in support of the Plan, the Debtors

proceeded to seek confirmation of the Plan.  On May 2, 2022, Appellant filed an

objection to the confirmation of the Plan.  *See* A008741-A008926.  On May 13,

2022, the Debtors filed their memorandum of law in support of their Plan and reply

to Appellant's objection, among others. *See* A011550-A018647. Several creditor groups and major shareholders also filed statements in support of confirmation of the Plan. *See* A023621-A023622; A023623-A023632; A023633-A023640; A023641-A023662. While Banco Estado and the UCC originally filed objections to the Plan, they subsequently entered into settlements with the Debtors that resolved their objections (by, *inter alia*, providing for improved recoveries for general unsecured creditors, including Appellant) and ultimately supported confirmation of the Plan. *See* sources cited *supra* note 13. Overall, the Plan had overwhelming creditor support, including from parent creditors who are not Backstop Parties, with each impaired class voting to confirm the Plan. A019699. Specifically, holders of over $3.8 billion in claims ultimately voted to accept the Plan, representing 81.52% of the total dollar amount tabulated on the Plan. *See* A011569.

On May 17-20, 2022, the Bankruptcy Court held a three-day Plan confirmation hearing with testimony presented by five witnesses, including the Debtors' chief financial officer and their financial advisor. *See* A019016-A019299; A018913-A019015; A019016-A019299. On June 18, 2022, the Bankruptcy Court entered an order confirming the Plan and overruling the remaining objections to the Plan from Appellant and three other objecting parties (the "Confirmation Order"). *See* A019857-A020020. The Bankruptcy Court's various rulings as part of the

25

Confirmation Order included the finding that the Backstop Fees were reasonable within the context of the Plan.  *See* A019696.

## SUMMARY OF ARGUMENT

Appellant rests its appeal on challenging the Bankruptcy Court's factual findings that are not clearly in error and thus should not be reversed.  The Bankruptcy Court did not err in approving the Backstop Agreements, which it found to be reasonable under sections 503 and 1129(a)(4), and a reasonable exercise of the Debtors' business judgment under 363(b) based on a well-developed record.  The record amply supports the Bankruptcy Court's findings that the Backstop Fees are reasonable under the facts of this case, which include a significantly larger-than-average backstop size for a much longer-than-average commitment period (necessitated by Chilean law requirements for implementation of the Plan) for an international airline still recovering from a global pandemic and facing other financial and geopolitical challenges.  Appellant has offered no basis upon which this Court could conclude that the Bankruptcy Court erred (let alone clearly so) in rendering its factual findings of reasonableness under various sections of the Bankruptcy Code in light of these unique and significant considerations.

Appellant also has offered no basis upon which this Court can conclude that the Backstop Agreements violate the equal treatment requirements of section 1123(a)(4).  Under the plain terms of the Plan and the Backstop Agreements, the

Commitment Creditors receive the same treatment on account of their Class 5 claims as every other Class 5 unsecured creditor of LATAM Parent. As the Bankruptcy Court found, the Backstop Fees and the Direct Allocation of New Convertible Notes Class C are compensation for the Commitment Creditors' agreement to backstop over $3.669 billion in new capital that will enable the Debtors to successfully emerge from chapter 11. The finding that the Backstop Fees and the Direct Allocation are compensation for the backstop is a factual one, supported amply by the record. Finally, Appellant has also failed to demonstrate how the Bankruptcy Court erred in finding that the Backstop Agreements did not violate section 1129(a)(3)'s requirement that the Plan be proposed in good faith.

Accordingly, Appellant has failed to meet its heavy burden to show that these and other findings of the Bankruptcy Court are clearly erroneous, and thus the Bankruptcy Court's Backstop Decision and Memorandum Decision on Confirmation of the Joint Plan of Reorganization of LATAM Airlines Group, S.A. et al. Under Chapter 11 of the Bankruptcy Code (the "Confirmation Decision"), BR ECF No. 5752 must be affirmed.

## ARGUMENT

I.   **The Bankruptcy Court Did Not Err in Approving the Backstop Agreements Under Sections 503, 363(b), and 1129(a)(4)**

A.   **The Bankruptcy Court Did Not Err in Finding the Backstop Agreements Reasonable Using the "All-In Backstop Fee at Plan Value" Methodology**

To determine the Backstop Agreements' reasonableness, the Bankruptcy Court compared the Backstop Fees to 28 comparable transactions using two methodologies offered by the Debtors and the parties opposing the Backstop Motion: the Implied Discount and the All-In Backstop Fee at Plan Value methodologies. The Bankruptcy Court ultimately adopted the All-In Backstop Fee at Plan Value methodology in finding the Backstop Agreements to be reasonable.[16]

The Debtors' expert, Mr. Herlihy, presented the Implied Discount methodology, which compared the cost of backstops to debtors' estates by combining the impact of (i) the discount at which new money was being invested; (ii) any backstop fees being paid; and (iii) any direct allocation amounts provided to the backstop parties netted against the investment made in the rights offering to determine an "implied discount" to invest. A higher Implied Discount indicates better economics for backstop parties. *See* A000903-A000904.

---

[16]   The Appellant does not challenge application of the All-In Backstop Fee at Plan Value methodology to the Backstop Shareholders.

