```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------- X
                                       :
 In Re: LATAM AIRLINES GROUP, S.A.,    :
                                       :
                            Debtor.    :      22cv5660 (DLC)
-------------------------------------- :
                                       :    OPINION AND ORDER
 AD HOC GROUP OF UNSECURED CLAIMANTS,  :
 et al.,                               :
                                       :
                          Appellants,  :
                                       :
                 -v-                   :
                                       :
 LATAM AIRLINES GROUP S.A.,            :
                                       :
                          Appellee.    :
-------------------------------------- X
```

APPEARANCES:

For the appellants:
Jeffrey Fuisz
Madelyn Nicolini
Robert Thomas Francisovich
Arnold & Porter Kaye Scholer LLP (NYC)
250 West 55th Street
New York, NY 10019

Michael Messersmith
Sarah Michelle Gryll
Arnold & Porter Kaye Scholer LLP (Chicago)
70 West Madison Street
Suite 4200
Chicago, IL 60602

William C. Perdue
Arnold & Porter Kaye Scholer LLP (DC)
601 Massachusetts Avenue NW
Washington, DC 20001

Benjamin G. Barokh
Seth Goldman
Munger, Tolles & Olson LLP
350 S. Grand Ave.

```
50th Floor
Los Angeles, CA 90071

Donald B. Verrilli, Jr.
Joshua Day
Ginger Dawn Anders
Munger, Tolles & Olson LLP
601 Massachusetts Avenue NW
Suite 500e
Washington, DC 20001

For the appellee:
Avena Ayowa Mainoo
David H. Herrington
Jeffrey A. Rosenthal
Lisa Maria Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006

Albert Togut
Bryan Kotliar
Kyle James Oritz
Togut, Segal & Segal LLP
One Penn Plaza
New York, NY 10119

For Parent Ad Hoc Claimant Group:
Rachel Lynn Ringer
David Ellis Blabey, Jr.
Kramer, Levin, Naftalis & Frankel, LLP
1177 Avenue of the Americas
New York, NY 10036

For Delta Air Lines, Inc.:
Lara Samet Buchwald
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017

For Ad Hoc Group of LATAM Bondholders:
John K. Cunningham
Richard Kebrdle
Varoon Sachdev
```

2

White & Case LLP
200 South Biscayne Blvd.
Suite 4900
Miami, FL 33131

Gregory M. Starner
Joshua Douglas Weedman
Kathryn Sutherland-Smith
White & Case LLP (NY)
1221 Avenue of the Americas
New York, NY 10020

For Official Committee of Unsecured Creditors:
Allan S. Brilliant
David A. Herman
Dechert LLP (NYC)
1095 Avenue of the Americas
New York, NY 10036

G. Eric Brunstad, Jr.
Dechert LLP (CT)
90 State House Square
Hartford, CT 06103

Craig Perry Druehl
Goodwin Procter, LLP
620 Eighth Avenue
New York, NY 10018

For Costa Verde Aeronautica S.A. and Lozuy S.A.:
Angela Kay Herring
Richard G. Mason
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019

For Qatar Airways Investments (UK) Ltd.:
Gerard S. Catalanello
James J. Vincequerra
Alston & Bird, LLP
90 Park Avenue
New York, NY 10016

DENISE COTE, District Judge:

The Ad Hoc Group of Unsecured Claimants ("GUC")[1] has appealed rulings by the Honorable James L. Garrity, Jr., U.S. Bankruptcy Judge, confirming the bankruptcy plan and approving backstop agreements between LATAM Airlines Group S.A. ("LATAM") and its affiliates (together, the "Debtors"), and certain shareholders and creditors.  LATAM opposes the appeal, as do intervenors Parent Ad Hoc Claimant Group, Delta Air Lines, Inc., Ad Hoc Group of LATAM Bondholders, Banco del Estado de Chile, Official Committee of Unsecured Creditors Costa Verde Aeronautica S.A., Lozuy S.A., and Qatar Airways Investments (UK) Ltd.  For the following reasons, the appeal is denied, and the Bankruptcy Court is affirmed.

## Background

LATAM is a publicly traded company incorporated in Chile, and the largest passenger airline in South America.  In 2020, LATAM filed for bankruptcy under chapter 11 of the U.S. Bankruptcy Code.  By the spring of 2021, the Debtors began seeking financing for their emergence from bankruptcy.  The

---

[1] The GUC is comprised of Avenue Capital Management II, L.P., Corre Partners Management, LLC, CQS (US), LLC, HSBC Bank Plc., Invictus Global Management LLC, Livello Capital Management LP, and Pentwater Capital Management LP.  Each of these entities, except for HSBC Bank Plc., is also an appellant.

Debtors contacted 45 investment funds or other entities,
receiving 60 different offers.  To emerge from bankruptcy, any
plan would need to comply with both U.S. and Chilean law.  Under
Chilean law, existing shareholders have preemptive rights on the
offerings at issue here.

In November 2021, LATAM and various other parties entered
into mediation with Allan L. Gropper, a former bankruptcy judge
for the Southern District of New York.  Through mediation, LATAM
reached an agreement with a group of creditors controlling more
than 70% of the amount of general unsecured claims asserted
against LATAM, as well as shareholders (the "RSA Shareholders")
owning a majority of LATAM's stock.[2]  This agreement was
memorialized in a Restructuring Support Agreement ("RSA"), two
Backstop Agreements, and a proposed reorganization plan (the
"Plan") to be approved by the Bankruptcy Court.  The Plan and
the Backstop Agreements call for the Debtors to raise over $8
billion in new money, both to fund distributions under the Plan
and to finance the Debtors' post-bankruptcy operations.  Funds
would be raised largely through an equity rights offering
("ERO") and a convertible notes offering.  The Backstop

---

[2] The RSA Shareholders include Andes Aerea SpA, Inversiones Pia
SpA, Comercial Las Vertientes, Costa Verde Aeronautica S.A.,
Delta Air Lines, Inc., and Qatar Airways Investments (UK) Ltd.