In conducting his Implied Discount analysis, Mr. Herlihy analyzed two scenarios reflecting a range of potential quantities of New Convertible Notes Class C that the Commitment Creditors are likely to subscribe to, ranging from approximately 86% (if the Commitment Creditors only receive their allocated portion of the New Convertible Notes Class C because the class is fully allocated to the eligible parties) to 100% of the Offering (if the Commitment Creditors are called on to acquire all New Convertible Notes Class C).  In the former scenario, the Backstop Agreements' Implied Discount would be 33.1%, between the 25th percentile and the mean Implied Discount for comparable transactions.  In the latter scenario, the Backstop Agreements' Implied Discount would be 31.6%, which again falls between the 25th percentile and the mean Implied Discount for comparable transactions.  *See* A000908.

Mr. Herlihy also compared the Backstop Agreements to the same 28 comparable transactions utilizing the All-In Backstop Fee at Plan Value methodology.  Several of the objecting parties endorsed this methodology and it was ultimately adopted by the Bankruptcy Court.  *See* A002917; *see also* A001918-A001919; A021808.[17]  This methodology measures the sum of the discounted shares in which a cash or equity fee is paid plus the value of the holdback, thereby

---

[17]    Appellant's expert, Mr. Scherer, offered the Bankruptcy Court no opinion on which methodology it should use to compare the Backstop Fees to comparable transactions, although his expert report utilized the All-In Backstop Fee at Plan Value methodology.  *See* A022392.

measuring the sum of the benefits provided exclusively to the backstop parties.  *See* A021399.

As Appellant's own expert, Mr. Scherer, agreed, the All-In Backstop Fee at Plan Value for the New Convertible Notes Class C is 23.8% (the 20% backstop fee as provided in the Commitment Creditors Backstop Agreement plus the 3.8% holdback value from the Direct Allocation).  *See* A022535-A022536.  The 3.8% figure represents the incremental value provided to the Commitment Creditors through the Direct Allocation rather than just to their pro rata share (approximately 70%) of the claims in the LATAM Parent General Unsecured Claims Pool (Class 5 treatment under the Plan).  *See* A022535-A022536.  When compared to the 28 comparable transactions, the 23.8% value is slightly above the 75th percentile, representing the sixth highest of the 28 comparable transactions analyzed.  *See* A000908.

In finding the Backstop Agreements reasonable under sections 503, the Bankruptcy Court acknowledged that the Backstop Fees at issue are "plainly among the highest fees on the chart."  *See* A002917.  However, the Bankruptcy Court's detailed analysis of the Backstop Agreements, the 28 comparable transactions, and the competing methodologies ultimately led it to conclude that the Backstop Fees were within the range of reasonableness using the All-In Backstop Fee at Plan Value methodology.  The Bankruptcy Court correctly noted that backstop fees on the

higher end of comparable transactions are justified because that the Commitment Creditors have agreed to backstop a uniquely risky offering of nearly $4 billion during one of the longest backstop periods on record (up to ten months) in a volatile industry against uncertainties caused by COVID-19 and surging fuel prices. *See* A002884, A002917. Even Appellant's own expert, Mr. Scherer, conceded that the duration of the backstop commitment increases its risk and therefore its cost. *See* A022410-A022411.

## B. The Bankruptcy Court Did Not Err in Approving the Backstop Agreements As Reasonable Under Section 503

Section 503(b)(1)(A) allows for the payment of certain administrative expenses if they are "actual, necessary costs and expenses of preserving the estate." *See* 11 U.S.C. § 503(b)(1)(A). While determinations of fact are reviewed on appeal for clear error and legal findings are reviewed *de novo*, determinations made under section 503 are reviewed with the additional gloss of whether the bankruptcy court abused its discretion. *See*, *e.g.*, *In re Fin. Oversight & Mgmt. Bd.,* 7 F.4th 31, 39 (1st Cir. 2021) ("We next review whether the . . . court abused its discretion in finding that the front-end transition services satisfied the requirements of § 503(b)(1)(A)."); *see also Trade Creditor Grp. v. L.J. Hooker Corp. (In re Hooker Invs., Inc.)*, 188 B.R. 117, 120 (S.D.N.Y.1995) (reviewing partial denial of administrative expense application "using an abuse of discretion standard, . . .

31

considering in the process whether [the bankruptcy court's] findings of fact are clearly erroneous"), *aff'd*, 104 F.3d 349 (2d Cir.1996).

When reviewing bankruptcy court decisions under section 503 for abuse of discretion, reviewing courts often find such inquiries to be fact-intensive. *See, e.g.*, *Bedford JV, LLC v. Sky Lofts, LLC*, No. 12-CV-5850 (DLI), 2013 WL 4735643, at *3 (E.D.N.Y. Sept. 3, 2013) ("Whether a party has made a 'substantial contribution' under Section 503 is considered a question of fact . . . ."); *see also Nichols v. Maxwell (In re Nichols)*, No. AZ-09-1325 PaDJu, 2010 Bankr. LEXIS 3168, at *9 (B.A.P. 9th Cir. Mar. 17, 2010) (extensively reviewing the evidentiary record and holding that the bankruptcy court did not abuse its discretion in denying an administrative claim that might have been allowable under § 503(b)(1)(A)).  This high standard for review on appeal is justified by "the bankruptcy judge's superior knowledge of the case."  *See In re Hooker Invs., Inc.*, 188 B.R. 117, 120 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 349 (2d Cir. 1996).

Here, after weighing the documentary, testimonial, and expert evidence following contested evidentiary hearings, the Bankruptcy Court approved the Backstop Fees as reasonable under section 503(b)(1)(A) when it approved the Backstop Agreements and again when it confirmed the Plan.  *See* A002918; *see* A019691-A019692.  The Bankruptcy Court found that higher-than-average fees were justified given that "[t]he Commitment Creditors have agreed to backstop

32

$3.669 billion of Plan Securities in a volatile industry (airlines)" "for a period that could reach ten months," and that "the Debtors require the financing to exit chapter 11," "demonstrated that they have sought out, but not located any other financing sources," and "engaged in arm's-length negotiations with the Commitment Creditors over the terms of the financing." A002917-A002918; *see also* A019695-A019696.