Agreements secure $5.4 billion of the $8 billion in new money investments.

Under the Plan, creditors with unsecured claims against LATAM are classified in Class 5. Class 5 consists of three subclasses -- Class 5a, Class 5b, and Class 5c -- the first two of which are relevant here. By default, unsecured creditors are placed into Class 5a. In exchange for their unsecured claims, Class 5a creditors receive a cash allocation and New Convertible Notes Class A ("Class A Notes"). Class 5a creditors need not contribute any new money. Unsecured creditors may opt into Class 5b, however, by contributing new money. In exchange, Class 5b creditors receive a cash allocation as well as New Convertible Notes Class C ("Class C Notes"), which convert to equity at a higher ratio than Class A Notes.[3] Existing shareholders have preemptive rights to purchase these notes, and the amount of Class C Notes available to creditors is subject to the shareholders' exercise of their preemptive rights.

---

[3] Certain unsecured creditors may opt into Class 5c, which allows creditors to exchange their claims for New Local Notes equal to 52% of the face amount of their unsecured claims. The parties to the Backstop Agreements are generally ineligible to elect Class 5c treatment.

I.   Backstop Agreements

The Plan, RSA, and two Backstop Agreements govern the allocation of the Debtors' convertible notes and equity offerings between different classes of shareholders and creditors.  A backstop agreement is an agreement to provide funding for (or "backstop") a securities offering if the securities are not purchased by other parties.  In exchange for this commitment, a backstopping party may receive money, an exclusive option to purchase the securities, or other consideration.

One of the Backstop Agreements (the "Backstop Agreement") provides that creditors party to the agreement (the "Commitment Creditors") must purchase any unsubscribed Class C Notes up to a value of approximately $6.8 billion -- that is, the total value of the Class C Notes offering -- and must backstop up to $400 million of New ERO Common Stock.  The Commitment Creditors are to purchase the $6.8 billion in Class C Notes with approximately $3.3 billion in cash and the discharge of the Commitment Creditors' unsecured claims.  In the other Backstop Agreement, the RSA Shareholders agree to backstop up to $1.4 billion in unsubscribed New Convertible Notes Class B ("Class B Notes"), and up to $400 million in unsubscribed ERO New Common Stock.

In exchange for their backstop commitment, the Backstop
Agreement provides the Commitment Creditors with guaranteed
access to a portion of the Class C Notes.  The Backstop
Agreement grants the Commitment Creditors the exclusive right to
purchase up to 50% of the Class C Notes (the "Direct
Allocation") in exchange for the discharge of 50% of the amount
of their unsecured claims as well as their contribution of
approximately $1.6 billion in new money.  Additionally, the
Commitment Creditors are automatically placed into Class 5b,
pursuant to which they may purchase Class C Notes with a pro-
rata share of their unsecured claims, along with a new money
commitment of approximately $1.15 billion.  The effect of these
provisions is to give the Commitment Creditors the ability to
purchase a disproportionately greater share of Class C Notes
relative to their unsecured claims than other Class 5 creditors
can access.

In addition to the Direct Allocation, the Backstop
Agreement provides the Commitment Creditors with a $734 million
payment (the "Backstop Fee"), which is equal to 20% of the
approximately $3.7 billion in funding the Commitment Creditors
agreed to backstop.  The Backstop Agreement also contains an
indemnification provision for damages imposed by the Chilean

government, and provides the Commitment Creditors with up to $3 million in reimbursement for reasonable and documented fees and expenses incurred in connection with the bankruptcy proceedings.

The Commitment Creditors' backstop commitment comes with certain conditions precedent.  For example, if LATAM's liquidity falls below a certain level, or if the short-term outlook for LATAM's passenger business falls below a certain margin just before the intended closing date of the backstop commitment, then the backstop commitment does not take effect.  If these conditions are not satisfied by September 30, 2022, then the Backstop Agreement is subject to termination by either the Debtors or the Commitment Creditors.  Closing may be delayed by up to 45 days, however, if the Centers for Disease Control or World Health Organization designates a new SARS-CoV-2 variant of concern or variant of high consequence within 45 days of closing.  Ultimately, if the Backstop Agreement does not close by September 30, the Debtors must pay a termination payment of approximately $73 million if the agreement is terminated before the Plan is confirmed, and approximately $100 million if it is terminated after the Plan is confirmed.

II.  Bankruptcy Court Proceedings

        1.   The Backstop Opinion

    On March 15, 2022, Judge Garrity issued an 85-page opinion
approving the Backstop Agreements (the "Backstop Opinion").  In
re LATAM Airlines Group S.A., 20BK11254, 2022 WL 790414 (Bankr.
S.D.N.Y. Mar. 15, 2022).  Several parties (the "Objectors") had
objected to the Backstop Agreements, arguing that they provided
the Commitment Creditors with payments significantly above the
market rate.  Id. at *2.  After a two-day evidentiary hearing at
which five witnesses testified, the Bankruptcy Court found that
the Backstop Agreements provided "necessary funding to the
Debtors on terms that are fair and reasonable," and that the
Backstop Agreements were "integral to the Debtors' pursuit of
the Plan."  Id. at *3.

    The Bankruptcy Court first addressed the Objectors'
contention that the Backstop Agreements were not negotiated in
good faith.  Id. at *13.  The Bankruptcy Court found that the
negotiations were "adequate and appropriate," finding that the
Debtors conducted arms-length negotiations with the Commitment
Creditors and had not "pre-determined" to partner with the
Commitment Creditors.  Id. at *14, *16.  The Bankruptcy Court
acknowledged that the Debtors primarily negotiated with certain

existing stakeholders, but emphasized that the Plan and the Backstop Agreements were the product of an extensive mediation process focused in part on obtaining shareholder assent to certain aspects of the Plan, as required by Chilean law.  <u>Id.</u> at *14.