On this basis, the Bankruptcy Court held that "[u]nder the circumstances *of this case*, . . . the Backstop Payment is reasonable." A002918 (emphasis added). This finding was based on an extensive factual record and is thus subject to the clearly erroneous standard. *See, e.g.*, A000903; A000904; A000908. Appellant has not contested the Bankruptcy Court's findings that the Backstop Agreements provide one of the longest commitments on record, are structured in a way that is common to other chapter 11 backstop transactions, and are within the range of comparable transactions, or that the Debtors' businesses faces risks over the backstop period due to industry, market, and geopolitical volatility. Thus, there is no indication that the Bankruptcy Court erred or abused its discretion in finding the Backstop Fees reasonable here.

Appellant argues that the Bankruptcy Court "did not actually engage in the searching reasonableness analysis required by § 503." *See* Opening Brief at 43. This bald assertion is incorrect. Before issuing the Backstop Decision, the Bankruptcy Court conducted a two-day evidentiary hearing for which four financial experts

33

prepared reports and provided testimony.   The Bankruptcy Court's detailed Backstop Decision closely examined the precedent transactions analyzed by all experts, and the competing metrics for assessing the Backstop Fees offered by these experts.   *See* A002864-A002909.   Indeed, in assessing the reasonableness of the Backstop Fees, the Bankruptcy Court rejected one of the two methodologies proffered by Appellees, instead adopting the All-In Backstop Fee at Plan Value methodology endorsed by several of the objecting parties (and Appellees).   *See* A002905, A002917.[18]   Applying this metric, the Bankruptcy Court found that the Backstop Fees were within the *range* of reasonableness—they were the sixth highest and just slightly above the 75th percentile of the comparable transactions presented. *See* A002908- A002909.  Moreover, the Bankruptcy Court concluded that the unique circumstances of this case—such as, *inter alia*, the volatile airline industry, the uncertainty of a continuing pandemic, and the nearly unprecedented length of the backstop commitment—justified fees at the higher end of the range (but nonetheless still *within* the range of comparable transactions).  *See* A002917-A002918.  Thus, the Bankruptcy Court considered the reasonableness of the Backstop Fees at great length, contrary to Appellant's assertion.

---

[18]   Critically, Appellant never proposed that the Bankruptcy Court use a different methodology.

**C.    The Bankruptcy Court Appropriately Applied Sections 363(b) and 503(b)(1) In Reviewing the Backstop Fees**

Appellant argues that the Bankruptcy Court improperly applied "the § 363 standard in purporting to analyze reasonableness under § 1129(a)(4)" and § 503. *See* Opening Brief at 42-43. Per Appellant, it was "error" for the Bankruptcy Court's "analysis [regarding the reasonableness of the Backstop Fees under §§ 503 and 1129(a)(4) to have] borrowed largely from its prior ruling, in the Backstop Decision, approving the Backstop Fees under § 363(b)." *See* Opening Brief at 41.

First, the Bankruptcy Court did not commit legal error by referencing its analysis regarding the Backstop Fees from the Backstop Decision when ruling on Plan confirmation. In its objection to the Plan, Appellant "rais[ed] the same arguments" regarding the Backstop Fees as it did in its objection to the Backstop Motion. *See* A019696. The Bankruptcy Court had previously approved the Backstop Fees in the Backstop Decision and thus when faced with Appellant's identical objections in the context of Plan confirmation, logic dictated that it review and reiterate its analysis regarding the Backstop Fees in confirming the Plan. *See* A002909-A002918. Appellant does not allege that the Bankruptcy Court ignored any new arguments that Appellant made regarding the Backstop Fees because Appellant raised none. Accordingly, the Bankruptcy Court did not err in "borrowing largely from its prior ruling" when reviewing the Backstop Fees when confirming the Plan. *See* Opening Brief at 41.

Second, it was not legal error for the Bankruptcy Court to have ruled that "[i]n assessing whether the Debtors have demonstrated that the Plan complies with section 1129(a)(4), the Court will apply the same standards under section 363(b) that it applied in approving the Backstop Fees as reasonable." *See* A019696.  As discussed *infra*, courts have *not* interpreted section 1129(a)(4) as requiring a separate review for reasonableness under section 1129(a)(4) if the fees at issue have been found reasonable under another provision of the Bankruptcy Code.   *See, e.g.*, *In re WorldCom, Inc.*, No. 02-13533, 2003 Bankr. LEXIS 1401, at *159-60 (Bankr. S.D.N.Y. Oct. 31, 2003) (holding that because certain fees and professional expenses would be subject to a reasonableness review under sections 330 and 503(b), the requirements of section 1129(a)(4) were satisfied); *In re Ashley River Consulting, LLC*, Nos. 14-13406 (MG), 14-13407 (MG), 2015 Bankr. LEXIS 3819, at *46 (Bankr. S.D.N.Y. Nov. 6, 2015) ("Any payment made or to be made by the Trustee . . . has been approved or is subject to the approval of the Court as reasonable, satisfying § 1129(a)(4) of the Bankruptcy Code."); *In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 770 (Bankr. S.D.N.Y. 1992) (same); *accord In re Trenton Ridge Invs., LLC*, 461 B.R. 440, 473 (Bankr. S.D. Ohio 2011).