The Objectors also argued that it was unreasonable for the Debtors to reject an alternative financing proposal (the "Ducera Proposal"), which offered some more favorable terms to the Debtors.  <u>Id.</u> at *15.  The Bankruptcy Court found that the proposal was appropriately rejected, however, because it provided insufficient capital, contained expansive due diligence conditions, did not secure a path to confirmation, did not state the amount of funding that each party would provide, and was offered in an unsigned letter without any binding commitments.  <u>Id.</u>

The Bankruptcy Court next considered the reasonableness of the $734 million Backstop Fee.  <u>Id.</u> at *16.  The Objectors argued that the fee was disproportionate to the Commitment Creditors' risk, because the new money required to purchase all Class C Notes not allocated to the Commitment Creditors totaled only $478 million.  <u>Id.</u> at *19.  But the Bankruptcy Court rejected this argument.  <u>Id.</u> at *19–20.  The Bankruptcy Court

explained that the Commitment Creditors did not have the obligation to purchase all Class C Notes allocated to them in the Direct Allocation (unless required to backstop them), and that they therefore might opt not to. Id. at *20. The Bankruptcy Court pointed out as well that other Class 5 creditors did not need to opt into Class 5b themselves, and that the Class C Notes might therefore be undersubscribed. Id. at *20. In that situation, the Commitment Creditors' backstop commitment would then require them to purchase Class C Notes they might not otherwise have wanted. Id. The Bankruptcy Court therefore found that it was appropriate to consider the entirety of the backstop commitment when determining the Backstop Fee's reasonableness. Id.

The Objectors argued that any risk imposed by the backstop commitment was nevertheless minimal, because the Backstop Agreements' conditions precedent gave the Commitment Creditors an out if the Debtors were underperforming, or if a new COVID variant threatened to disrupt the market. Id. at *16-18. But the Bankruptcy Court found that the Debtors were likely to satisfy these conditions, and that the Objectors had presented no evidence to support their assessment of the Debtors' business risks. Id. at *18. Accordingly, the Bankruptcy Court

12

determined that the backstop commitment would take effect, and
the Commitment Creditors would be exposed to a risk of loss.
Id. at *19.  The Bankruptcy Court also considered the Backstop
Agreements' termination payment, expense reimbursement, and
indemnification provisions, finding that they were reasonable
and comparable to provisions in other similar plans.  Id. at
*21-23, *25.

   The Bankruptcy Court then performed a comparative analysis
of the Backstop Agreement in order to determine the
reasonableness of the Backstop Fee, employing a data set of 28
comparable backstop arrangements from 26 other Chapter 11 cases.[4]
The Bankruptcy Court considered two different methodologies to
evaluate the Backstop Agreement: the Implied Discount
Methodology, which was designed to measure the total discount on
new money investments that the Commitment Creditors would
receive, id. at *27; and the All-In Backstop Fee at Plan Value,
which measures the "sum of the benefits to a backstop party."
Id. at *29.  Under the Implied Discount Methodology, the
Backstop Agreements fell within the 20th to 47th percentiles

---

[4] The 28 comparators included equity backstop agreements for
amounts of at least $200 million over the five-year period since
February 10, 2017, and arrangements of more than $50 million to
have been executed since the beginning of the pandemic.  Id. at
*26.

when compared with similar plans, depending on how much of the new money offering the Commitment Creditors would need to backstop.  Id. at *28.  Under the All-In Backstop Fee at Plan Value methodology, the Backstop Agreements fell just above the 75th percentile, providing more benefits to the Commitment Creditors than all but five of the 28 comparable plans.  Id. at *29.

The Bankruptcy Court then addressed the lawfulness of the Backstop Agreements under the Bankruptcy Code.  The Bankruptcy Court found that the agreements were reasonable under 11 U.S.C. § 363(b)(1), which permits a trustee to "use, sell or lease . . . property of the state" outside the ordinary course of business if there is "some articulated business justification" for doing so.  Id. at *31 (quoting In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983)).  The Bankruptcy Court applied the business judgment rule, which rebuttably presumes that a business decision is made "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company."  Id. (citation omitted).  The Bankruptcy Court held that the Objectors had not rebutted the presumption that the Backstop Agreements constituted a proper exercise of the Debtors' business judgment, finding that the

14

Debtors followed a fair process to enter into commercially
reasonable agreements.  Id. at *33.  The Bankruptcy Court
explained that

> [w]ithout limitation, the Backstop Parties' commitment
> of approximately $ 5.44 billion in new money
> investments for up to ten months (1) ensures that the
> Debtors have sufficient cash to fund distributions
> under the Plan, (ii) facilitates the Debtors' need to
> obtain exit debt financing on reasonable terms, (iii)
> serves as the linchpin for a Chapter 11 plan that
> affords the Debtors a feasible post-emergency capital
> structure and restructuring as a going concern, and
> (iv) otherwise protects against the contingency that
> insufficient funds are generated by the New
> Convertible Notes Offering and Equity Rights Offering.

Id.  Additionally, the Bankruptcy Court held that the Backstop
Agreements satisfied the more demanding "entire fairness"
standard, finding that the agreements were both substantively
reasonable and negotiated through a fair process.  Id. at *32 &
n.43.

The Bankruptcy Court then analyzed the Backstop Agreements
under 11 U.S.C. § 503(b)(1)(A), which allows a debtor to pay
administrative expenses, including the "actual, necessary costs
of expenses of preserving the estate."  Id. at *33.  The
Bankruptcy Court held that the Backstop Agreements were
consistent with this provision, finding that courts regularly
approve fee payments and indemnification agreements in
connection with backstop arrangements.  Id.  Finally, the

Bankruptcy Court deferred any analysis under 11 U.S.C. §
1129(a)(4) until plan approval, finding that such analysis was
not relevant until confirmation of the Plan was before the
court. Id. at *34.