Finally, although Appellant argues that it was error for the Bankruptcy Court to "conclude that the fees were reasonable under § 503 based primarily on procedural considerations more appropriate to the § 363 business-judgment analysis," *see*

36

Opening Brief at 43, the Bankruptcy Court conducted a separate analysis regarding section 503 when issuing the Backstop Decision. *See* A002905-A002909, A002915-A002918.   Appellant did not raise arguments in its Plan confirmation objection regarding the Backstop Fees' compliance with section 503(b)(1), thus the Bankruptcy Court made no error in not conducting a section 503(b)(1) analysis in its Confirmation Decision.[19] *See* A008741-A008926.

### D.   The Bankruptcy Court Correctly Found that Section 1129(a)(4) Does Not Apply to the Backstop Agreements

Appellant's argument that the Backstop Agreements do not satisfy section 1129(a)(4) fails where it rests on Appellant's egregiously misleading assertion that "[t]he bankruptcy court correctly recognized that the Backstop Fees must comply with § 1129(a)(4)." *See* Opening Brief at 38.  In fact, the Bankruptcy Court did not find that section 1129(a)(4) applied to the Backstop Agreements, instead stating that "[t]he [Appellant] did not cite to a single case to support their argument that the Backstop Fees at issue should be analyzed for reasonableness under section 1129(a)(4)." *See* A019696; *see also* A002916-A002917.  In confirming the Plan, the Bankruptcy Court found "no basis for revisiting its findings and conclusions set forth in the Backstop Opinion" with regard to section 1129(a)(4).  *See* A019696.

---

[19]     Because Appellant did not raise this argument to the Bankruptcy Court in its objection to Plan confirmation, it should not be considered on appeal.

In the Opening Brief, which constitutes Appellant's third time litigating section 1129(a)(4)'s applicability to backstop payments, it again fails to cite any case law or statutory basis for reviewing the Backstop Agreements under section 1129(a)(4) or to explain why the Bankruptcy Court erred in finding section 1129(a)(4) inapplicable to the Backstop Agreements.[20]  Appellant attempts to avoid its heavy burden by asserting that "[j]udicial scrutiny is particularly warranted here, as the Backstop Fees 'are made from assets of the estate,'" and that "[p]ayments from the estate's assets implicate important principles animating the Bankruptcy Code."  Opening Brief at 40-41 (internal citations omitted).  But Appellant does not explain how or why these assertions merit overturning the Bankruptcy Court's decision with respect to section 1129(a)(4).

Appellant appears to misunderstand the function of section 1129(a)(4) within the Bankruptcy Code.   Rather than forming a basis for an independent reasonableness review of fees paid under a plan, section 1129(a)(4) has been construed as a procedural safeguard to ensure that all payments of fees that are made in connection with a plan are subject to court review and approval at least once.  *See*

---

[20]     Appellant cites to Judge Furman's dismissal of its appeal of the Backstop Decision, *In re LATAM Airlines Grp. S.A.*, 2022 WL 1471125 (S.D.N.Y. May 10, 2022), for the proposition that "§ 1129(a)(4) applies to the Backstop Agreement at confirmation."  *See* Opening Brief at 39.  However, Judge Furman held no such thing.  Instead, the district court was merely explaining that the issues raised by Appellant there were inextricably tied to confirmation issues as evidenced by the arguments they raised under Section 1129(a)(4), a statute primarily concerned with plan issues.  *See In re LATAM Airlines Grp. S.A.*, 2022 WL 1471125, at *7 (S.D.N.Y. May 10, 2022) ("In fact, Appellants' own arguments on the merits demonstrate that the issues addressed by the Backstop Order are part of, and not discrete from, the Chapter 11 Plan confirmation disputes. For instance, one of the primary arguments Appellants raised below in opposing the Backstop Motion relied on Section 1129(a)(4) of the Bankruptcy Code.").  The fact that Appellants *raised* certain arguments does not make them applicable.

*In re WorldCom, Inc.*, 2003 Bankr. LEXIS 1401, at *159-60 (holding that because certain fees and professional expenses would be subject to a reasonableness review under sections 330 and 503(b), the requirements of section 1129(a)(4) were satisfied).  As explained *supra* in Section I.C, courts have not interpreted section 1129(a)(4) as requiring a second, separate review for reasonableness under section 1129(a)(4) once the fees at issue have already been found reasonable under another provision of the Bankruptcy Code.  *See, e.g.*, *id.* at *160; *In re Ashley River Consulting*, 2015 Bankr. LEXIS 3819, at *46; *In re Drexel*, 138 B.R. at 770; *In re Trenton Ridge*, 461 B.R. at 473.  Section 1129(a)(4) only requires a factual finding by the Bankruptcy Court that the fees at issue are reasonable.  Because the Bankruptcy Court found the Backstop Fees to be reasonable under section 503, *see* A002918, it did not err in abstaining from conducting a separate reasonableness analysis under section 1129(a)(4).

### E.   The Bankruptcy Court Did Not Err in Finding that the Backstop Payments Are Commensurate With the Risks Assumed by the Backstop Parties

Challenging a quintessential factual finding by the Bankruptcy Court, Appellant disagrees with the Bankruptcy Court's balancing of the Backstop Fees against the amount of risk to which the Commitment Creditors are exposed through the Backstop Agreements.  *See* Opening Brief at 44-53.  Even were this Court to desire to substitute its own judgment for the Bankruptcy Court's based on a live

39

record, which it should not do, Appellant fails to offer any evidence to suggest that the Bankruptcy Court's factual findings are clearly in error. Indeed, Appellant refuses to acknowledge the background of unprecedented global and market uncertainty against which the Commitment Creditors agreed to commit $3.669 billion in funding, which is fundamental to any balancing of the risk. The Bankruptcy Court did not clearly err—to the contrary, it made a well-reasoned, supported decision—in concluding that the Backstop Fees are commensurate with the risks assumed by the Commitment Creditors under the Backstop Agreements and that the Backstop Agreements are therefore reasonable.