After the Bankruptcy Court issued the Backstop Opinion,
several parties appealed the opinion to the Southern District of
New York. In re LATAM Airlines Group S.A., 22CV02556, 2022 WL
1471125 (S.D.N.Y. May 10, 2022). The Honorable Jesse M. Furman
dismissed the appeal, holding that the Backstop Opinion was not
an appealable final judgment, and that leave to file an
interlocutory appeal was not warranted. Id. at *5-6.

2.   Plan Confirmation

On June 18, 2022, following a three-day hearing, the
Bankruptcy Court issued a 125-page opinion confirming the Plan.
In re LATAM Airlines Group, S.A., 20BK11254, 2022 WL 2206829, at
*2 (Bankr. S.D.N.Y. June 18, 2022). The GUC had objected to the
Plan, arguing in large part that the Backstop Agreement violated
11 U.S.C. § 1123(a)(4)'s requirement of equal treatment for
claims in the same class, that the Backstop Agreement required
unreasonable payments in violation of § 1129(a)(4), and that the
Backstop Agreement amounted to impermissible vote-buying in
violation of § 1129(a)(3). Id. at *6. The Bankruptcy Court

16

considered and rejected each of these objections.  Id. at *34–40.

The GUC first argued that the Backstop Agreement violated the equal treatment requirement of § 1123(a)(4), because it provided the Commitment Creditors with a greater opportunity to purchase Class C Notes than other unsecured creditors.  Id. at *35.  The Bankruptcy Court rejected this argument, finding that the Commitment Creditors were given preferential treatment in consideration for their commitments under the Backstop Agreement, not on account of their claims against the Debtors.  Id. at *35–36.  Referencing its findings in the Backstop Opinion, the Bankruptcy Court also found that the Backstop Agreement provided reasonable consideration to the Commitment Creditors for their backstop commitments, and did not constitute impermissible special treatment.  Id. at *37.  It emphasized that the Commitment Creditors may be called upon "to purchase the entire $3.6 billion" in securities and that they are "subject to meaningful risk."  Id. at *38.

The GUC next argued that the Backstop Agreement violated 11 U.S.C. § 1129(a)(4), which requires that any payment made by a debtor in connection with a bankruptcy case or plan be "approved by, or subject to the approval of, the court as reasonable."

17

Id. at *38.  The Bankruptcy Court, however, found that the
reasonableness of the fees paid in the Backstop Agreements was
subject to the reasonableness standards that it employed in the
Backstop Opinion pursuant to § 363(b).  Id. at *39.
Incorporating its findings from the Backstop Opinion, the
Bankruptcy Court found that the Backstop Fee was reasonable
under § 1129(a)(4) as well.   Id.

Finally, the GUC argued that the Plan was not proposed in
good faith, in violation of § 1129(a)(3), and that it
constituted an impermissible attempt to buy the Commitment
Creditors' votes in support of the Plan.  Id.  The Bankruptcy
Court rejected this argument, finding that any benefits secured
by the Commitment Creditors were the reasonable and good-faith
result of arm's-length negotiations.  Id. at *40.  It found that
the Objectors had failed to demonstrate that the Debtors
"engaged in 'vote buying'" or that the Plan was filed in bad
faith.  Id. at *39.  The Bankruptcy Court considered and
overruled all remaining objections, and confirmed the Plan.  Id.
at *56.

On June 27, the GUC filed a motion for the Bankruptcy Court
to stay the case pending appeal.  Judge Garrity denied the
motion in a 27-page opinion on July 16.  In re LATAM Airlines

18

Group S.A., 20BK11254, 2022 WL 2811904 (Bankr. S.D.N.Y. July 16,
2022).  The Bankruptcy Court explained that a stay was
unnecessary because the appeal would likely be decided before
the Plan took effect.  Id. at *4.  Additionally, the Bankruptcy
Court found that a stay could be harmful, because it could cause
the Debtors to "lose their backstop commitments entirely."  Id.
at *6.  The Bankruptcy Court explained that "market conditions
have deteriorated significantly since the Backstop Agreements
were executed in January," and that it was "highly unlikely that
the Debtors could obtain backstop commitments on equally
favorable terms" if required to renegotiate.  Id.  The
Bankruptcy Court also found that the GUC was not likely to
succeed on the merits of their appeal, and that the public
interest did not favor a stay.  Id. at *7–11.

III. Appeal

On July 1, 2022, the appellants filed this appeal of the
Bankruptcy Court's decision.  On July 5, the appellants filed an
emergency motion for an expedited briefing schedule.  The case
was reassigned to this Court on July 6.  That same day, the
Court ordered the appellants to file their opening brief by July
11.  At a July 13 conference, the parties agreed to a schedule
for the remainder of the briefing.  The Intervenors also filed a

19

motion to intervene on July 13, which the Court granted the same day.

On July 29, the appellees submitted their response brief, and the appellee-intervenors submitted a supplemental brief. The Official Committee of Unsecured Creditors also submitted its own supplemental brief.  The appellants submitted their reply brief on August 5.

Meanwhile, on July 11 2022, the TLA Claimholders Group -- consisting of unsecured creditors for TAM Linhas Aéreas, a subsidiary of LATAM -- filed an appeal of the Bankruptcy Court's decision approving the Plan.  Briefing on the related appeal was fully submitted on August 15.  Oral argument in both appeals was held on August 26.

## Discussion

A bankruptcy court's factual findings are accepted on appeal unless they are clearly erroneous, and its conclusions of law are reviewed de novo.  In re DiBattista, 33 F.4th 698, 702 (2d Cir. 2022).  "A finding of fact is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In re Lehman Bros. Holdings Inc., 855 F.3d 459, 469 (2d Cir. 2017) (citation omitted).  "[I]f the bankruptcy court's account

20

of the evidence is plausible in light of the record viewed in
its entirety, the [reviewing court] may not reverse it even
though convinced that had it been sitting as the trier of fact,
it would have weighed the evidence differently."  In Matter of
Motors Liquidation Co., 829 F.3d 135, 158 (2d Cir. 2016)
(citation omitted).