### 1. The Commitment Creditors Are Exposed to Downside Risk on the Entire $3.669 Billion Commitment

Appellant asks this Court to look at the Backstop Fees in a vacuum blinded to the conditions that gave rise to those fees. That is fatal to its analysis, even were these factual findings to be revisited by the Court.

Moreover, Appellant manipulates its presentation of the Backstop Fees in order to exaggerate their magnitude. Appellant does so by contending that because the Commitment Creditors have the right to receive (i) 50% of the New Convertible Notes Class C through the Direct Allocation, and (ii) an additional 72% of the remaining New Convertible Notes Class C (its pro rata share), "[t]hat leaves only 14% of the New Convertible Notes Class C that might go unsubscribed and trigger the Commitment Creditors' actual backstop." *See* Opening Brief at 46. This is

40

incorrect; as recognized by Appellant's own expert, Mr. Scherer, the Backstop Agreement obligates the Commitment Creditors to fund the *entire* New Convertible Notes Class C offering, not merely 14%. *See* A022415. As the Bankruptcy Court explained, while the Commitment Creditors "hold the right, not the obligation, to claim their contractual Direct Allocation and pro rata share of the New Convertible Notes Class C," "[a]s parties to the agreements, the Commitment Creditors are assuming the risk that they will be called upon to *purchase the entire $3.669 billion in securities that they have agreed to backstop*; not merely the new money that would be provided by other investors if the Commitment Creditors elected their Direct Allocation and pro rata share of the New Convertible Notes Class C." A002880-A002881 (emphasis added). Appellant offers no evidence to support their assertion that only 14% of the New Convertible Notes Class C are "actually at risk of being unsubscribed," Opening Brief at 46, and moreover cannot rebut the plain terms of the Backstop Agreements, which require the Commitment Creditors to reserve $3.669 billion to backstop all the New Convertible Notes Class C and $400 million of the ERO if necessary.

Not only does this argument reflect a fundamental miscomprehension—or misrepresentation—by Appellant of the total amount the Commitment Creditors have "at risk," but it was addressed in detail at the Backstop Motion's evidentiary hearing. Appellant's expert, Mr. Scherer, testified that "the proposed backstop

41

arrangements constitute nearly an 84% fee on the financial risk they are backstopping" and that "solely with respect to the Convert C [in reference to the New Convertible Notes Class C]," the fee would be over 136%. *See* A022546; A002678-A002680. As described in the Debtors' Omnibus Brief in Further Support of Their Motion for Entry of an Order (I) Authorizing and Approving the Debtors' (A) Entry Into and Performance Under Backstop Agreements and (B) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations, and (II) Granting Related Relief, BR ECF No. 4311, however, "[a] key problem with this calculation is that it is predicated on a definition of 'at-risk' as being solely the portion of the backstop commitment made available to other parties to subscribe." A001969. Mr. Scherer was ultimately forced to concede that his calculation is not the proper definition of "at-risk"; the Commitment Creditors are at risk to find the *entire* backstop commitment of $3.669 billion. *See* A022466-A022467. Finally, when asked how Appellant's so-called "at risk" percentage here compared to the 28 comparable transactions so as to allow the assessment of the reasonableness of the fees using this metric, Mr. Scherer was unable to offer any comparison. Mr. Scherer had no idea to whether 84% or 136% under Appellant's fabricated metric was reasonable or unreasonable compared to the other transactions in the data set and conceded that in comparable transactions where there was a 100% holdback, the "at risk" fee percentage under this metric would be "infinite." A022468-A022470.

42

## 2. The Limited Conditions Precedent Do Not Meaningfully Reduce The Commitment Creditors' Risk

Seeking to reverse its burden on this appeal to show that the Bankruptcy Court committed clear error, Appellant complains that "the bankruptcy court accepted that the Commitment Creditors face particularly acute risks because of the continued uncertainty caused by the pandemic and the extended period the commitments must remain in place. But the Debtors, despite bearing the burden, provided no concrete evidence to measure that risk." Opening Brief at 49-50 (internal quotation marks and citations omitted).

Appellant's sole argument in support of its position is that "the plain terms of the agreement insulate the Commitment Creditors from any real pandemic-related risk" because "[i]f a variant is designated in [the 45-day] period [prior to closing], the Backstop Agreement suspends the closing date for forty-five days until certain conditions are met." Opening Brief at 50. Appellant misconstrues this provision's "protections." First, the provision suspending the closing date unambiguously only applies if there is a *new* "variant of concern" or "variant of high consequence" formally designated by the World Health Organization or the U.S. Center for Disease Control in the 45 days preceding the closing date. Thus the continuing effects of Omicron—or any of its sub-variants—provide no basis for the Commitment Creditors to escape their obligations. Moreover, even were there to be a *new* variant

of concern first designated during this period, if the Debtors are able to meet the conditions precedent to closing after 45 days, the Commitment Creditors must close.