     The appellants raise three arguments that the judgment of
the Bankruptcy Court should be reversed.  First, the appellants
argue that the Plan and the Backstop Agreement violate 11 U.S.C.
§ 1123(a)(4)'s requirement that creditors in the same class
receive equal treatment for their claims.  Second, the
appellants argue that the consideration for the Backstop
Agreement was unreasonable in violation of 11 U.S.C. §§ 503,
1129(a)(4).  Third, the appellants argue that the Backstop
Agreement constituted an impermissible mechanism to buy the
Commitment Creditors' votes in support of the Plan in violation
of 11 U.S.C. § 1123(a)(3).  For the following reasons, each of
these arguments is without merit, and the appeal is denied.

I.   Section 1123(a)(4) - Equal Treatment

     The Bankruptcy Code requires a reorganization plan to
"provide the same treatment for each claim or interest of a
particular class."  11 U.S.C. § 1123(a)(4).  Nevertheless, "some

21

classification of claimants within a class is permissible."  In re Joint E. & S. Dist. Asbestos Litig., 982 F.2d 721, 749 (2d Cir. 1992).  "[A] reorganization plan may treat one set of claim holders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim."  In re Peabody Energy Corp., 933 F.3d 918, 925 (8th Cir. 2019).

The appellants argue that the Plan and the Backstop Agreement violate the Bankruptcy Code's equal treatment requirement by giving the Commitment Creditors favorable treatment on their claims.  The appellants explain that the Direct Allocation, in combination with the Plan, gives the Commitment Creditors the opportunity to purchase up to 86% of the relatively favorable Class C Notes, despite possessing only around 72% of unsecured claims.  On top of that, the Commitment Creditors will receive the Backstop Fee, which is additional cash that the other Class 5 creditors cannot receive.

Neither the Direct Allocation nor the Backstop Fee violate the equal treatment requirement, because they provide the Commitment Creditors favorable treatment on account of their commitments under the Backstop Agreements, not on account of their claims.  As the Backstop Agreement makes clear, the Direct

22

Allocation and Backstop Fee are offered as consideration for the
Commitment Creditors' agreement to backstop $3.3 billion in cash
for Class C Notes and $400 million in ERO stock.  Courts often
approve reorganization plans that provide certain claimants
additional benefits -- including backstop fees and additional
opportunities to invest in preferred equity -- in exchange for
their agreement to backstop certain offerings.  See, e.g., In re
Peabody Energy Corp., 933 F.3d at 926 & n.4 (a "right to buy . .
. preferred stock at a discount" did not violate § 1123(a)(4));
In re TCI 2 Holdings, LLC, 428 B.R. 117, 133 (Bankr. D.N.J.
2010) (backstop fee did not violate § 1123(a)(4)); see also In
re LATAM Airlines Group S.A., 2022 WL 790414, at *26 (discussing
a set of 28 comparable backstop agreements approved in Chapter
11 cases).

     The appellants concede that backstop agreements are not
necessarily unlawful.  Nevertheless, the appellants argue that
the Backstop Agreement violates § 1123(a)(4) because any Class C
Notes that may be acquired through the Direct Allocation will be
purchased through the discharge of a portion of the Commitment
Creditors' claims.  The appellants therefore insist that the
Commitment Creditors receive a disproportionate share of Class C

Notes as "treatment" for their claims, not just as compensation
for their backstop commitments.

The appellants did not raise this argument before the
Bankruptcy Court.  The appellants' submissions to the Bankruptcy
Court argue that the Backstop Agreement treats creditors
unequally because it allows the Commitment Creditors greater
opportunity to purchase Class C Notes than other Class 5
claimants have.  But those submissions do not argue that the
mechanism of the Direct Allocation -- that is, the exchange of
claims for Class C Notes -- inherently implicates § 1123(a)(4)
because it provides "treatment" for "claims."  That argument has
been raised for the first time on appeal, and it therefore need
not be considered here.  See In re Nortel Networks Corp. Sec.
Litig., 539 F.3d 129, 132 (2d Cir. 2008) ("It is a well-
established general rule that an appellate court will not
consider an issue raised for the first time on appeal."
(citation omitted)).

Regardless, the appellants' argument is incorrect.  Class C
Notes are provided to the Commitment Creditors, not on account
of their claims, but on account of their new money investment.
Any Class 5 creditor may exchange all of its Class 5 claims for
Class A Notes.  And the purchasing power of a Class 5 claim is

the same whether it is being used to purchase a Class A Note or a Class C Note.  In either case, discharge of the creditor's claims entitles it to a proto rata share of approximately 12.7% of LATAM's equity once the notes are converted.  The only difference in the cost between Class A and Class C Notes is that Class C Notes must also be purchased with new money.  The relative value of the Class C Notes over the Class A Notes is therefore unlocked in exchange for this new money commitment, not in exchange for a creditor's claims.

Additionally, unlike other unsecured creditors, the Commitment Creditors have an obligation to purchase any Class C Notes that go unsubscribed, either from the Direct Allocation or from the non-allocated portion.  This obligation requires the Commitment Creditors to spend up to $3.3 billion in new money to purchase all of the Class C Notes should they be unsubscribed.

In the course of its fact finding, the Bankruptcy Court concluded that the Direct Allocation, as well as the Backstop Fee, were granted to the Commitment Creditors as consideration for their backstop commitments and "not on account of their General Unsecured Class 5 Claims."  In re LATAM Airlines Group S.A., 2022 WL 2206829, at *35.  That determination was well supported by the record and is not erroneous, much less clearly

25

so.  Moreover, a plan may provide a direct allocation as
compensation for a backstop commitment without violating the
Bankruptcy Code, see In re Peabody Energy Corp., 933 F.3d at 926
n.4.  And of course, the appellants do not contend that a
reorganization plan may not allow creditors to purchase
convertible notes with their claims.  The combination of these
two lawful components of a reorganization plan does not result
in a violation of § 1123(a)(4), and the appellants do not
explain why this purchase mechanism poses any greater threat to
the fair and equal treatment of similarly situated creditors
than other direct allocations that courts have approved.  After
all, the Commitment Creditors pay the same amount for each Class
C Note, in both discharge of claims and in new money, as other
unsecured claimants.  They simply have the right to purchase
more of these notes as compensation for their backstop
commitments -- a right that they may be lawfully given in
exchange for their backstop commitment.  Id.