Most critically, notwithstanding Appellant's arguments, Appellant's expert conceded at the hearing that he performed *no analysis* of these conditions precedent and whether they provide *any* material protection to the Commitment Creditors to enable them to evade closing.  *See* A022483-A022484.  Moreover, while Appellant focuses on the provision relating to new COVID-19 variants (which is not a condition precedent in the first place), it completely ignores that the Commitment Creditors must close notwithstanding a downturn in general economic conditions, soaring fuel prices, or other market developments; in contrast, since no other creditors have to decide at this time whether they wish to invest, only the Commitment Creditors are on the hook for any of the Debtors' post-emergence financing under virtually any circumstances.  The Bankruptcy Court considered all of this in finding that "the Direct Allocation Amount and the Backstop Fees are appropriate given the risks assumed by the Commitment Creditors, including the risks of material changes to the Debtors' business outlook which could negatively impact the price of the Debtors' stock such as the Omicron variant and volatile fuel prices."  *See* A019691-A019692; *see also* A002883-A002884.  Subsequent world events have only further proven the prescience of that finding.

Nor do the two limited conditions precedent in the Commitment Creditors Backstop Agreement that Appellant highlights mitigate these substantial risks to the Commitment Creditors.[21]  Appellant's argument that "[t]he bankruptcy court . . . found 'that there is a significant likelihood that' the Debtors 'will be able to meet the conditions precedent,' which . . . ensure that the Debtors' business is operating smoothly," and that "the court then ignored the salience of the Debtors' strong financial condition in its risk analysis" is disingenuous for two reasons.  Opening Brief at 51 (internal citations omitted).

First, in opposing the Backstop Motion, Appellant's own financial expert admitted that he had not "done any evaluation of the likelihood that any of [the condition precedents identified in his report] would be triggered."  A022483-A022484.  When asked about the conditions individually and whether he knew whether it "will significantly mitigate the backstop parties' risk," Mr. Scherer responded: "I have not done that analysis."  A022484-A022485.  There is thus no evidentiary support whatsoever for Appellant's claim that the Commitment Creditors are not shouldering any risk in agreeing to reserve $3.669 billion for up to ten months due to the presence of these conditions precedent.

---

[21]    The Forward Net Bookings Condition requires that, as of the date that is 5 Business Days prior to the Closing Date, the Forward Net Bookings, defined as the number of passenger tickets that were booked, as of such date, for the forward 30 days (i.e. the 30 day period following such date) must exceed the Net Booking Threshold for the same date in 2019.  *See* A023766.  The Minimum Liquidity Condition requires that the Debtors meet a minimum threshold of cash and cash equivalents at the time of closing. *See* A023766.

Second, Appellant has previously argued that the conditions precedent mitigated risk to the Commitment Creditors because there was a significant risk that the conditions would *not* be met, therefore allowing the Commitment Creditors to walk away from the transaction without providing the negotiated funding at all. The Bankruptcy Court instead found: "the Debtors have demonstrated that there is a significant likelihood that they will be able to meet the conditions precedent necessary *to hold the Commitment Creditors to the funding requirements under the agreement*." A002878. In other words, the fact that the Debtors are well-positioned to meet the conditions precedent, as Appellant highlights, actually increases rather than mitigates the risk to the Commitment Creditors, as it ensures that they will be held to the entire $3.669 billion funding commitment, despite the plethora of other market instabilities not captured in these limited conditions precedent, such as fuel price volatility.

The ongoing COVID-19 pandemic, global financial and geopolitical instability, as well as Appellant's own appeal, are some of many factors that have made the Debtors' emergence from chapter 11 particularly challenging. Appellant has failed to offer any compelling reason why the Bankruptcy Court erred in finding that "the Commitment Creditors are subject to meaningful risk on the entire portion of the rights offerings they are backstopping," A002884, including "the Omicron variant and volatile fuel prices." A019692.

46

### F.      The Bankruptcy Court Properly Found that the Ducera Proposal Was Not A Viable Alternative to the Backstop Agreements

Finally, Appellant argues that the Backstop Agreements were unreasonable because the Ducera proposal was "financially superior—proving that the Debtors could have obtained better terms to backstop the same risk." Opening Brief at 53. Appellant ignores the indisputable deficiencies in the Ducera Proposal demonstrated at the hearing.   Appellant cannot brush away the Debtors' testimony on these deficiencies or the Bankruptcy Court's findings in this regard merely by saying that the Bankruptcy Court's well-supported factual findings constituted a dismissal of the proposal "out of hand" or derisively characterizing them as "a laundry list of reasons." *Id.*  The Bankruptcy Court did not clearly err in finding that the eleventh-hour Ducera Proposal made by Appellant in the midst of litigation, many months after the Debtors' exhaustive capital-raising process began and $1.8 billion short of the necessary funding and offered as a non-binding commitment, was not a superior alternative to the Backstop Agreements—binding commitments that resulted from hard-fought, arms-length, months-long negotiations that included a mediation overseen by Judge Gropper.  Appellees refer the Court to their discussion of the Ducera Proposal and its deficiencies discussed *supra* Statement of the Case, Section II.C.1.

## II.   The Plan Does Not Violate 1123(a)(4)'s Equal Treatment Requirements

The Bankruptcy Court did not clearly err in making its factual determination that the Plan and the Backstop Agreements met the requirements of section 1123(a)(4) because all creditors "have the same opportunity for recovery, are being treated equally, and that the Backstop Fees and Direct Allocation are distributed to the Backstop Parties in consideration for their willingness to backstop the New Convertible Notes Class C and the ERO Rights Offering, *not* on account of their General Unsecured Class 5 Claims."   *See* A019689 (emphasis added); *see also* A023736-A023737;  A023083-A023084,  A023139;  A025140.   This finding is contrary to Appellant's oft-repeated mischaracterization of the Backstop Agreements and the ultimate conclusion of the Bankruptcy Court.   Indeed, this mischaracterization of the Bankruptcy Court's conclusion that the Backstop Fees were "*on account of their" general unsecured claims* is so fundamental to Appellant's arguments that the Bankruptcy Court's holding is misstated in Appellant's very first issue presented:   ". . . even though the agreement and plan provide a select group of *pari passu* creditors with preferential treatment that cannot be justified as compensation for their agreement to backstop certain securities . . . ."   Opening Brief at 4-5.