In their reply brief the appellants shift their emphasis in
arguing that the Plan violates § 1123(a)(4).  The appellants
argue that, even if the Direct Allocation were itself lawful,
the Plan violates § 1123(a)(4) because it allows the Commitment
Creditors to spend a greater portion of their claims purchasing

26

Class C Notes as part of their Class 5b treatment than other
creditors opting into Class 5b can.  The appellants do not
explain why claims exchanged for Direct Allocation notes should
be subtracted before calculating the Commitment Creditors' pro-
rata share of Class C Notes allocated through Class 5b
treatment.  Without the Direct Allocation, class 5b treatment
does not give the Commitment Creditors the ability to purchase
more Class C Notes than other Class 5 claimants.  And as
explained, the Direct Allocation provides lawful compensation
for the Commitment Creditors' obligations under the backstop
agreement, not unequal treatment for their claims.

Finally, the appellants argue that approval of the Plan
would provide a roadmap for other debtors to treat minority
creditors unequally by laundering favorable treatment through a
pretextual backstop agreement.  But backstop agreements in
reorganization plans must still comply with other sections of
the Bankruptcy Code, including provisions requiring that such
agreements be reasonable and made in good faith.  <u>See, e.g.</u>, 11
U.S.C. §§ 363(b)(1), 503(b)(1)(A), 1129(a)(3).  These provisions
allay concerns that parties may use backstop agreements as a
pretext for unjustifiable unequal treatment of creditors.  And,

as explained below, the Plan and the Backstop Agreements comply with these requirements.

## II.  Section 503 - Allowed Administrative Expense

Section 503 of the Bankruptcy Code permits the payment of "allowed administrative expense", including "the actual, necessary costs and expenses of preserving the estate."  11 U.S.C. § 503(b)-(b)(1)(A).  An administrative expense is allowed "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." In re Bethlehem Steel Corp., 479 F.3d 167, 172 (2007) (citation omitted).  "The burden of proving entitlement to a priority payment as an administrative expense rests with the party requesting it."  Id. (citation omitted).  To determine whether an administrative expense is allowed under § 503, courts often ask whether the expense is reasonable in light of its costs and benefits.  See, e.g., In re Fin. Oversight & Mgmt. Bd., 7 F.4th 31, 39 (1st Cir. 2021); In re Energy Future Holdings Corp., 990 F.3d 728, 742-43 (3d Cir. 2021); see also Wolf v. Weinstein, 372 U.S. 633, 639 (1963) (warning against "exacting fees [with] no relation to the value of services rendered" (citation omitted)).

A.   Substantive Reasonableness

The appellants argue that the Backstop Fee of $734 million paid by the Debtors to the Commitment Creditors is unreasonable, and unjustified by any benefit to the estate.[5]  The appellants emphasize that the fees under the Backstop Agreement are relatively high when compared to similar backstop agreements. And the appellants argue that this compensation is not justified by any risk to the Commitment Creditors, because few of the Class C Notes are at actual risk of going unsubscribed.

The appellants' argument overstates the Backstop Agreement's benefit to the Commitment Creditors, and understates its risk.  After an evidentiary hearing, the Bankruptcy Court employed two different methodologies to compare the value of the Backstop Agreements to similar agreements in its data set.  In re LATAM Airlines Group S.A., 2022 WL 790414, at *27-29.  The Bankruptcy Court's comparative approach is commonly employed in bankruptcy cases, and the set of agreements was crafted after the Bankruptcy Court considered input from both the debtors and the Objectors.  Id.  Under both methodologies employed by the

---

[5] As explained above, the Backstop Fee amounts to 20% of the $3.3 billion in cash used to purchase Class C Notes and 20% of the $400 million ERO which the Commitment Creditors agreed to backstop.  In re LATAM Airlines Group S.A., 2022 WL 790414, at *30.

29

Bankruptcy Court, the value of the Backstop Agreement fell within the range of comparable backstop agreements from other cases.  Id.  The Bankruptcy Court acknowledged that, using the All-In Backstop Fee at Plan Value methodology, the Backstop Fee were "plainly among the highest," requiring the Debtors to pay the Commitment Creditors over 20% of the value they committed to backstopping.  Id. at *34.  But the Bankruptcy Court found this cost justified by the unusual length of the commitment in a particularly volatile industry.  Id.  The Backstop Agreement was executed in January 2022 and runs through September 30, 2022. Id. at *16, 21.  During this entire period the $3.7 billion earmarked for the backstop has been reserved and has remained at risk.  Id. at *21.

The appellants have not shown that the Bankruptcy Court's findings were erroneous, much less clearly so.  This was a complex bankruptcy and the Debtors' emergence from bankruptcy is occurring in a tumultuous economic environment.  The Bankruptcy Court conducted a fact-intensive inquiry, and its findings are entitled to deference.

The appellants dispute this conclusion, arguing that any risk conferred by the backstop commitments is merely theoretical because so few of the Class C Notes are truly at risk of going

unsubscribed.  The appellants point out that the Commitment
Creditors negotiated for the right to purchase the same notes
that they are agreeing to backstop, and therefore presumably
intend to purchase those notes.  The appellants calculate that
the Commitment Creditors have the option to purchase not just
the 50% of the Class C Notes in the Direct Allocation, but up to
86% of all Class C Notes.  Accordingly, the appellants argue
that the Commitment Creditors are only truly at risk of having
to backstop the remaining 14% of the Class C Notes, plus $400
million of the ERO -- a total commitment of around $850 million.
The appellants therefore characterize the Backstop Agreement as
providing excessive compensation to the Commitment Creditors.