Section 1123(a)(4) of the Bankruptcy Code requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a

particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). "Section 1123(a)(4) does not require precise equality, only approximate equality." *In re Quigley Co.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007).

As the Bankruptcy Court correctly recognized, section 1123(a)(4) "requires equality of treatment, among creditors in the same class, not equality of result," and "is satisfied if claimants in the same class have the same opportunity for recovery." A019688; *see also In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("[C]ourts have interpreted the 'same treatment' requirement [of section 1123(a)(4)] to mean that all claimants in a class must have 'the same opportunity' for recovery."); *Ad Hoc Comm. of Pers. Inj. Asbestos Claimants v. Dana Corp. (In re Dana Corp),* 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."). Importantly, "[t]he requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims or interests* in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 250-51 (Bankr. S.D.N.Y. 2007); *see also In re CHC Grp., Ltd.*, Case No. 16-31854 (BJH), 2017 WL 11093971, at *12 (Bankr. N.D. Tex. Mar. 3, 2017) (finding that put option premium

payable to plan sponsors as consideration for commitment to backstop rights offering was not a distribution on account of plan sponsors' claims); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (finding that backstop fee proposed to be paid to backstop parties was not a distribution to the parties on account of their claims); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992) ("The objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons. Only the former is governed by § 1123(a)(4)."). Were the law otherwise, backstop parties and other creditors who contribute value in the plan process could never receive compensation for that contribution.

Appellant bases its arguments that the Bankruptcy Court erred in its review of the Backstop Agreements under section 1123(a)(4) on the notion that the Backstop Fees and Direct Allocation are being delivered to the Commitment Creditors on account of their claims. *See* Opening Brief at 27-38. But they unquestionably are not, as the Bankruptcy Court found as a matter of fact: "the Backstop Fees and Direct Allocation are distributed to the Backstop Parties in consideration for their willingness to backstop the New Convertible Notes Class C and the ERO Rights Offering, *not on account of their General Unsecured Class 5 Claims*." A019689 (emphasis added). Moreover, the Bankruptcy Court correctly found that because the Backstop Fees and Direct Allocation are compensation for the Backstop

Agreements, "[t]he treatment that the Commitment Creditors are receiving in their capacity as Holders of Allowed General Unsecured Class 5 Claims of LATAM Parent *is the same* as the Non-Commitment Creditors in Class 5."   A019689 (emphasis added).   Appellant does not offer any reason why the Bankruptcy Court erred in making these findings, and thus it necessarily resorts to mischaracterizing them.

### A.   The Direct Allocation of New Convertible Notes Class C Is Compensation, Not a Claim Recovery

Appellant argues that the Plan violates section 1123(a)(4) because "the Commitment Creditors are assured of the opportunity to subscribe to 86% of all New Convertible Notes Class C—almost 15% more than their pro rata share of all Class 5 Claims (72%)."   Opening Brief at 28.   It further argues that "Commitment Creditors are set to recover a far greater percentage of their allowed claims compared to non-Commitment Creditors," which it supports with the claim that, "including the Direct Allocation and Backstop Fees, the Commitment Creditors will receive approximately 63 cents for every dollar of allowed Class 5 claims.   And even excluding the Backstop Fees, the Commitment Creditors have the opportunity to receive 43 cents for every dollar of allowed Class 5 claims through the direct allocation of Class C Notes."   *Id.* at 30.

Both arguments rely on a mischaracterization of the Direct Allocation.   Under the plain terms of the Plan and the Backstop Agreements, the Commitment Creditors

receive the right to subscribe to 50% of the New Convertible Notes Class C through the Direct Allocation *as compensation for backstopping the entirety of the New Convertible Notes Class C.  See* A019690; *see also* A023729-A023731, A023735-A023736, A023740, A023767-A023769; A023083-A023084, A023139; A025140; A024636, A024683, A024762.  Direct allocations to backstopping parties are a common feature in backstop agreements.  A021397; A002860; A000903; *see also In re Peabody Energy Corp.*, 933 F.3d 918, 927 (8th Cir. 2019) (affirming confirmation of a plan where the opportunity to invest in preferred equity was afforded to only backstopping parties, and explaining that "[t]he right to participate in the [p]rivate [p]lacement was consideration for valuable new commitments," and "was not 'treatment for' a claim").

The remaining 50% of the New Convertible Notes Class C will be allocated to all General Unsecured Class 5 Creditors, including the Commitment Creditors, who may elect to receive the New Convertible Notes Class C purely on a pro rata basis according to the total number of claims held.  Because the Commitment Creditors hold 72% of all General Unsecured Class 5 claims, they will be able to receive up to 72%—their precise *pari passu* share, no more and no less—of the non-allocated New Convertible Notes Class C on account of a combination of the settlement of their claims and a new money contribution.  *See* A023699 ("[P]ursuant to the terms of this Agreement, the Company will offer the Backstop Parties New

Convertible Notes Class C (as defined herein) in an aggregate principal amount equal to the Direct Allocation Amount."); A023736-A023738 (describing payment of backstop fees).  Thus, because the Commitment Creditors may only receive this portion of the New Convertible Notes Class C up to their pro rata share, they are receiving the same treatment and opportunity for recovery as all of the other General Unsecured Class 5 creditors.  *See* A019689-A019690; *see also* A024689- A024692; A002850-A002851; A023146-A023148, A023154-A023155.