The appellants' argument confuses a right to purchase Class
C Notes with an obligation to do so.  As the Bankruptcy Court
found, the appellants are incorrect that, absent the backstop
commitment, only 14% of Class C Notes would be at risk of going
unsubscribed.  Id. at *20.  Even though the Commitment Creditors
have the option to purchase the lion's share of the Class C
Notes, they do not have to exercise that option.  Accordingly,
it is unknown how many of the notes would go unsubscribed were
it not for the backstop commitment.

31

Nor does the fact that the Commitment Creditors negotiated for the right to purchase additional Class C Notes guarantee that they would inevitably want to do so. The Backstop Agreements were executed in January 2022, almost ten months before the outside closing of date of September 30th. The fact that the Commitment Creditors sought a Direct Allocation in January suggests that they anticipated the Class C Notes would offer them a good deal by the end of this period. But that anticipated future was not an inevitability, and the backstop commitment exposed them to the risk that they may have to purchase the Notes even in the event that they would not otherwise want to. The Bankruptcy Court therefore correctly rejected the appellants' argument that the backstop commitment carried no real risk. Id. at *19–20.

Moreover, the Bankruptcy Court explained that these risks were not "mere abstractions." Id. at *21. The Bankruptcy Court found that the Debtors' business outlook could be negatively affected by a number of factors, including volatile fuel prices and surges in infections driven by the Omicron SARS-CoV-2 variant. Id. The appellants criticize this finding, arguing that it was based on insufficient evidence. But the Bankruptcy Court's determination was made after considering testimony

32

regarding risks to the Debtors' business.  Id.  The appellants,
on the other hand, produced no analysis evaluating the
seriousness of these risks.  Id. at *18.  And, as the Bankruptcy
Court recently described in denying the appellants' request for
a stay pending appeal, "[i]t is undisputed that market
conditions have deteriorated significantly since the Backstop
Agreements were executed in January."  In re LATAM Airlines
Group S.A., 2022 WL 2811904, at *6.  The appellants have
therefore failed to show that the Bankruptcy Court's findings
regarding the Commit Creditors' risk were erroneous, much less
clearly so.

        B.   Procedural Fairness

        The appellants also take issue with the process by which
the Backstop Agreements were negotiated.[6]  The appellants state
that, even if the negotiations were conducted at arm's-length,
they were also conducted through a closed mediation process in
which the appellants were not allowed to participate.  The
appellants also contend that the negotiating process was
deficient because the Debtors did not "market test" the fees,
and because they gave insufficient consideration to the Ducera

---

[6] At oral argument, the appellants largely abandoned their claim
of procedural unfairness.

Proposal.  Accordingly, the appellants argue that, to the extent
these procedural considerations are relevant, they warrant
heightened scrutiny of the Backstop Agreements' reasonableness.

The appellants' characterization of the negotiating process
portrays it as more closed off than it was.  Crediting the
Debtors' expert testimony, the Bankruptcy Court found that the
Debtors negotiated with dozens of investment funds to raise
capital, that they received and considered proposals from
entities other than the Commitment Creditors and RSA
Shareholders, and that the Debtors' financial condition was
sufficiently well-known that others had the opportunity to come
forward with their own offers.  In re LATAM Airlines Group S.A.,
2022 WL 790414, at *15.

Nor does the Debtors' rejection of the Ducera Proposal
render the Backstop Agreements unreasonable.  The Ducera
Proposal offers less financing than the Backstop Agreements
because it does not cover the Backstop Shareholders'
commitments, contains extensive due diligence requirements that
would permit the GUC to withdraw at any time, and was put
forward in an unsigned letter with no binding commitments.  The
Bankruptcy Court therefore found that it did not provide a
viable alternative to the Backstop Agreements, id. at * 15, and

the appellants have pointed to no evidence suggesting that this finding was clearly erroneous.  Accordingly, the appellants have failed to show that the circumstances under which the Backstop Agreements were negotiated justify heightened scrutiny.

    C.   Clear Error

    Finally, the appellants argue that the Bankruptcy Court's evaluation of the Backstop Agreements under § 503 was legally erroneous because it did not engage in a sufficiently searching review.  The appellants criticize the Bankruptcy Court for not requiring the Debtors to quantify the risks to the airline industry from COVID-19 and other phenomena, and for disregarding evidence that the risk that the Commitment Creditors actually faced was disproportionate to the Backstop Fee.

    The appellants' attempt to recast their factual dispute as a legal one is unavailing.  In order to approve expenses pursuant to the Backstop Agreement under § 503(b), the Bankruptcy Court was required to find that the Backstop Agreement provided a benefit to the Debtors that was reasonable in light of its costs.  See In re Bethlehem Steel Corp., 479 F.3d at 172; In re Energy Future Holdings Corp., 990 F.3d at 742.  It did so.  As explained above, the Bankruptcy Court found that the backstop payments provided reasonable compensation for

the Commitment Creditors' obligations, which provided the

"necessary funding" for the Debtors to successfully emerge from

bankruptcy.  See In re LATAM Airlines Group S.A., 2022 WL

790414, at *3.  This finding, and its related findings, came

after days of hearings and are described in a lengthy,

informative opinion analyzing the Backstop Agreement's costs,

benefits, and risks.  The appellants have therefore failed to

show that the Bankruptcy Court erred in approving the Backstop

Agreement under § 503.