However, unlike the other General Unsecured Class 5 Creditors, the Commitment Creditors also have the *obligation* to subscribe to and purchase any and all New Convertible Notes Class C that go unsubscribed, either from the Direct Allocation or the non-allocated portion.  This is an obligation to purchase up to $3.269 billion worth of New Convertible Notes Class C depending on how many other unsecured creditors elect to receive them.  It is this substantial financial obligation that gives rise to the compensation offered to the Commitment Creditors in the form of the Backstop Fees and the right to access the Direct Allocation.  In his deposition testimony, Appellant's own financial expert, Mr. Scherer, was unable to refute or quantify the economic risks that the Commitment Creditors face because of this obligation, *see* A022467, A022483, even going so far as to say that he could not predict whether the Commitment Creditors were entering into a "bad investment."  A022486-A022487.  As the Bankruptcy Court correctly noted, "[t]he

Commitment Creditors' *obligation* to purchase unsubscribed Class C Notes does not provide them with something of value unavailable to the Non-Commitment Creditors." A019691 (emphasis added). Indeed, were Appellant's argument accepted—that a direct allocation of securities to a backstopping party provides them with unequal treatment in violation of section 1123(a)(4)—existing creditors could never receive direct allocations, a common feature in backstop agreements. Not only are the Debtors unaware of any court that has ever adopted that argument, but ultimately it would not benefit parties like Appellant in any event because the economic value paid to backstop parties through a direct allocation at a discount would instead be paid in cash, which Appellant does not contend runs afoul of section 1123(a)(4).

Once again, Appellant has failed to meet its burden of establishing that the Bankruptcy Court's factual determination that the Direct Allocation is compensation for the Backstop Agreements (and not on account of the Commitment Creditors' status as Class 5 General Unsecured Creditors) was clearly in error. Without a showing that the Bankruptcy Court clearly erred in making this determination, Appellant's equal treatment arguments cannot succeed.

**B.    The Bankruptcy Court Did Not Err in Finding that the Mechanism by Which the Commitment Creditors Access the Direct Allocation Does Not Implicate 1123(a)(4)**

The fact that the Commitment Creditors must discharge a portion of their claims to access the Direct Allocation "does not implicate section 1123(a)(4) of the Bankruptcy Code" because "[i]t is the mechanism through which Class C Notes are obtained." A019691; *see also* A024689-A024692. Under the terms of the Plan, New Convertible Notes Class C can only be accessed through a process that involves both the settlement of claims and a contribution of new money. This claims-settlement process governs the subscription of all New Convertible Notes Class C, whether the New Convertible Notes Class C are part of the Direct Allocation or not. *See* A024689-A024692.

As compensation for backstopping the New Convertible Notes Class C and $400 million of the ERO, the Commitment Creditors are receiving the exclusive right to access the Direct Allocation. If the Commitment Creditors choose to exercise these rights, they will receive the same recovery for any claims settled through the Direct Allocation as the rest of the General Unsecured Creditors will receive for the settlement of their claims. Therefore, the Commitment Creditors are not receiving different treatment for their claims, and the Direct Allocation does not violate section 1123(a)(4). A019689-A019691.

### III.  The Bankruptcy Court Did Not Err in Finding that the Debtors Proposed the Plan in Good Faith in Accordance with the Requirements of Section 1129(a)(3)

Section 1129(a)(3) of the Bankruptcy Code requires that a "plan be proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3). Appellant argues that "the Debtors bought confirmation votes from the Commitment Creditors in exchange for preferential treatment," and thus the Bankruptcy Court "erred when it found the Plan was proposed in good faith" pursuant to section 1129(a)(3).  *See* Opening Brief at 54.

Appellant's severe allegation that Appellees "bought confirmation votes," *see id.*, is a false factual allegation that Appellant was unable to prove to the Bankruptcy Court.  *See* A019696-A019697.  Moreover, as explained *supra*, Appellant's assertions with respect to preferential treatment are wrong.  Finally, whether a plan complies with section 1129(a)(3)'s good faith requirement is a question of fact, to be reviewed under the "clearly erroneous" standard.  *See In re Bd. of Dirs. of Telecom Arg., S.A.*, 528 F.3d 162, 174 (2d Cir. 2008) (holding that "[a] 'finding of good faith [under section 1129(a)(3)] will not be overturned unless the opponent of the plan can show that the finding was clearly erroneous'" (quoting *In re Koelbl*, 751 F.2d 137, 139 (2d Cir. 1984))).  Appellant has provided no basis to disturb the findings the Bankruptcy Court made in this regard based on the evidence before it. *See* A019696-A019698.  Thus, this finding must be affirmed.

56

## **CONCLUSION**

For the reasons set forth above, Appellees respectfully request that the District

Court affirm the Bankruptcy Court's Backstop Decision and Confirmation Decision.


 Dated: July 29, 2022
        New York, New York

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: */s/ Lisa M. Schweitzer*

Jeffrey A. Rosenthal
Lisa M. Schweitzer
David H. Herrington
Abena A. Mainoo
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for Appellees LATAM Airlines Group S.A.,
et al.*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), because it contains 12,411 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:      New York, New York
            July 29, 2022

                                        By:     */s/ Lisa M. Schweitzer*
                                                Lisa M. Schweitzer