III. Section 1129(a)(4) - Reasonableness

Section 1129(a)(4) of the Bankruptcy Code requires that any

payments made by a debtor in connection with a bankruptcy case

or reorganization plan be "approved by, or . . . subject to the

approval of, the court as reasonable."  The appellants argue

that the Bankruptcy Court erred by failing to adequately

evaluate the reasonableness of the Backstop Agreements.  In

particular, the appellants criticize the Bankruptcy Court for

relying on its analysis under § 363 when assessing

reasonableness under § 1129(a)(4).  The appellants argue that

the Bankruptcy Court's analysis under § 363 was incompatible

with the required analysis under § 1129(a)(4) because the § 363

analysis employed the business judgment rule, which carries a

presumption of reasonableness, whereas § 1129(a)(4) places the burden of proof on the proponent of a payment to show that it is reasonable.

The Second Circuit Court of Appeals and the Supreme Court have yet to issue any opinion construing § 1129(a)(4).  Courts in this District, however, have interpreted § 1129(a)(4) to provide a procedural protection, ensuring that payments are disclosed and that the Bankruptcy Court has the opportunity to assess their reasonableness before a plan is confirmed.  See, e.g., In re Journal Register Co., 407 B.R. 520, 537 (S.D.N.Y. 2009); In re Ditech Holding Corp., 606 B.R. 544, 574 (Bankr. S.D.N.Y. 2019).  Many bankruptcy courts have found § 1129(a)(4)'s requirements satisfied by review for reasonableness under some other provision of the Bankruptcy Code, such as § 503.  See, e.g., In re Metro-Goldwyn-Mayer Studios, Inc., 10BK15774, 2010 WL 5136417, at *7 (Bankr. S.D.N.Y. Dec. 6, 2010); In re Worldcom, Inc., 02BK13533, 2003 WL 23861928, at *54 (Bankr. S.D.N.Y. Oct. 31, 2003); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 770 (Bankr. S.D.N.Y. 1992). Accordingly, the Bankruptcy Court satisfied the requirements of § 1129(a)(4) when it reviewed the Backstop Agreements under §§ 503 and 363.

Even if § 1129(a)(4) requires independent review for reasonableness, however, the appellants have not shown that the Bankruptcy Court erred in finding payments made pursuant to the Backstop Agreement reasonable.  As discussed the above, the Bankruptcy Court thoroughly evaluated payments made pursuant to the Backstop Agreement under § 503(b), finding that they constituted the "actual, necessary costs and expenses of preserving the estate."  In re LATAM Airlines Group S.A., 2022 WL 790414, at *29 (quoting § 503(b)(1)(a)).  The Bankruptcy Court referenced its findings under § 503 in adjudicating the appellants' argument under § 1129(a)(4).  See In re LATAM Airlines Group S.A., 2022 WL 2206829, at *38.  And the appellants do not contend that the § 503(b) standard falls short of § 1129(a)(4)'s requirements.  Compare § 503(b)(1)(a) (permitting "actual, necessary costs") with In re Journal Register Co., 407 B.R. at 537–38 (warning that courts "should be chary about succumbing to the exhortations of litigants to turn 1129(a)(4) into a mandate for an expensive and unnecessary inquiry") (quoting Mabey v. Sw. Elec. Power Co., 150 F.3d 503, 517 (5th Cir. 1998)).

The appellants also criticize the Bankruptcy Court for incorporating its analysis under § 363(b), which they argue

applied too lenient a standard to support a finding of reasonableness under § 1129(a)(4).  But the Bankruptcy Court's analysis under § 363(b) did not rest exclusively on the relatively deferential business judgment rule.  In re LATAM Airlines Group S.A., 2022 WL 790414, at *32.  It also found that the Backstop Agreements satisfied the "entire fairness" standard, which required the Bankruptcy Court to determine that the agreements were both substantively and procedurally fair. Id. at *32 n.43.  Applying these standards, the Bankruptcy Court found that the Backstop Agreements were the result of a good-faith and arm's-length negotiating process that produced an equitable agreement providing necessary funding for the Debtors' post-bankruptcy operations.  Id. at *32-33.  These findings are not clearly erroneous, and are sufficient to satisfy § 1123(a)(4)'s requirement that the Backstop Agreements be reviewed for reasonableness.

IV.  Section 1129(a)(3) - Good Faith

Section 1129(a)(3) of the Bankruptcy Code requires that a reorganization plan be "proposed in good faith and not by any means forbidden by law."  "[A] plan will be found in good faith if it was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."  In

39

re Bd. Of Directors of Telecom Argentina, S.A., 528 F.3d 162,
174 (2d Cir. 2008) (citation omitted).  "A finding of good faith
will not be overturned unless the opponent of the plan can show
that the finding was clearly erroneous."  Id.  (citation
omitted).

The appellants argue that the Backstop Agreement violates §
1129(a)(3) because it constitutes an impermissible mechanism to
purchase the Commitment Creditors' votes.  To support this
conclusion, the appellants reference their previous arguments
that the Backstop Agreement provides unequal treatment of the
Commitment Creditors' claims and grants them an unreasonable
benefit in exchange for taking on little risk.

The appellants have not shown that the Backstop Agreement
was negotiated in bad faith.  As explained above, the Backstop
Agreement provides the Commitment Creditors consideration in
exchange for their commitment to backstop necessary financing
for the Debtors to successfully emerge from bankruptcy.
Additionally, the Bankruptcy Court found that the Backstop
Agreements were negotiated through an arm's-length process in
which all parties bargained vigorously and in good faith.  In re
LATAM Airlines Group S.A., 2022 WL 2206829, at *39-40.  The
appellants point to no evidence to suggest that the Bankruptcy

Court's finding of good faith was clearly erroneous, instead referencing their earlier arguments under other sections of the Bankruptcy Code.   For the reasons given above, however, those arguments are unavailing.   Accordingly, the appellants have not shown that the Plan or the Backstop Agreements violate §1129(a)(3).

## Conclusion

The Ad Hoc Group of Unsecured Claimants' appeal is denied. The March 15, 2022 and June 18, 2022 decisions of the United States Bankruptcy Court for the Southern District of New York are affirmed.

```
Dated:     New York, New York
           August 31, 2022
```

_____
DENISE COTE
United States District Judge

41